# 26-820

## In the United States Court of Appeals for the Second Circuit

BINAH GORDON, KAY MAYERS, ALMA AVALLE,
JAMIE HOMNICK, GENNIFER HERLEY AND S.N.,
*individually and on behalf of all similarly situated individuals,*
PLAINTIFFS-APPELLEES,

*v.*

AETNA LIFE INSURANCE COMPANY,
DEFENDANT-APPELLANT.

---

*ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT NO. 3:24-CV-1447,
HON. VICTOR A. BOLDEN*

---

**APPELLANT'S OPENING BRIEF AND SPECIAL APPENDIX**

---

EARL B. AUSTIN
BAKER BOTTS LLP
*30 Rockefeller Plaza
New York, NY 10112
(212) 408-2649*

THEODORE J. TUCCI
ROBINSON & COLE LLP
*One State Street
Hartford, CT 06103
(860) 275-8210*

CHARLES L. MCCLOUD
WILLIAMS & CONNOLLY LLP
*680 Maine Avenue, S.W.
Washington, DC 20024
(202) 434-5000
lmccloud@wc.com*

*Counsel for Appellant*

## CORPORATE DISCLOSURE STATEMENT

Aetna Life Insurance Company is 100% owned by Aetna Inc., which is 100% owned by CVS Pharmacy, Inc., which is 100% owned by CVS Health Corporation (CVS Health), a Delaware corporation and publicly traded company. CVS Health has no parent company, and no publicly held corporation owns 10% or more of its stock.

# TABLE OF CONTENTS

Page

INTRODUCTION ...................................................................................1

STATEMENT OF JURISDICTION ......................................................4

STATEMENT OF THE ISSUE ..............................................................5

STATEMENT OF THE CASE ...............................................................5

    A.    Aetna's Role as Third-Party Administrator ........................5

    B.    Plaintiffs' Benefit Plans and CPB 615 ................................8

    C.    The Proceedings Below .......................................................12

    D.    Interim Proceedings Before This Court ............................16

SUMMARY OF ARGUMENT ...............................................................17

STANDARD OF REVIEW .....................................................................20

ARGUMENT ...........................................................................................21

I.    Plaintiffs Are Unlikely to Succeed on the Merits of Their Discrimination Claim ..........................................................21

    A.    *Skrmetti* Forecloses Plaintiffs' Discrimination Claim ................22

    B.    The District Court's Reasoning Is Incompatible with *Skrmetti* ..........................................................26

II.    Plaintiffs Lack Article III Standing to Seek an Injunction ..................33

    A.    Granting Plaintiffs Their Requested Relief Would Not Redress Their Alleged Injury ......................................35

    B.    Plaintiffs' Alleged Injuries Are Not Traceable to Aetna ............42

III.    The Remaining Preliminary Injunction Factors Support Aetna, Not Plaintiffs ..........................................................45

    A.    Plaintiffs Have Not Demonstrated Irreparable Harm ................46

    B.    The Equities Do Not Favor Plaintiffs .............................................49

    C.    An Injunction Would Disserve the Public Interest ......................53

CONCLUSION ........................................................................................54

ii

# TABLE OF AUTHORITIES

Page

## CASES

*Adams v. Freedom Forge Corp.*, 204 F.3d 475 (3d Cir. 2000) ........................47

*Alvarez v. City of New York*, 2 F. Supp. 2d 509 (S.D.N.Y. 1998) ....................48

*Am.'s Health Ins. Plans v. Hudgens*, 742 F.3d 1319 (11th Cir. 2014)..............5

*Anderson v. Crouch*, 169 F.4th 474 (4th Cir. 2026)..................................*passim*

*Ateres Bais Yaakov Acad. v. Town of Clarkstown*,
88 F.4th 344 (2d Cir. 2023)..................................................................43

*Baroni v. Port Auth. of N.Y. & N.J.*, 161 F.4th 48 (2d Cir. 2025)...................53

*Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887 (2d Cir. 2015).......20

*Bennett v. Spear*, 520 U.S. 154 (1997)..................................................44

*Bostock v. Clayton County*, 590 U.S. 644 (2020) ...............................*passim*

*Brandt ex rel. Brandt v. Griffin*,
147 F.4th 867 (8th Cir. 2025) (en banc) ...........................3, 22, 25, 31

*California v. Texas*, 593 U.S. 659 (2021).....................................35, 40, 42

*Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco
Managed Care, L.L.C.*, 433 F.3d 181 (2d Cir. 2005) ........................34

*Citibank, N.A. v. Citytrust*, 756 F.2d 273 (2d Cir. 1985)..................................49

*Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013)..............................34, 36, 41

*Davis v. Fed. Election Comm'n*, 554 U.S. 724 (2008) ........................................34

*Egelhoff v. Egelhoff ex rel. Breiner*, 532 U.S. 141 (2001) ...................................6

*Feller v. Brock*, 802 F.2d 722 (4th Cir. 1986) ......................................................51

*Gov't Emps. Ins. Co. v. Patel*, 166 F.4th 280 (2d Cir. 2026)..............................47

*Green Haven Prison Preparative Meeting of Religious Soc'y of
Friends v. N.Y. State Dep't of Corr. & Cnty. Supervision*,
16 F.4th 67 (2d Cir. 2021)....................................................................20

*Guitard v. U.S. Sec'y of Navy*, 967 F.2d 737 (2d Cir. 1992)..............................48

*Haaland v. Brackeen*, 599 U.S. 255 (2023) ....................................................*passim*

*Interox Am. v. PPG Indus., Inc.*, 736 F.2d 194 (5th Cir. 1984).........................50

*Kadel v. Folwell*, 100 F.4th 122 (4th Cir. 2024), *cert. granted, judgment
vacated sub nom. Crouch v. Anderson*, 145 S. Ct. 2835 (2025) ..................33

*Lange v. Houston County*, 152 F.4th 1245 (11th Cir. 2025) (en banc) ...*passim*

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992).........................34, 37, 42, 45

*Merritt v. Shuttle, Inc.*, 187 F.3d 263 (2d Cir. 1999)............................................5

*Murthy v. Missouri*, 603 U.S. 43 (2024)......................................................*passim*

*N. Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483 (2d Cir. 2013).................21

*N. Y. State Firearms Ass'n v. James*, 157 F.4th 232 (2d Cir. 2025) ................21

iii

Page

Cases—continued:

*New York ex rel. Schneiderman v. Actavis PLC*,
787 F.3d 638 (2d Cir. 2015) .................................................................52

*Poe ex rel. Poe v. Drummond*, 149 F.4th 1107 (10th Cir. 2025) .......3, 22, 25, 31

*Pritchard ex rel. C.P. v. Blue Cross Blue Shield*,
159 F.4th 646 (9th Cir. 2025) ...................................................*passim*

*Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393 (2d Cir. 2004) .........................52

*Sampson v. Murray*, 415 U.S. 61 (1974) ..................................................48

*Schultz v. Alabama*, 42 F.4th 1298 (11th Cir. 2022) ..................................34

*Seminole Tribe v. Florida*, 517 U.S. 44 (1996) ..........................................32

*Silber v. Barbara's Bakery, Inc.*, 950 F. Supp. 2d 432 (E.D.N.Y. 2013) ...48, 49

*Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26 (1976)..................................35

*Singh v. Berger*, 56 F.4th 88 (D.C. Cir. 2022) ..........................................53

*Sohm v. Scholastic Inc.*, 959 F.3d 39 (2d Cir. 2020)..................................32

*St. Joseph's Hosp. Health Ctr. v. Am. Anesthesiology*,
131 F.4th 102 (2d Cir. 2025)..............................................................47

*State Farm Mut. Auto. Ins. Co. v. Tri-Borough N.Y. Med. Prac. P.C.*,
120 F.4th 59 (2d Cir. 2024)................................................................46

*Stewart v. U.S. INS*, 762 F.2d 193 (2d. Cir. 1985)................................46, 47, 48

*Tecspec LLC v. Donnolo*, 2026 WL 1361842 (2d Cir. May 15, 2026)...............54

*Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63 (2d Cir. 1999) ..............................52

*Tough Traveler, Ltd. v. Outbound Prods.*, 60 F.3d 964 (2d Cir. 1995)............49

*United States v. Skrmetti*, 605 U.S. 495 (2025) .......................................*passim*

*West Virginia v. B.P.J. ex rel. Jackson*,
609 U.S. __, 2026 WL 1868739 (2026) ......................................29, 31

*Williby v. Aetna Life Ins. Co.*, 867 F.3d 1129 (9th Cir. 2017).......................6, 44

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ...............................21

*Yang v. Kosinski*, 960 F.3d 119 (2d Cir. 2020)..........................................52

*Younger v. Harris*, 401 U.S. 37 (1971)................................................48

**CONSTITUTION AND STATUTES**

U.S. Const. art. III ....................................................................*passim*

20 U.S.C. § 1681 ......................................................................1, 13

28 U.S.C.
§ 1292....................................................................................5
§ 1331....................................................................................5

iv

Page

Cases—continued:

Employee Retirement Income Security Act,
  29 U.S.C. § 1001 *et seq.*...................................................................6, 8, 19, 50
  § 1104................................................................................................7, 51
42 U.S.C. § 18116 .......................................................................................*passim*

## INTRODUCTION

Plaintiffs here are two transgender women who seek certain facial feminization surgeries as a treatment for gender dysphoria. Aetna, the defendant, is a healthcare company that provides administrative services for Plaintiffs' employer-sponsored health insurance plans. Aetna-affiliated plans cover a wide variety of treatments for gender dysphoria, and Plaintiffs have availed themselves of that coverage. But Aetna has determined that the relevant medical and scientific evidence has not shown that certain facial surgeries are effective and medically necessary as a treatment for the symptoms of gender dysphoria. Aetna's clinical guidelines reflect that conclusion, and Plaintiffs' employers have, to varying degrees, instructed Aetna to follow those guidelines when deciding whether a procedure qualifies for reimbursement.

On Plaintiffs' view, Aetna's decision to comply with the instructions of its clients amounts to sex discrimination. Plaintiffs have sued under section 1557 of the Affordable Care Act, which prohibits discrimination "on the basis of sex" by "any health program or activity" that receives federal funding. 42 U.S.C. § 18116(a); 20 U.S.C. § 1681(a). That provision governs scores of actors in the healthcare system—payors, hospitals, medical providers, and more. As Plaintiffs tell it, those entities facially commit sex discrimination when they

1

decline to offer a particular surgical procedure (for example, a rhinoplasty) as a treatment for gender dysphoria if they would provide the same procedure to treat a different medical condition (for example, to treat a deviated septum). That is so, Plaintiffs say, even if the medical evidence establishes that the procedure at issue is not proven effective to treat gender dysphoria. The district court agreed with Plaintiffs and preliminarily enjoined Aetna from applying its applicable clinical guidelines to Plaintiffs.

The district court's injunction order is flatly wrong, and this Court should reverse it. First and foremost, Plaintiffs' theory of discrimination flouts the Supreme Court's decision in *United States v. Skrmetti*, 605 U.S. 495 (2025). *Skrmetti* upheld a Tennessee law that prohibited certain treatments for gender dysphoria but permitted those same treatments for other medical conditions. As the Court held, such a policy "does not exclude any individual from medical treatments on the basis of transgender status but rather removes one set of diagnoses—gender dysphoria, gender identity disorder, and gender incongruence—from the range of treatable conditions." *Id.* at 518-19. Policies like Aetna's therefore "clearly do[] not classify on the basis of sex"—they classify based on whether an individual has a qualifying diagnosis. *Id.* at 513. Following *Skrmetti*, five courts of appeals have applied that decision to hold that

2

statutes or health-benefit plans that allow medically necessary treatments for certain diagnoses, but bar the same treatments for gender dysphoria, are not facially discriminatory. *See Anderson v. Crouch*, 169 F.4th 474, 493-94 (4th Cir. 2026); *Pritchard ex rel. C.P. v. Blue Cross Blue Shield*, 159 F.4th 646, 669-70 (9th Cir. 2025); *Lange v. Houston County*, 152 F.4th 1245, 1251-52 (11th Cir. 2025) (en banc); *Brandt ex rel. Brandt v. Griffin*, 147 F.4th 867, 878-79 (8th Cir. 2025) (en banc); *Poe ex rel. Poe v. Drummond*, 149 F.4th 1107, 1124 (10th Cir. 2025). And two circuits, the Fourth and Ninth, have so held under section 1557 specifically. *Anderson*, 169 F.4th at 481, 494; *Pritchard*, 159 F.4th at 670. This Court should avoid creating a circuit split and recognize that Plaintiffs' claims lack merit.

Second, and independently, Plaintiffs lack Article III standing for the injunctive relief they sought because they have dragged the wrong party into court. Plaintiffs have sued only Aetna, not their employers. But Aetna's clinical guidelines are merely advisory: Plaintiffs' employers have final say over which treatments receive reimbursement. If Aetna decided tomorrow to simply authorize treatments not covered by Plaintiffs' benefit plans, the absent employers would not be obligated to provide reimbursement. As a result, neither this Court nor the district court can remedy Plaintiffs' injuries by

ordering Aetna to take steps that Plaintiffs' employers can simply thwart or override. And for the same reason, Plaintiffs' alleged injuries are traceable to their employers' plan choices, not to Aetna's advisory guidelines. For this reason as well, Plaintiffs cannot establish a likelihood of success on the merits—let alone the substantial likelihood of success necessary to obtain the kind of mandatory injunction the district court awarded.

The equities also support Aetna, not Plaintiffs. Plaintiffs' claimed injuries are fully compensable by monetary damages. And their tardiness in seeking the injunction further undermines their claim of irreparable harm. By contrast, the injunction visits real harm on Aetna and the public interest—undermining Aetna's business relationships and subjecting it to possible liability, and undermining the lower courts' role in faithfully applying binding Supreme Court precedent.

In short, Plaintiffs have no claim, no standing, and no irreparable injury. This Court should reverse the district court's injunction.

## STATEMENT OF JURISDICTION

This is an appeal from an Order granting Plaintiffs' motion for a preliminary injunction and denying Aetna's motion to dismiss. Because Plaintiffs' claim involves a cause of action created by federal law, the district court had

jurisdiction under 28 U.S.C. § 1331. *See* JA76. This Court has jurisdiction to review the district court's Order and issues "necessary to ensure [its] meaningful review" under 28 U.S.C. § 1292(a)(1). *Merritt v. Shuttle, Inc.*, 187 F.3d 263, 269 (2d Cir. 1999) (citation omitted). Appellant Aetna Life Insurance Company timely filed its notice of appeal on March 31, 2026, twenty-three days after the district court's March 8, 2026 Order. JA1246-47.

## STATEMENT OF THE ISSUE

Whether the district court erred in granting a preliminary injunction to Plaintiffs on their discrimination claim.

## STATEMENT OF THE CASE

### A. Aetna's Role as Third-Party Administrator

1. Aetna is a healthcare company that offers insurance and related administrative services to individuals and companies across the country. Employers can work with Aetna to provide health insurance to their employees in different ways. Under "fully funded" or "insured" plans, employers pay a per-employee monthly premium to Aetna in exchange for a one-size-fits-all slate of benefits controlled and paid out by Aetna. *See generally Am.'s Health Ins. Plans v. Hudgens*, 742 F.3d 1319, 1324 (11th Cir. 2014). By contrast, under "self-funded" health plans, employers design the health plans and assume the

costs of coverage. JA1131-32, 1134-35; *Williby v. Aetna Life Ins. Co.*, 867 F.3d 1129, 1131 (9th Cir. 2017).

Self-funded plans leave ultimate benefits and coverage decisions to employers, allowing them greater flexibility to reduce costs while still meeting their employees' needs. At the same time, administering self-funded plans can be complex. Many self-funded health plans are governed by the Employee Retirement Income Security Act, 29 U.S.C. § 1001 *et seq.* ("ERISA"), which requires that plans "be administered, and benefits be paid, in accordance with plan documents." *Egelhoff v. Egelhoff ex rel. Breiner*, 532 U.S. 141, 150 (2001). And deciding whether a plan covers specific claims requires familiarity with current clinical research and with federal regulations governing health plans and claims processing.

Lacking this specialized knowledge, some self-insuring employers hire Aetna to serve as a third-party administrator ("TPA") under their plans. As TPA, Aetna provides access to a network of medical providers and adjudicates claims for payment that those providers submit. But the sponsoring employers remain responsible for designing coverage and choosing what procedures the plan will or will not cover. JA1131-32, 1134-35. Likewise, ERISA requires

that TPAs like Aetna follow the terms of the plan as set by the sponsoring employer. *See* 29 U.S.C. § 1104(a)(1)(D).

2. Many self-insuring employers decline to cover services and procedures that are not medically necessary, or that are cosmetic or experimental. To help fulfill its responsibilities as a TPA for these plans, Aetna has developed Medical Clinical Policy Bulletins ("CPBs"), which outline many of the services that Aetna has determined are medically necessary or, conversely, are still considered experimental and unproven. JA403. Aetna's goal is to ensure that its CPBs reflect Aetna's up-to-date understanding of the medical and scientific consensus regarding whether a procedure is effective in treating a particular disease, illness, injury, or condition. JA403.

Aetna maintains over 100 active CPBs evaluating the efficacy of various medical interventions as applied to a wide array of diagnoses. JA404. Aetna reviews each CPB annually (if not more frequently) and develops new CPBs as needed to address new procedures. JA404-05. And even where Aetna's CPBs deem a particular intervention medically necessary, it is the employer's self-funded benefit plan (not Aetna's CPB) that ultimately determines coverage. JA405-06. Thus, a plan may elect to cover a service that a CPB deems

experimental, or it may elect not to cover a service that the CPB deems medically necessary.

**B.      Plaintiffs' Benefit Plans and CPB 615**

1.      Dr. Jamie Homnick and Dr. Gennifer Herley are two transgender women, covered under two different self-funded plans for which Aetna serves as TPA.  As with other self-funded plans, these plans and accompanying service agreements outline Aetna's role in administering plans while leaving ultimate decision-making power to employers.

Homnick's plan is sponsored by her employer, Bausch & Lomb.  JA469. Under its agreement with Aetna, Bausch & Lomb retains "final and sole authority" over benefits, while Aetna as TPA is responsible for "process[ing] claims."  JA499-500.  Bausch & Lomb's plan is governed by ERISA, 29 U.S.C. § 1000, *et seq.*, which places an independent obligation on Aetna to administer the plan according to its terms.  Bausch & Lomb's plan also offers an appeals process for resolving benefits disputes, including by an external reviewer. JA400.  If a reviewer determines a particular treatment is medically necessary, Bausch & Lomb will cover it, even if the reviewer's medical-necessity determination differs from Aetna's CPBs.  JA400.  Additionally, Bausch &

Lomb has also sometimes exercised its discretion to expand coverage, including for treatments involving gender-affirming care.  JA469.

Herley is covered under a self-funded health plan provided by the New York Metropolitan Transportation Authority ("MTA").  JA34-35.  As with Bausch & Lomb, MTA's service agreement places Aetna in an administrative role, while guaranteeing MTA "ultimate and discretionary authority to decide … benefits covered under the Plan."  JA601-02; *see* JA718-20.  It also reserves "the right to review [Aetna's] adopted procedures and practices for claims approval, claims denial, and other aspects of the administration of the Plan."  JA601-02; *see* JA718-20.  MTA exercised that authority to provide benefits related to gender-affirming care where no such benefits previously existed under its plan.  JA719-20.  And like Bausch & Lomb, MTA authorizes external reviewers to make a "final decision" where their medical-necessity determinations differ from Aetna's.  JA731-32, 774.

2.     In September 2024 and December 2024, Homnick and Herley sought prior authorization from Aetna under their respective employers' policies for "gender-affirming facial reconstruction" surgeries and procedures, or "GAFR."  JA50, 53, 128, 214.  "GAFR" is a loose umbrella term used to encompass procedures also sometimes referred to as "facial feminization surgeries,"

9

"gender affirming facial surgeries," and "facial gender affirming procedures," among other similar terms.  JA26 n.2.  Prior to 2024, both Homnick and Herley had already begun receiving various gender-affirming treatments, including things like hormone replacement therapy, facial hair removal, and (in Herley's case) vaginoplasty surgery and breast augmentation to treat their gender dysphoria.  JA50, 52.  But both contended that GAFR was also medically necessary to treat their gender dysphoria.  JA50-51, 52-53.

3.    Aetna's CPB 615 contains medical-necessity determinations related to various surgical procedures to treat gender dysphoria.  JA156, 406-07. As with other bulletins, CPB 615 treats different treatments and procedures differently, depending on Aetna's judgment as to whether the evidence establishes the treatment as medically necessary to treat a particular condition.  For instance, because medical and scientific agreement has long existed supporting the efficacy of genital and chest surgical procedures for treating gender dysphoria, CPB 615 deems those procedures medically necessary, and has done so for years.  JA156-59, 408.

By contrast, CPB 615 classifies gender-affirming facial surgeries as cosmetic rather than medically necessary.  As Aetna's Executive Director of Clinical Policy Research and Development explained, that determination is based

10

on Aetna's review of the available data on the effectiveness of those surgeries as treatments for gender dysphoria. JA159-60, 406-16.

4.     Both Bausch & Lomb and the MTA have instructed Aetna that in making coverage decisions under their plans, Aetna should generally apply CPB 615. In 2024, Bausch & Lomb specifically reviewed its plan and reaffirmed Aetna should continue to apply CPB 615. JA469, 558, 575. Likewise, when MTA added coverage for gender-affirming care to its plan in 2017, it explicitly directed Aetna to adhere to CPB 615. JA718-19, 723. Consistent with those directives, Aetna denied Homnick and Herley's coverage requests for facial surgery. JA50, 53.

In response, Homnick lodged an internal appeal with Aetna and separately approached her employer Bausch & Lomb, requesting the company revise its plan to cover facial gender-affirming surgery or authorize an exception for her. JA50, 727-28. Bausch & Lomb declined. JA50. Subsequently, however, the company revised its 2025 plan to include coverage for certain additional gender-affirming procedures, including face and neck electrolysis, voice/communication therapy, and adult tracheal shave, while continuing to adhere to CPB 615 for other procedures. JA469; *see also* JA159-60.

11

Herley elected not to appeal the denial of her coverage request to Aetna or to seek an exception from MTA. JA725. And neither Homnick nor Herley have sought an independent external review of Aetna's medical necessity determinations under CPB 615, despite both their plans offering that option. JA725, 1199-1200.

### C.    The Proceedings Below

1.    Following the denial of their prior approval requests, Homnick and Herley joined this suit against Aetna in the District of Connecticut alongside several additional Plaintiffs. D. Ct. Dkt. 46 at 1; JA26.[1] Homnick joined in December 2024, while Herley joined in February 2025. D. Ct. Dkt. 46 at 1; JA26. Homnick and Herley declined to name their employers Bausch & Lomb and MTA as parties to this action. *See* JA26. Given the nature of the self-funded plans at issue, Aetna argued that Plaintiffs' employer plan sponsors were necessary parties, since "the Court cannot award the individual relief each Plaintiff seeks" without their presence. JA1221. But Plaintiffs resisted

---

[1] Plaintiffs' original complaint was filed in September 2024 without Homnick or Herley as plaintiffs. JA7; *see* D. Ct. Dkt. 1 at 1. The operative complaint also includes four additional named Plaintiffs, making similar allegations regarding their own employer-provided insurance plans. *See* JA26, 1192-93, 1195-1200. Because the district court's preliminary injunction that is the basis of this appeal applies only to Homnick and Herley, Aetna's brief discusses only their claims.

joinder. JA1221-22. Instead, Plaintiffs elected to seek remedies against Aetna alone, both individually and on behalf of a putative class. *See* JA26.

2.     As relevant here, the operative complaint alleges that Aetna's CPB 615 discriminates against transgender individuals in violation of section 1557 of the Affordable Care Act, 42 U.S.C. § 18116. JA26. Section 1557 provides that:

> an individual shall not, on the ground prohibited under title VI of the Civil Rights Act of 1964, title IX of the Education Amendments of 1972, the Age Discrimination Act of 1975, or section 794 of title 29, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance ….

42 U.S.C. § 18116(a) (citations omitted). Title IX, in turn, prohibits discrimination "on the basis of sex." 20 U.S.C. § 1681(a). Plaintiffs alleged that because other Aetna CPBs deem various facial reconstructive surgeries medically necessary to treat other diagnoses (such as surgical repairs following an accident), CPB 615's failure to do so with respect to facial surgeries to treat gender dysphoria amounted to discrimination on the basis of sex. JA26-27, 76.

Plaintiffs' complaint sought various forms of class-wide relief. Based on the sex-discrimination allegedly perpetrated by CPB 615, Plaintiffs sought a declaration that CPB 615 violates section 1557 of the Affordable Care Act. JA77. Plaintiffs also sought a class-wide injunction prohibiting Aetna from

13

applying CPB 615 to any transgender individual in the U.S. assigned male at birth who might seek facial surgery as a treatment for gender dysphoria under a plan offered, underwritten, or merely administered by Aetna. JA77. Finally, plaintiffs sought class-wide damages for a putative class of transgender individuals assigned male at birth who have been denied coverage or "deterred from seeking coverage" for a facial surgery to treat gender dysphoria while covered under a plan offered, underwritten, or administered by Aetna. JA77.

3. On March 3, 2025, Homnick and Herley filed a motion for a preliminary injunction seeking to "enjoin Aetna from enforcing" CPB 615. D. Ct. Dkt. 61 at 1. Aetna opposed the motion. D. Ct. Dkt. 81. The Supreme Court then decided *United States v. Skrmetti*, 605 U.S. 495 (2025), prompting the district court to order supplemental briefing regarding the effect of *Skrmetti* on Plaintiffs' claims. JA1140. Aetna argued that under *Skrmetti*, CPB 615 was non-discriminatory because the policy sets available treatments on the basis of medical diagnoses and determinations of medical effectiveness, not sex or transgender status. D. Ct. Dkt. 141 at 5-7.

On March 8, 2026, more than a year after the motion was filed, Judge Victor Bolden issued an order granting Homnick and Herley a preliminary injunction ("the Order"). *See* JA1246. The Order directs that "Aetna is

14

required to make individualized coverage determinations as to Dr. Homnick and Dr. Herley only, on the basis of medical necessity." JA1246. In the same Order, the district court denied Aetna's parallel motion to dismiss. JA1246.

In concluding that Aetna's CPB 615 likely discriminates against transgender individuals (and by extension, based on sex) in violation of section 1557, the district court relied heavily on *Bostock v. Clayton County*, 590 U.S. 644 (2020). *Bostock* held that an employer violates Title VII's anti-discrimination provision if "the plaintiff's sex was one but-for cause of" the employer's adverse employment action. 590 U.S. at 656. The district court reasoned that under *Bostock*, Aetna's policy is discriminatory because Aetna "prohibits only transgender individuals, the only individuals who can experience gender dysphoria, from receiving this type of care." JA1242. In a footnote, the district court acknowledged that the Supreme Court held in *Skrmetti* that a state statute prohibiting certain gender-affirming medical treatments did not facially discriminate on the basis of sex. JA1242 n.15. The district court nevertheless concluded that *Skrmetti* "does not change [the] analysis," and that only "*Bostock* remains binding on Plaintiffs' claim under Section 1557." JA1242 n.15.

4.      Aetna filed a notice of appeal from the Order on March 31, 2026, accompanied by a motion asking the district court to stay its injunction

15

pending appeal.  JA1247; D. Ct. Dkt. 157.  Plaintiffs filed their own motion the same day, requesting that the district court immediately enforce the injunction.  D. Ct. Dkt. 155.

On May 15, 2026, the district court denied both motions.  JA1262.  As to Aetna's motion, the district court reiterated its conclusion that "*Bostock*, not *Skrmetti*," supplied the "proper legal principles" governing the merits of Plaintiffs' discrimination claim.  JA1256 (citation omitted).  The district court added that, "having denied Aetna's motion to stay, the Court expects Aetna to act with reasonable diligence in complying" with the injunction.  JA1262.  The court further noted that Plaintiffs could renew their motion to enforce the injunction if "Aetna fails to make reasonable and diligent steps to comply." JA1262.

### D.    Interim Proceedings Before This Court

1.  Following the district court's denial of Aetna's request for a stay, Aetna filed a motion with this Court on May 20, 2026, seeking an emergency stay of the district court's preliminary injunction pending resolution of Aetna's appeal.  CA2 Dkt. 34 at 1.  Aetna also requested an administrative stay of the district court's injunction to preserve the status quo while its interim motion was pending.  CA2 Dkt. 34 at 1.  As below, Aetna contended that the Supreme

16

Court's decision in *Skrmetti* foreclosed Plaintiffs' discrimination claims. CA2 Dkt. 34 at 12-18. Aetna likewise contended that consideration of the relevant equitable factors justified a stay. CA2 Dkt. 34 at 19-24.

2. On June 3, 2026, this Court issued an order denying Aetna's request for an administrative stay, instead referring Aetna's motion to the "earliest available motions panel." JA1263. This Court further ordered that Aetna's appeal be expedited, and "be heard as soon as reasonably practicable after briefing is complete." JA1263.

## SUMMARY OF ARGUMENT

I. Plaintiffs failed to demonstrate likelihood of success on the merits. Plaintiffs contend that Aetna engages in unlawful sex discrimination under section 1557 by deeming coverage for facial reconstructive surgery medically necessary to treat various conditions but not gender dysphoria. That theory of discrimination is plainly foreclosed by *Skrmetti*.

In *Skrmetti*, the Supreme Court held that a law or policy that "classifies on the basis of medical use" does not discriminate on the basis of sex. 605 U.S. at 511. Rather, it simply "removes one set of diagnoses [such as] gender dysphoria … from the range of treatable conditions." *Id.* at 518-19. As no fewer than five courts of appeals have held, that same logic applies to statutes or

17

health-benefit plans like Aetna's that allow medically necessary treatments for certain diagnoses but bar the same treatments for gender dysphoria. To reach the opposite conclusion, the district court engaged in reasoning that flies in the face of that settled legal consensus and is directly contrary to *Skrmetti*.

II. Plaintiffs also failed to demonstrate a likelihood of success on the merits because they lack Article III standing to seek an injunction.

A. An injunction will not redress Plaintiffs' alleged injury. Plaintiffs seek to remedy allegedly unlawful differential treatment regarding reimbursement for facial surgeries. But it is Plaintiffs' employers, not Aetna, that hold final decision-making authority over those coverage decisions. And because Plaintiffs have not sued their employers, providing them the relief they seek depends on speculation over the actions of third parties not before this Court—the classic instance where redressability is lacking.

B. Plaintiffs likewise failed to establish that their injury is traceable to Aetna's policies rather than their employers' decisions. Plaintiffs assert that CPB 615 caused their injuries. But CPB 615 is just a form of guidance, which Plaintiffs' employers are free to adopt or ignore at will when designing coverage. That independent exercise of judgment severs any causal link to

Aetna and independently defeats Plaintiffs' standing for the proposed injunction.

III.   The remaining preliminary injunction factors support Aetna, not Plaintiffs.

A.   Plaintiffs failed to demonstrate irreparable harm.  Plaintiffs claim they are irreparably harmed by continued denial of coverage for their requested facial surgeries.  But Plaintiffs were and always are free to seek out individual coverage for the services they desire, or to pay for those services out of pocket.  Thus, Plaintiffs' injuries are fully compensable through damages.  And in any event, Plaintiffs' months-long delay in seeking an injunction undercuts the claim of urgency essential to justifying the district court's extraordinary interim relief.

B.   The equities favor Aetna, not Plaintiffs.  The injunction imposes irreparable harm on Aetna.  It requires Aetna to violate its contractual obligations to Plaintiffs' employers and its obligations under ERISA, publicly forcing Aetna to disregard plan terms and the employers' express coverage directives.  It requires Aetna to alienate its customers by ignoring their instructions, causing potentially irreparable damage to Aetna's business

19

relationships. And the injunction could effectively end this case, rendering Aetna's right to defend its interests through trial and appeal a dead letter.

C. An injunction disserves the public interest. The stability and predictability served by adherence to Supreme Court precedent is at the core of the public interest. But here, the district court's injunction defies *Skrmetti* and undermines those values. Moreover, the injunction visits unfairness on Plaintiffs' employers. Plaintiffs chose to exclude their employers from this litigation. Yet as a result of the injunction, the employers could find themselves being forced to choose between having to pay for surgeries they already elected not to cover, or having to manage whatever conflicts arise from not paying for their employees' healthcare. Here too, Plaintiffs' claim for a preliminary injunction fails.

## STANDARD OF REVIEW

This Court "review[s] the grant of a preliminary injunction for abuse of discretion." *Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 895 (2d Cir. 2015). When applying that standard, the Court reviews factual conclusions for clear error, but "examin[es] the legal conclusions underpinning the decision *de novo*." *Green Haven Prison Preparative Meeting of Religious*

*Soc'y of Friends v. N.Y. State Dep't of Corr. & Cnty. Supervision*, 16 F.4th 67, 78 (2d Cir. 2021).

### ARGUMENT

Plaintiffs failed to satisfy the criteria for a preliminary injunction. A preliminary injunction is "an extraordinary remedy" that courts may award only "upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). To satisfy that heavy burden, Plaintiffs must establish at a minimum (1) likelihood of success on the merits, (2) irreparable harm absent an injunction, (3) that the balance of equities tips in their favor, and (4) that the public interest supports an injunction. *N.Y. State Firearms Ass'n v. James*, 157 F.4th 232, 241-42 (2d Cir. 2025) (citing *Winter*, 555 U.S. at 20). And because the injunction here would "alter the status quo," Plaintiffs are also required to "demonstrate a 'substantial' likelihood of success" as to the first factor. *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 486 (2d Cir. 2013) (citation omitted). Plaintiffs came nowhere close to making those demanding showings.

## I. Plaintiffs Are Unlikely to Succeed on the Merits of Their Discrimination Claim

Plaintiffs' discrimination claim fails. Plaintiffs assert that by covering facial-reconstruction treatments for some conditions but not gender

21

dysphoria, Aetna violated section 1557 by discriminating "on the basis of sex." JA1236-37. But *Skrmetti* unequivocally foreclosed that theory. As *Skrmetti* confirms, a classification based on a diagnosis of gender dysphoria "clearly does not classify on the basis of sex." *United States v. Skrmetti*, 605 U.S. 495, 513 (2025). And following *Skrmetti*, every court of appeals to consider the question has held that statutes or health-benefit plans that allow medically necessary treatments for certain diagnoses, while barring the same treatments for gender dysphoria, are not facially discriminatory. *Anderson v. Crouch*, 169 F.4th 474, 493-94 (4th Cir. 2026); *Pritchard ex rel. C.P. v. Blue Cross Blue Shield*, 159 F.4th 646, 669-70 (9th Cir. 2025); *Lange v. Houston County*, 152 F.4th 1245, 1251 (11th Cir. 2025) (en banc); *Brandt ex rel. Brandt v. Griffin*, 147 F.4th 867, 878-79 (8th Cir. 2025) (en banc); *Poe ex rel. Poe v. Drummond*, 149 F.4th 1107, 1124 (10th Cir. 2025). This Court should join that consensus and reverse the decision below.

### A. *Skrmetti* Forecloses Plaintiffs' Discrimination Claim

1. Plaintiffs' theory of discrimination is irreconcilable with *Skrmetti*. In *Skrmetti*, the Supreme Court upheld a Tennessee law, SB1, that prohibited certain medical treatments for gender dysphoria but permitted those same treatments for other medical conditions. 605 U.S. at 506-07, 525. The

challengers had brought suit under the Equal Protection Clause, contending that the law created a "facial sex-based classification[] by defining the prohibited medical care based on the patient's sex." *Id.* at 511. The Supreme Court disagreed. SB1, the Court held, "does not mask sex-based classifications [because] the law does not prohibit conduct for one sex that it permits for the other." *Id.* at 514-15. No one—male or female—could obtain the treatments at issue to treat gender dysphoria. *Id.*

Rather than classifying based on sex, the Court explained, SB1 "classifies on the basis of medical use." *Id.* at 511. Patients of any sex could obtain the treatments at issue to treat a qualifying diagnosis, such as precocious puberty, hirsutism, or physical injury. *Id.* at 514, 521. The law simply "remove[d] one set of diagnoses—gender dysphoria, gender identity disorder, and gender incongruence—from the range of treatable conditions." *Id.* at 518-19.

In so ruling, *Skrmetti* also expressly rejected the argument that *Bostock v. Clayton County*, 590 U.S. 644 (2020), rendered SB1 discriminatory. *Bostock* recognized that under Title VII, claims of sex discrimination must satisfy "the traditional but-for causation standard." 590 U.S. at 656. That standard directs courts to "change one thing at a time and see if the outcome changes." *Id.* And for claims of sex discrimination specifically, courts must ask whether changing

23

the plaintiff's sex—and only the plaintiff's sex—would alter the outcome. *Id.* If so, discrimination is afoot. *Id.*

*Skrmetti* explained that SB1 passed muster under *Bostock*. *Id.* at 519-22. The Court found it irrelevant whether *Bostock*'s test "reaches beyond" Title VII, because even "[u]nder the logic of *Bostock*," "sex is simply not a but-for cause of SB1's operation." *Id.* at 498, 520-22. Just as a biological female could not secure treatment for gender dysphoria, the same result obtains "[i]f you change [the person's] biological sex from female to male." *Id.* at 520. Eligibility under SB1 turned instead on a patient's intended "medical use"— treating gender dysphoria as opposed to a "qualifying diagnosis." *Id.* at 511, 520.[2]

2.      *Skrmetti*'s reasoning bars Plaintiffs' discrimination claim. CPB 615 explicitly conditions coverage on the existence of a qualifying diagnosis, not sex or transgender status. If a patient seeks facial reconstruction "to treat gender dysphoria," then CPB 615 deems the procedure not medically necessary, regardless of the patient's sex. JA1194. Conversely, if a patient seeks "facial reconstruction to treat" a qualifying diagnosis, such as a "traumatic

---

[2] As discussed below, the Court subsequently limited *Bostock*'s reach, holding that *Bostock* is "not relevant in th[e] very different statutory and factual context" of Title IX. *West Virginia v. B.P.J. ex rel. Jackson*, 609 U.S. __, 2026 WL 1868739, at *9 (2026); *infra* p. 31 n.3.

injury, illness, or congenital defect," then CPB 615 deems such a request to be medically necessary for coverage purposes. JA1194. Just as in *Skrmetti*, coverage "does not turn on sex." 605 U.S. at 514.

Every circuit to consider the question has adopted the same understanding of *Skrmetti*. Five courts of appeals have applied that decision to hold that statutes or health-benefit plans that restrict certain treatments for gender dysphoria do not discriminate based on sex. *See Anderson*, 169 F.4th at 493-94; *Pritchard*, 159 F.4th at 669-70; *Lange*, 152 F.4th at 1251; *Brandt*, 147 F.4th at 878-79; *Poe*, 149 F.4th at 1124. Two of those circuits, the Fourth and Ninth, have so held under section 1557 specifically. *Anderson*, 169 F.4th at 493-94; *Pritchard*, 159 F.4th at 669-70.

The Fourth Circuit, for its part, rejected a challenge under section 1557 to West Virginia's Medicaid program, which broadly prohibited "coverage for sex-change surgeries." *Anderson*, 169 F.4th at 480, 494. As the challengers pointed out, West Virginia permitted many of the surgeries at issue to treat "some other diagnosis, like breast cancer." *Id.* at 493. But the Fourth Circuit found that fact immaterial: A dividing line based on *diagnosis* did not amount to a dividing line based on *sex*. *Id.* *Skrmetti* was on all fours, so the plaintiffs' claims failed. *Id.* at 494.

25

The Ninth Circuit reached the same conclusion in a case involving a challenge under section 1557 to a Blue Cross policy that prohibited certain treatments for gender dysphoria. *Pritchard*, 159 F.4th at 669-70. "Without more," the Court held, restricting "treatment for gender dysphoria" does not discriminate based on sex. *Id.* Ruling otherwise would "r[u]n afoul of *Skrmetti*." *Id.* at 669.

**B.** **The District Court's Reasoning Is Incompatible with *Skrmetti***

1. The district court offered a series of reasons why CPB 615 supposedly discriminates. But its analysis ignored that the Supreme Court in *Skrmetti* had already rejected each of those reasons. The district court's novel reinterpretation of *Skrmetti*, which the court initially confined to a footnote, cannot stand. JA1242 n.15.

a. The district court first asserted that CPB 615 discriminates based on sex because "transgender individuals [are] the only individuals who can experience gender dysphoria." JA1242. So "when Aetna decided that facial gender-affirming procedures 'performed as a component of a gender transition [were] not medically necessary and cosmetic,' Aetna prohibited only transgender individuals from seeking this medical care, and thus discriminated on the basis of sex." JA1242 (quoting CPB 615).

26

*Skrmetti* expressly rejected that reasoning. The Court held it irrelevant that "only transgender individuals seek treatment for gender dysphoria." *Skrmetti*, 605 U.S. at 519. That was so, the Court explained, because SB1 still permitted transgender individuals with qualifying diagnoses to obtain puberty blockers and hormones. *Id.* at 518-19. Accordingly, there was "a 'lack of identity' between transgender status and the excluded medical diagnoses." *Id.* at 519. The same is true here: Transgender individuals remain eligible to receive facial surgery, provided they have a qualifying diagnosis.

*Skrmetti* explained that in the same vein, it likewise does not constitute sex discrimination to "regulat[e] a medical procedure that only one sex can undergo." *Id.* at 518. Prostate cancer, for instance, arises only in biological males. But no one calls it sex discrimination when an insurer deems a procedure experimental, unsafe, or ineffective to treat prostate cancer. So too here.

b. Next, the district court posited that CPB 615 discriminates because "to determine if the procedures are requested as a component of gender transition, Aetna must determine whether a patient is transgender or cisgender, which necessarily considers sex." JA1241. Here again, the district court flouted *Skrmetti*. The Tennessee law in *Skrmetti* required that very same determination—whether "the procedures are requested as a component

27

of gender transition." JA1241; *see Skrmetti*, 605 U.S. at 505-06. Even more to the point, *Skrmetti* held that a policy does not discriminate based on sex simply because implementing it requires "reference to [a patient's] sex." 605 U.S. at 512. "Such an approach," the Court elaborated, "would be especially inappropriate in the medical context." *Id.* The safe practice of medicine *depends* on setting rules and standards for treating particular medical conditions, including conditions that arise only in transgender people. *Id.* It does not constitute discrimination to deem a treatment unsafe or ineffective.

A contrary rule would endanger transgender patients. The district court posited that federal law prohibits "determin[ing] if … procedures are requested as a component of gender transition." JA1241-42. If so, then hospitals, governments, and insurers cannot prohibit *any* treatments for gender dysphoria—no matter how demonstrably dangerous or fringe.

*Skrmetti* turned away from that path. Because judges lack competence to assess the "propriety of medical treatments," there exists "little basis for judicial responses in absolute terms" to disputes in the medical arena. *Skrmetti*, 605 U.S. at 524-25 (citation omitted). The Supreme Court reiterated that guidance just last month, explaining that judges must refrain from "swooping in" "on medical and scientific matters," especially by announcing

28

"absolute" rules. *West Virginia v. B.P.J. ex rel. Jackson*, 609 U.S. __, 2026 WL 1868739, at *15 (2026) (quoting *Skrmetti*, 605 U.S. at 524). Yet the decision below announced just such an absolute rule. That approach is irreconcilable with *Skrmetti*.

c. Pivoting to yet a third theory, the district court invoked *Bostock*'s but-for test. CPB 615 fails that test, the court claimed, because if Plaintiffs' "sex assigned at birth changed, and they sought the same procedures to affirm the same gender identity they possess, they would necessarily receive a medical necessity determination." JA1257. That reasoning fails. *Bostock* "directs [courts] to change one thing at a time and see if the outcome changes." 590 U.S. at 656; *accord Skrmetti*, 605 U.S. at 520. But the district court's hypothetical changes two things: Plaintiffs' sex *and* their intended medical use. If Plaintiffs' sex changed and they sought these procedures "to affirm the same gender identity they possess," JA1257, they would no longer be seeking to treat gender dysphoria; they would instead be pursuing some other medical use. *Skrmetti*, 605 U.S. at 513, 520-22. *Skrmetti* explained exactly this point. When applying *Bostock*, courts must hold constant not only the treatment the patient seeks but also "the underlying medical concern the treatment is

29

intended to address." *Id.* at 513, 520-21. Because the district court's hypothetical transforms "the underlying medical concern," *id.*, it gets *Bostock* wrong.

Properly understood, *Bostock* refutes Plaintiffs' claims. Changing only Plaintiffs' sex assigned at birth—and not their intended medical use—does not alter CPB 615's application. That is so because *no one*, no matter their biological sex, can obtain the various facial surgeries at issue for the medical use of treating gender dysphoria. Conversely, any patient (whatever their gender identity) is entitled to receive the same facial surgeries if requested for an established, medically necessary use, such as rhinoplasty to treat a deviated septum or orbital reconstruction to repair a fractured eye socket. *See* JA1194. And even then, Aetna's clinical guidelines would not broadly permit any attempt to "affirm" one's gender identity, *contra* JA1257; they would permit treatment only for qualifying diagnoses, JA403. "Under the logic of *Bostock*, then, sex is simply not a but-for cause of [CPB 615's] operation." *Skrmetti*, 605 U.S. at 522.

In holding otherwise, the district court struck out alone. The district court conceded that five "courts of appeal [sic] have read *Skrmetti* to deny claims" that raised similar hypotheticals under *Bostock*. JA1256 (citing

*Anderson*, 169 F.4th 474; *Pritchard*, 159 F.4th 646; *Lange*, 152 F.4th 1245; *Brandt*, 147 F.4th 867; and *Poe*, 149 F.4th 1107). The district court's bald insistence that all those courts misconstrued the law is telling.[3]

2. The district court never suggested that Plaintiffs' claims could survive if *Skrmetti*'s reasoning were binding in this context. Instead, seeking to sidestep *Skrmetti*, the court suggested that *Skrmetti* is not "binding precedent" here at all. JA1256; *see also* JA1242 n.15. Because *Bostock* addressed a statutory claim whereas *Skrmetti* did not, the court concluded that "*Bostock*, not *Skrmetti*," supplies "the 'proper legal principles' to be applied here." JA1256. Plaintiffs took a similar position in opposing Aetna's stay request in this Court, claiming that anything *Skrmetti* said about *Bostock* amounts to "dicta." CA2 Dkt. 35 at 20.

---

[3] Further undermining the district court's reasoning, the Supreme Court recently indicated that *Bostock*'s but-for standard does not apply under Title IX at all. In *West Virginia v. B.P.J. ex rel. Jackson*, the Supreme Court held that a State does not violate Title IX or the Equal Protection Clause by barring transgender women from competing in women's sports. 609 U.S. __, 2026 WL 1868739, at *9 (2026). In so ruling, the Court refused to extend *Bostock* to the challengers' Title IX claims. *Id.* *Bostock* arose in a "vastly different" factual setting—the workplace, not the playing field—and under a "vastly different" statute—Title VII. *Id.* (citation omitted). *Bostock* therefore was "not relevant in th[e] very different statutory and factual context" of Title IX. *Id.* The same result should obtain here, because section 1557 of the Affordable Care Act incorporates Title IX's antidiscrimination standard. 42 U.S.C. § 18116.

That position is untenable. To begin with, *Skrmetti*'s analysis of *Bostock* was not dicta. The holding of a case comprises "those portions of the opinion necessary to th[e] result." *Seminole Tribe v. Florida*, 517 U.S. 44, 67 (1996); *accord Sohm v. Scholastic Inc.*, 959 F.3d 39, 52 (2d Cir. 2020). And to rule for Tennessee in *Skrmetti*, it was "necessary" to dispatch the challengers' main contention: that *Bostock* rendered SB1 discriminatory. Because *Skrmetti* assumed that *Bostock*'s test governed, *Skrmetti*'s application of that test was "necessary" to the Court's disposition. The Fourth, Ninth, and Eleventh Circuits have all treated *Skrmetti*'s discussion as binding and thus upheld health-benefit plans of the sort here. *Anderson*, 169 F.4th 474; *Pritchard*, 159 F.4th 646; *Lange*, 152 F.4th 1245.

Moreover, *Skrmetti*'s holding did not announce some heightened standard applicable only to discrimination claims brought under the Constitution. Quite the contrary: *Skrmetti* expressly assumed that it had to apply the same test as in "the Title VII context"—namely, *Bostock*'s "but-for causation standard." 605 U.S. at 520. Applying that standard, *Skrmetti* reached a clear bottom line: "Under the reasoning of *Bostock*, neither [a person's] sex nor [their] transgender status is the but-for cause of" SB1's operation. *Id.* at 521.

*Skrmetti* thus teaches courts how to apply *Bostock*—including in the statutory context in which it arose.

Here again, other courts of appeals agree: They recognize that *Skrmetti* binds courts beyond the constitutional context. As the Fourth Circuit explained, "[e]ven though *Skrmetti* did not address Title VII, Title IX, or the Affordable Care Act, we are still bound to follow the Supreme Court's instructions about the correct way to apply *Bostock*." *Anderson*, 169 F.4th at 493. The Eleventh Circuit put the point more bluntly: "It is passing strange … [to] rely extensively on *Bostock*, and, at the same time, reject the Supreme Court's own explanation of what *Bostock* means." *Lange*, 152 F.4th at 1254; *see also Pritchard*, 159 F.4th at 669-70. The district court here had no basis to reject the Supreme Court's guidance, and this Court should correct its error.[4]

## II. Plaintiffs Lack Article III Standing to Seek an Injunction

Even apart from their errant theory of discrimination, Plaintiffs' claim is unlikely to succeed because Plaintiffs lack Article III standing. Standing "is

---

[4] The Supreme Court itself has signaled that *Skrmetti* controls under section 1557. Before *Skrmetti* came down, the Fourth Circuit held that West Virginia's Medicaid policy "violate[d]" section 1557. *Kadel v. Folwell*, 100 F.4th 122, 164 (4th Cir. 2024), *cert. granted, judgment vacated sub nom. Crouch v. Anderson*, 145 S. Ct. 2835 (2025) (mem.). The Supreme Court vacated that decision and remanded for reconsideration in light of *Skrmetti*. *Anderson*, 145 S. Ct. at 2835. The Court's decision to vacate and remand speaks volumes: The Court is not in the business of reopening cases based on irrelevant precedent.

an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560 (1992). "[A] plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008) (cleaned up). Accordingly, where a plaintiff lacks Article III standing as to a claim seeking an injunction, "a court has no subject matter jurisdiction" over that claim, *Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 433 F.3d 181, 198 (2d Cir. 2005), meaning the plaintiff is "not entitled to a preliminary injunction," *Schultz v. Alabama*, 42 F.4th 1298, 1313 (11th Cir. 2022).

The same is true here. Besides requiring a "concrete" and "particularized" injury in fact, Article III required Plaintiffs to demonstrate that their claimed injury is "fairly traceable" to the challenged action and "redressable by a favorable ruling." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (citations omitted). Plaintiffs failed to establish either requirement. On redressability: Enjoining Aetna from applying CPB 615 would not redress Plaintiffs' claimed harm—being "treat[ed] … worse" than cisgender employees, JA32—because under the plans at issue, it is Plaintiffs' *employers*, not Aetna, that possess ultimate decision-making authority for paying benefits. On

traceability, Plaintiffs' arguments fail for similar reasons. Although Aetna and CPB 615 may play a role in Plaintiffs' coverage denials, their ultimate *injury* (differential treatment by withholding benefit funding) is traceable to their employers' authority under the plans, not CPB 615.

### A. Granting Plaintiffs Their Requested Relief Would Not Redress Their Alleged Injury

Enjoining Aetna from applying CPB 615 will not redress Plaintiffs' alleged injury. Plaintiffs allege they have been injured by being treated "differently—and worse—than their cisgender counterparts" by being denied facial reconstruction surgery. JA32; *see also* JA74 (alleging related economic harms stemming from that allegedly unlawful differential treatment). But Aetna does not ultimately control what coverage Plaintiffs do or don't receive; that is up to Plaintiffs' employers. There is accordingly a basic mismatch between "the judicial relief requested and the injury suffered." *California v. Texas*, 593 U.S. 659, 671 (2021) (cleaned up).

1. "[I]t is a bedrock principle that a federal court cannot redress 'injury that results from the independent action of some third party not before the court.'" *Murthy v. Missouri*, 603 U.S. 43, 57 (2024) (quoting *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 41-42 (1976)). That requirement flows directly from the logic of Article III. Where a plaintiff's injury ultimately stems

35

from decisions of an independent actor outside the lawsuit, a court cannot issue a binding judgment resolving the controversy. Instead, it can engage only in "guesswork as to how independent decisionmakers will exercise their judgment." *Murthy*, 603 U.S. at 57 (quoting *Clapper*, 568 U.S. at 413). Accordingly, where the entities that ultimately control the decision-making process are "not parties to the suit," redressability is lacking. *Haaland v. Brackeen*, 599 U.S. 255, 293 (2023) (citation omitted).

The Supreme Court's recent decision in *Murthy* illustrates the principle. There, plaintiffs sued various government actors alleging they had unlawfully pressured social-media companies, leading the companies to censor plaintiffs' speech. 603 U.S. at 48. The Court did not deny the validity of the plaintiffs' concerns over government overreach. But the Court held that the plaintiffs had not established redressability, because their alleged injury—removal of content from social-media—depended on the exercise of the "independent judgment" of non-party companies. *Id.* at 60, 68. And indeed, the companies "continued to exercise their independent judgment even after communications with the defendants began." *Id.* at 60. Because the social-media companies were not "parties to the suit" and thus remained "free to enforce, or not to

36

enforce" their censorship decisions irrespective of any judgment, redressability was lacking. *Id.* at 73 (citation omitted).

The same logic applied in *Brackeen*. There, plaintiffs sued various federal actors for declaratory and injunctive relief, claiming that the Indian Child Welfare Act (ICWA) unlawfully discriminated on the basis of race by allowing members of Indian tribes preference in adoption proceedings. 599 U.S. at 292. But there too, the Supreme Court held redressability was lacking. "[R]edressability requires that the court be able to afford relief *through the exercise of its power*, not through the persuasive or even awe-inspiring effect of the opinion." *Id.* at 294 (citation omitted). Because the "state officials who implement ICWA [were] 'not parties to the suit,'" there was "no reason they should be obliged to honor an incidental legal determination the suit produced." *Id.* at 293 (quoting *Lujan*, 504 U.S. at 569 (plurality opinion)). As in *Murthy*, merely assuming the judgment might "persuade" independent actors was not enough. *Id.* at 294.

2.      Plaintiffs' request for injunctive relief defies these basic principles. Plaintiffs seek an injunction to remedy the alleged differential treatment they suffer in being denied facial reconstruction surgery. JA32. But remedying that alleged injury indisputably depends upon independent action by their

non-party employers, who fund and exercise ultimate control over the relevant health plans. Plaintiffs declined to sue those entities or bind them by their requested relief. Here as in *Murthy* and *Brackeen*, that omission presents a fatal obstacle to redressing Plaintiffs' alleged injuries under Article III.

The agreements governing Plaintiffs' self-funded healthcare plans confirm the point. Homnick's employer Bausch & Lomb employed Aetna as third-party administrator of its plan. JA499. But indisputably, Bausch & Lomb maintains "final and sole authority regarding the benefits and provisions of the Plan[]." JA500-01. And indeed, Bausch & Lomb has exercised its independent authority in the past, instructing Aetna how to handle particular cases and amending plan terms to overrule Aetna's determinations regarding various gender-affirming procedures. JA469, 1134-35, 1207, 1210. It even refused to grant an exception from its general plan policies for Homnick specifically. JA50.

Herley's situation is no different. Aetna processes claims on behalf of Herley's employer MTA. But as with Bausch & Lomb, MTA's service agreement explicitly guarantees MTA "ultimate and discretionary authority to decide … benefits covered under the plan." JA601. It explicitly reserves "the right to review [Aetna's] adopted procedures and practices for claims

approval, claims denial, and other aspects of the administration of the plan." JA601. And like Bausch & Lomb, MTA has directly exercised its authority to modify coverage for gender-affirming care. JA718-19.

All of that is fatal to Plaintiffs' redressability arguments. Like the companies who retained ultimate control over social media posts in *Murthy*, Homnick and Herley's employers—not Aetna—retain ultimate control over whether a particular benefits request is granted or denied. And like the state officials administering adoptions in *Brackeen*, Plaintiffs' employers remain free to grant or deny Plaintiffs' benefits request, irrespective of any judgment in this case—even a judgment that CPB 615 is unlawful. In this case as in those, Plaintiffs' injury "results from the independent action of some third party not before the Court." *Murthy*, 603 U.S. at 57, 60 (citation omitted). And in this case as in those, non-parties remain "free to enforce, or not to enforce," the decisions that allegedly injured Plaintiffs. *Id.* at 73. Because a favorable decision wouldn't redress Plaintiffs' alleged injury, Article III standing is lacking.

3. The district court's contrary conclusions lack merit. The district court never suggested that it could issue remedies against Plaintiffs' absent employers or "modify the plans themselves." JA1218, 1223. Nonetheless, it

39

reasoned that even though Plaintiffs may "ultimately desire coverage for all requested gender-affirming facial reconstruction procedures," it could "provide complete relief among the *existing* parties" through an injunction preventing Aetna from enforcing CPB 615. JA1223 (emphasis added).

That reasoning was wrong, not to mention circular. Under the Supreme Court's precedents, a plaintiff cannot prove redressability simply by pointing to the remedy sought and asserting that a court has power to provide it. Instead, the analysis requires analyzing "the *relationship* between the judicial relief requested *and the injury suffered*." *Texas*, 593 U.S. at 671 (cleaned up) (emphasis added). And here, Plaintiffs' alleged injury—differential treatment from cisgendered patients regarding facial-surgery coverage—cannot be remedied without a command directed to Plaintiffs' *employers* who fund and exercise ultimate control over the plans, similar to the absent parties in *Murthy* and *Brackeen*.

Nor does it matter that Plaintiffs' self-funded plans "delegate" initial coverage decisions to Aetna. JA1218. Such an argument upends the relationship at the center of Aetna's arrangement with the employers. As even the district court admitted, Plaintiffs' employers continue to exercise *their own* ultimate authority over coverage decisions, notwithstanding any delegation to

40

Aetna. *See* JA1218 ("Presumably, where an employer dislikes a change Aetna has made, it retains the authority to expressly include or exclude coverage of the contested procedure in its plan."). And here as in *Murthy*, that fact proves that Plaintiffs' alleged differential-treatment injury can't be remedied solely by enjoining Aetna. *Murthy*, 603 U.S. at 60, 74 (social-media companies "continued to exercise their independent judgment even after communications with the [federal] defendants began," proving an injunction against federal officials inadequate to remedy Plaintiffs' injuries). The whole point of the redressability analysis is to avoid "guesswork as to how independent decisionmakers will exercise their judgment." *See id.* at 57, 73-74 (quoting *Clapper*, 568 U.S. at 413). The district court spurned that caution.

Likewise, the district court was simply wrong when it asserted that enjoining Aetna alone would redress Plaintiffs' injuries by "requiring that any denial be based on a lack of medical necessity as opposed to alleged discrimination on the basis of sex." JA1219. As noted above, Aetna's coverage decisions relying on CPB 615 *are* based on medical necessity, not sex. *Supra* pp. 21-33. But regardless, requiring Aetna to make "individualized medical necessity determinations" without reference to the CPB, JA1219, does not remove the simple fact that whether those determinations ultimately result in

41

coverage is up to the *employer*, not Aetna—employers that explicitly elected to follow that same CPB. While the district court's order purports to require Aetna to disregard its assessment of the medical evidence, the employers need not do so. Plaintiffs' employers could re-enact CPB 615's policy tomorrow as a matter of their individual plans, and an injunction in this case would do nothing to stop them. "[R]edressability requires that the court be able to afford relief *through the exercise of its power*," not an "awe-inspiring" opinion. *Brackeen*, 599 U.S. at 294 (citation omitted). And because Plaintiffs chose not to sue their employers, this Court lacks the power to redress the alleged harms the preliminary injunction purports to remedy.

## B. Plaintiffs' Alleged Injuries Are Not Traceable to Aetna

1. For largely the same reasons, Plaintiffs also cannot satisfy Article III's traceability requirement. The traceability prong of standing requires "a causal connection between the injury and the conduct complained of" that is "fairly traceable to the challenged action of the defendant." *Lujan*, 504 U.S. at 560 (cleaned up). Where, as here, "a causal relation between injury and challenged action depends upon the decision of an independent third party," "standing is not precluded, but it is ordinarily *substantially more difficult* to establish." *California*, 593 U.S. at 675 (citation omitted).

42

Aetna does not contend that it played no role whatsoever in the denial of Plaintiffs' claims. Aetna applied CPB 615 when reviewing those coverage requests, as the self-funding employers directed it to do. But the relevant question is whether Plaintiffs' *injuries*—noncoverage, nonpayment, and (claimed) inability to access care—are "fairly traceable" to Aetna's claim-adjudication conduct, or whether those injuries instead flow from independent decisions by employer plan sponsors that break the causal chain enough to destroy traceability. The answer is clear: Employer plan sponsors—not Aetna—exercise final authority over benefit design, coverage, and funding, and their independent decisions sever any traceable link to Aetna.

2.    The district court overstated Aetna's role and committed reversible error in concluding that Plaintiffs adequately traced their injuries to Aetna.

The district court first reasoned that "[i]f the categorical exclusion against gender-affirming facial reconstruction in CPB 0615 did not exist, each of the Plaintiffs would have received individualized medical necessity determinations, and, allegedly, grants of coverage for this prescribed medical care." JA1215. As this Court recently held, however, "[s]tanding requires more than 'mere speculation about the decisions of third parties.'" *Ateres Bais Yaakov*

43

*Acad. v. Town of Clarkstown*, 88 F.4th 344, 352 (2d Cir. 2023) (citation omitted). And Plaintiffs' theory of harm relies on exactly such a "speculative chain of possibilities" to establish traceability to Aetna. *Murthy*, 603 U.S. at 70. For instance, assuming Aetna made the required determination without reference to CPB 615, it is unclear whether Aetna would approve coverage for the requested procedures. And even if *Aetna* approved coverage, the district court itself acknowledged that "where an employer dislikes a change Aetna has made, it retains the authority to expressly include or exclude coverage of the contested procedure in its plan." JA1218. The record confirms that employers exercise this authority. Indeed, as Homnick concedes in her complaint, her employer has *already* declined to reverse Aetna's determination in her individual case. JA50. At bottom, the employer's decision—not Aetna's recommendation—determines the outcome. That independent exercise of judgment by nonparty plan sponsors severs any causal link to Aetna.

The district court attempted to sidestep this problem by characterizing Aetna's application of CPB 615 as having a "determinative or coercive effect upon the action" of employers. JA1215 (quoting *Bennett v. Spear*, 520 U.S. 154, 169 (1997)). But the record refutes that characterization. Employers demonstrably exercise independent judgment. Some reverse Aetna's

44

determinations, others affirm them, and still others adopt plan exclusions that operate independently of Aetna's policies altogether. JA43, 50, 1134-35, 1210. Where employers act as "independent decisionmakers" exercising "independent judgment," traceability fails. *Murthy*, 603 U.S. at 57, 60 (citation omitted). The district court's contrary holding rests on a factual premise the record disproves.

In sum, Plaintiffs' injuries are not "fairly traceable" to Aetna. They are traceable to the independent decisions of employer plan sponsors who (1) design plan benefits, (2) retain and may exercise override authority, and (3) fund or decline to fund claims. Aetna's application of CPB 615 is, at most, one step in a causal chain dominated by independent employer choices. Because Plaintiffs "must rely on a 'speculative chain of possibilities'" to connect their injuries to Aetna, *Murthy*, 603 U.S. at 70 (citation omitted), they have not supported "each element" of standing "with the manner and degree of evidence required" at the preliminary injunction stage, *Lujan*, 504 U.S. at 561.

## III. The Remaining Preliminary Injunction Factors Support Aetna, Not Plaintiffs

This Court should hold that Plaintiffs have failed to establish likelihood of success on the merits. But even apart from the merits, the district court erred in concluding that the equities supported a preliminary injunction.

### A.     Plaintiffs Have Not Demonstrated Irreparable Harm

To demonstrate irreparable injury, "the moving party must show that 'there is a continuing harm which cannot be adequately redressed by final relief on the merits and for which money damages cannot provide adequate compensation.'" *State Farm Mut. Auto. Ins. Co. v. Tri-Borough N.Y. Med. Prac. P.C.*, 120 F.4th 59, 80 (2d Cir. 2024) (citation omitted).  Plaintiffs face no irreparable injury from remaining in the same position as when this litigation started nearly two years ago.  Moreover, if Plaintiffs ultimately prevail in this case, they could obtain full compensation for the injuries they allege.

To start, Plaintiffs' injuries are fully compensable.  Plaintiffs contend that they suffer "irreparable harm due to Aetna's ongoing denial of" reimbursement for facial surgeries, which they claim they are "[w]ithout the means" to afford themselves.  D. Ct. Dkt. 62 at 8, 19; JA128, 213.  But a financial "hardship," painful as it might be, "is exactly [the] type of harm which the Supreme Court [has] stated would be insufficient to demonstrate" irreparable injury.  *Stewart v. U.S. INS*, 762 F.2d 193, 199-200 (2d. Cir. 1985).  This Court has adhered to that rule even in extreme cases, such as where a person is unable "to financially provide for the[ir] [family]."  *Id.*  Basic principles of equity compel that result.  Claims that are "economic in nature" are ordinarily

46

"compensable in money." *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 485 (3d Cir. 2000). And preliminary injunctions are reserved for cases where injuries "cannot be remedied after a final adjudication, whether by damages" or otherwise. *Gov't Emps. Ins. Co. v. Patel*, 166 F.4th 280, 296 (2d Cir. 2026) (citation omitted).

True, an economic injury might be irreparable "where it would be very difficult to calculate monetary damages." *St. Joseph's Hosp. Health Ctr. v. Am. Anesthesiology*, 131 F.4th 102, 107 (2d Cir. 2025) (internal quotation marks omitted). But no such difficulty exists here. On the contrary, Homnick states that the procedures she seeks would cost approximately $130,000. JA213. And nothing suggests that Herley would have difficulty estimating her own costs.

Nor can Plaintiffs recast their economic injuries as irreparable by alleging that their inability to pay causes "anxiety," "pain[]," or "anger." JA128-29, 214. Distress and anxiety are common after suffering economic injuries, including in the insurance context. But such allegations do not end-run the rule that economic injuries are not irreparable.

This Court has already recognized as much. In *Stewart v. U.S. INS*, for example, this Court found no irreparable harm when a plaintiff whose

47

employer suspended his pay alleged "degrad[ation] and humiliat[ion] … in the eyes of his peers, family, and community" and a loss of "reputation and self-esteem." 762 F.2d at 199-200. Such allegations "'fall[] far short of the type of irreparable injury which is a necessary predicate to the issuance of a temporary injunction.'" *Id.* (quoting *Sampson v. Murray*, 415 U.S. 61, 91-92 (1974). Other cases agree, holding that "anxiety[] and inconvenience" "could not by themselves be considered irreparable." *Younger v. Harris*, 401 U.S. 37, 46 (1971) (internal quotation marks omitted); *see also, e.g.*, *Guitard v. U.S. Sec'y of Navy*, 967 F.2d 737, 742 (2d Cir. 1992); *Alvarez v. City of New York*, 2 F. Supp. 2d 509, 514 (S.D.N.Y. 1998).

Finally, even assuming Plaintiffs had otherwise established irreparable injury, that showing was "destroyed" by their "delay in seeking this injunction." *Silber v. Barbara's Bakery, Inc.*, 950 F. Supp. 2d 432, 441 (E.D.N.Y. 2013). Homnick's unsuccessful appeal to Aetna concluded in November 2024, yet Homnick did not move for a preliminary injunction until March 2025, nearly three months after joining this suit. JA50; D. Ct. Dkt. 46 at 23-25; D. Ct. Dkt. 61 at 1-2. Similarly, Herley's request for prior authorization was denied in December 2024, and Herley sat on the denial for three months before seeking injunctive relief. JA53; D. Ct. Dkt. 61 at 1-2. Moreover, Herley

"neither appealed the denial to Aetna nor requested external review" before turning to the courts.  JA1199-1200.

As this Court has repeatedly held, a plaintiff's "failure to act sooner undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury." *Tough Traveler, Ltd. v. Outbound Prods.*, 60 F.3d 964, 968 (2d Cir. 1995) (citation omitted).  Preliminary injunctions are "granted under the theory that there is an urgent need for speedy action to protect the plaintiffs' rights." *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985).  So "[m]onths-long delays in seeking preliminary injunctions have repeatedly been held by courts in the Second Circuit to" refute irreparable harm.  *Silber*, 950 F. Supp. 2d at 439 (collecting cases).  The same is true here.

## B.    The Equities Do Not Favor Plaintiffs

Unlike Plaintiffs, Aetna faces irreparable harm from the preliminary injunction.  Compliance with the injunction threatens to expose Aetna to claims for breach of contract and breach of fiduciary duty.  It risks disrupting Aetna's business relationships with Plaintiffs' employers.  And it may well resolve this case without a court ever deciding the merits.

49

1.     *The preliminary injunction likely requires Aetna to violate legal obligations.*  To start, the injunction threatens to place Aetna in violation of its contractual obligations to Plaintiffs' employers.  Recall that as a third-party administrator for these self-funded plans, Aetna is empowered to act on behalf of Plaintiffs' employers "only to the extent expressly stated" in the plan.  JA491; *see also* JA600 (similar).  It is undisputed that Homnick's plan followed CPB 615.  JA558-59.  And it is likewise undisputed that Herley's employer directed Aetna to follow its Clinical Policy Bulletins in processing claims for gender-affirming care.  JA718.

Those directions are contractually binding on Aetna.  JA1135.  If Plaintiffs prevail and "the plan sponsors … pay for the procedures" they made the reasoned choice not to provide, D. Ct. Dkt. 162 at 12, the plan sponsors may seek to recover those costs from Aetna.  Standing alone, the possibility of "fac[ing] a suit for breach of contract" with a customer is sufficient to tip the balance of equities in Aetna's favor.  *Interox Am. v. PPG Indus., Inc.*, 736 F.2d 194, 203 (5th Cir. 1984).

But it gets worse.  The Order also creates a conflict with Aetna's obligations under federal law.  ERISA, which governs the terms of Homnick's plan, requires Aetna to administer plans "in accordance with the documents and

50

instruments governing the plan." 29 U.S.C. § 1104(a)(1)(D). Yet the injunction commands Aetna to do the opposite—to disregard plan terms and the employer's express coverage directives. Complying with the injunction could thus expose Aetna to breach-of-fiduciary-duty claims. Courts have repeatedly vacated injunctions that require parties to "violate" a competing legal obligation, and this Court should do the same. *See, e.g.*, *Feller v. Brock*, 802 F.2d 722, 727 (4th Cir. 1986).

2.     *The injunction will cause irreparable damage to Aetna's business relationships*. The threat of liability aside, the district court's Order forces Aetna to alienate its own customers. All agree that the injunction at a minimum compels Aetna to disregard its customers' directives to apply CPB 615. According to Plaintiffs, however, the injunction also commands something more: It supposedly triggers a "contractual[] obligat[ion]" by Plaintiffs' employers to pay out for Plaintiffs' surgeries. D. Ct. Dkt. 162 at 14. As explained already, that factual assertion is wrong: Plaintiffs' employers maintain final authority over plan design and funding decisions, so the district court's injunction does not bind the employers' hands. *Supra* pp. 33-41; *see also* JA501, 578-79. But if Plaintiffs' contrary view were correct, then Aetna must now compel its clients to pay out benefits they may not legally owe, with no assurance

whatsoever that they may recover those funds later. No client is likely to appreciate Aetna's violating their bargain—and draining their coffers—in that way. The resulting "loss of reputation, good will, and business opportunities" is more than sufficient to establish irreparable injury. *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004); *see also Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 69 (2d Cir. 1999) (finding irreparable harm because it is "very difficult to calculate monetary damages that would successfully redress the loss of a relationship with a client that would produce an indeterminate amount of business in years to come").

3.      *The preliminary injunction may end this case.* The preliminary injunction also threatens to be the final word on the parties' rights. If the injunction stays in effect, Plaintiffs providers may be able to obtain reimbursement for the procedures at issue before this litigation concludes. By that point, Aetna's objection to covering the procedures may become moot, nullifying Aetna's right to defend its interests through trial and appeal. This Court has long expressed skepticism of injunctions that would go that far—that would "provide the movant with substantially all the relief sought and that relief cannot be undone even if the defendant prevails at a trial on the merits." *Yang v. Kosinski*, 960 F.3d 119, 127-28 (2d Cir. 2020) (citation omitted); *accord New*

*York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015); *Singh v. Berger*, 56 F.4th 88, 95 (D.C. Cir. 2022).

### C. An Injunction Would Disserve the Public Interest

The district court also erred in finding the public interest supported an injunction. This Court like others is "bound to follow the existing precedent of the Supreme Court until that Court tells us otherwise." *Baroni v. Port Auth. of N.Y. & N.J.*, 161 F.4th 48, 57 (2d Cir. 2025) (citation omitted). And here, the Supreme Court's decision in *Skrmetti* forecloses Plaintiffs' core legal theory—a conclusion that no fewer than five courts of appeals have reached on claims virtually indistinguishable from those here. *Supra* pp. 25-26. The public interest in stability, predictability, and fairness is served by the consistent application of Supreme Court precedents.

Applying those precedents faithfully is also necessary to protect important rights of third parties. Under the injunction, it is Plaintiffs' employers, not Aetna, who would be forced to fund any surgeries. Yet Plaintiffs' employers have had no opportunity to defend their interests in this litigation. In fact, Plaintiffs have resisted their joinder. JA1221-22. This Court should not lightly subject Plaintiffs' employers to thousands of dollars in unbudgeted plan costs, either in the form of unplanned benefit payments, or associated with the

53

resolution of any potential conflict between the employers and Aetna over payments.

Imposing those costs would frustrate the employers' contracted-for expectations. As Judge Rakoff recently explained in a decision this Court affirmed, "the public interest would be advanced by encouraging adherence to contractual commitments." *Tecspec LLC v. Donnolo*, 2026 WL 1361842, at *5 (2d Cir. May 15, 2026). The district court's injunction requires the opposite.

## CONCLUSION

For the foregoing reasons, this Court should vacate the preliminary injunction.

Respectfully submitted,

/S/    CHARLES L. MCCLOUD
CHARLES L. MCCLOUD
WILLIAMS & CONNOLLY LLP
  *680 Maine Avenue, S.W.*
  *Washington, DC 20024*
  *(202) 434-5000*
  *lmccloud@wc.com*

EARL B. AUSTIN
Baker Botts LLP
  *30 Rockefeller Plaza*
  *New York, NY 10112*
  *(212) 408-2649*

THEODORE J. TUCCI
ROBINSON & COLE LLP

54

*One State Street*
*Hartford, CT 06103*
*(860) 275-8210*

*Counsel for Appellant*

JULY 8, 2026

# CERTIFICATE OF COMPLIANCE
## WITH TYPEFACE AND WORD-COUNT LIMITATIONS

I, Charles L. McCloud, counsel for appellant and a member of the Bar of this Court, certify, pursuant to Federal Rule of Appellate Procedure 32(a)(7)(B) and Local Rule 32.1(a)(4), that the attached Appellant's Opening Brief is proportionately spaced, has a typeface of 14 points or more, and contains 11,112 words.

JULY 8, 2026                                  /s/     *Charles L. McCloud*
                                              CHARLES L. MCCLOUD

# CERTIFICATE OF SERVICE

I, Charles L. McCloud, counsel for appellant and a member of the Bar of this Court, certify that, on July 8, 2026, a copy of the attached Appellant's Opening Brief was filed with the Clerk and served on the parties through the Court's electronic filing system. I further certify that all parties required to be served have been served.

JULY 8, 2026

/s/ *Charles L. McCloud*
CHARLES L. MCCLOUD

# SPECIAL APPENDIX

# TABLE OF CONTENTS

Ruling and Order on Pending Motions,
    D. Conn. No. 3:24-cv-01447 (Mar. 8, 2026), Dkt. 153 ............................... SA1

20 U.S.C. § 1681(a) .................................................................................. SA56

29 U.S.C. § 1104(a)(1)(D) ........................................................................ SA58

42 U.S.C. § 18116(a) ................................................................................ SA58

**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

|  |  |
|---|---|
| BINAH GORDON, *et al.*, <br>     *Plaintiffs*, <br><br> v. <br><br> AETNA LIFE INSURANCE COMPANY, <br>     *Defendant*. | No. 3:24-cv-1447 (VAB) |

**RULING AND ORDER ON PENDING MOTIONS**

Binah Gordon, Kay Mayers, Alma Avalle, Jamie Homnick, Gennifer Herley, and S.N. ("Plaintiffs") filed a Complaint on behalf of themselves and a putative class of similarly situated individuals against Aetna Life Insurance Company ("Aetna" or "Defendant") alleging a violation of the prohibition of discrimination on the basis of sex in federally funded health programs and activities under Section 1557 of the Affordable Care Act ("ACA"), 42 U.S.C. § 18116 ("Section 1557"); Compl., ECF No. 1.

The Plaintiffs are transgender women who are seeking or have received gender-affirming facial reconstruction ("GAFR") which they allege is or was medically necessary to treat their gender dysphoria. Gender dysphoria is defined as "a marked incongruence between one's experienced/expressed gender and assigned gender of at least six months' duration," as manifested by at least two characteristics of an enumerated list. *See* Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders (5th ed., text revision 2022) ("DSM-5").

They are or were enrolled in health insurance plans that are designed, sold, or administered by Aetna and funded by their or their spouses' employers. Aetna is a health insurance company that receives federal financial assistance, and is therefore required to comply

1

SA1

with the prohibition of discrimination on the basis of sex in federally funded health programs and activities under Section 1557 of the Affordable Care Act, 42 U.S.C. § 18116.

Aetna has filed a motion to dismiss the Second Amended Complaint asserting lack of standing under Article III of the United States Constitution, failure to join necessary and indispensable parties under Federal Rule of Civil Procedure 19, failure to exhaust statutory and administrative remedies, and failure to seek judicial review in accordance with the Federal Employees Health Benefit Act of 1959, 5 U.S.C. § 8901 *et seq.*, and its accompanying regulations, 5 C.F.R. § 890.101, *et seq.*

Dr. Homnick and Dr. Herley have filed a motion for a preliminary injunction against Aetna to enjoin the application of Aetna's Clinical Policy Bulletin 0615 ("CPB 0615"), which excludes gender-affirming facial reconstruction surgeries to treat gender dysphoria from medical insurance coverage.

For the following reasons, Aetna's motion to dismiss is **DENIED** and the motion for a preliminary injunction brought by Dr. Homnick and Dr. Herley is **GRANTED**.

As a result of this Ruling and Order, Aetna is required to make individualized coverage determinations as to Dr. Homnick and Dr. Herley only, on the basis of medical necessity, as opposed to categorically excluding their claims under CPB 0615.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

### A.  Factual Allegations

#### 1.  Aetna's Clinical Policy Bulletin 0615

An employer using a health insurance plan designed, sold, or administered by Aetna may allegedly choose whether to include or exclude certain benefits from coverage. Where a member's plan is silent on a particular benefit, Aetna allegedly uses its clinical policy bulletins

("CPB") to determine whether the procedure is medically necessary, as opposed to cosmetic, experimental, or unproven. Medically necessary procedures are generally a covered benefit. *See* Mem. in Support of Mot. for Prelim. Inj., 8-9, ECF No. 62 ("Mot. for Prelim. Inj.").

Aetna's clinical policy bulletin 0615 ("CPB 0615") governs medical necessity determinations, and subsequently coverage of gender-affirming surgery for transgender individuals. While certain gender transition procedures, like medically necessary breast and genital reconstruction, are covered under the policy, CPB 0615 allegedly characterizes all gender-affirming facial reconstruction when done to treat gender dysphoria as purely "cosmetic" rather than "medically necessary," thereby categorically excluding such treatment from coverage. *Id.* at 8. The policy states:

> "Aetna considers the following procedures that may be performed as a component of a gender transition as not medically necessary and cosmetic []:
> …
> Facial Gender Affirming Procedures, including: Brow (reduction, augmentation, lift); Hair line advancement and/or hair transplant; Facelift/mid-face lift (following alteration of the underlying skeletal structures) (platysmaplasty); Blepharoplasty (lipofilling); Rhinoplasty (+/- fillers); Cheek (implant, lipofilling); Lip (upper lip shortening, lip augmentation); Lower jaw (reduction of mandibular angle, augmentation); Chin reshaping (osteoplastic, alloplastic (implant-based)); Chondrolaryngoplasty (also known as Adam's apple reduction, thyroid cartilage reduction, or tracheal shave); Vocal cord surgery[.]"

*Gender Affirming Surgery, Clinical Policy Bulletin 0615*, Aetna Inc. (Mar. 7, 2026, at 11:08 a.m. ET), https://www.aetna.com/cpb/medical/data/600_699/0615.html.

Requests for facial reconstruction to treat a traumatic injury, illness, or congenital defect are generally granted or assessed for medical necessity on a case-by-case basis. *Id.* at 9. And Aetna covers facial reconstruction, even if coincidentally gender-affirming, to treat conditions unrelated to an individual's gender dysphoria. *Id.* at 9. When an individual requests coverage for facial reconstruction to treat gender dysphoria, however, Aetna's policy under CPB 0615

allegedly is to deny the request automatically without conducting an individualized medical necessity determination. *Id.* at 8-9.

### 2. The Plaintiffs

The six Plaintiffs in this case, Binah Gordon, Kay Mayers, Alma Avalle, Jamie Homnick, Gennifer Herley, and S.N. seek to bring a class action lawsuit on behalf of themselves and all similarly situated individuals against Aetna alleging a violation of Section 1557 of the Affordable Care Act. Ms. Gordon and Ms. N seek to represent a damages class and Ms. Avalle, Ms. Mayers, Dr. Homnick, and Dr. Herley seek to represent an injunctive and declaratory class.

### i. Binah Gordon

Binah Gordon has allegedly suffered symptoms of gender dysphoria since childhood. Compl. ¶ 31. In 2019, Ms. Gordon began her gender transition and was formally diagnosed with gender dysphoria. Ms. Gordon has received gender-affirming treatments including feminizing hormone therapy, gender-affirming genital reconstruction surgery, and voice therapy. *Id.* ¶ 32. Despite these interventions, Ms. Gordon allegedly "continued to suffer from severe gender dysphoria specifically related to certain typically masculine facial features," which allegedly exacerbated symptoms of post-traumatic stress disorder and caused her to experience profound fear and anxiety about her safety and well-being. *Id.* ¶ 33. From 2021 to 2022, Ms. Gordon's medical providers determined that gender-affirming facial reconstruction was medically necessary to treat her gender dysphoria. *Id.* ¶¶ 36-38.

On July 1, 2022, Ms. Gordon enrolled in an Aetna plan as part of her Federal Employee Health Benefits ("FEHB") plan. *Id.* ¶ 39. In July 2022, Ms. Gordon allegedly applied for preauthorization for the prescribed medical care. *Id.* ¶ 40. On September 30, 2022, Aetna denied coverage for Ms. Gordon's requested services, citing CPB 0615. *Id.* ¶ 41. On March 27, 2023,

Ms. Gordon allegedly appealed Aetna's denial, *id.* ¶ 42, which Aetna once more denied on April 21, 2023, *id.* ¶ 43. On June 27, 2023, Ms. Gordon allegedly requested that the United States Office of Personnel Management ("OPM") conduct an external review of Aetna's denial. *Id.* ¶ 45.

OPM allegedly took months to respond to Ms. Gordon's request, *id.* ¶ 47, during which time she allegedly experienced "debilitating harms" such as panic attacks, depression, suicidality, post-traumatic stress disorder, and social avoidance, *id.* ¶¶ 44-47. Ms. Gordon allegedly began to seek money from crowdfund sources to pay for the out-of-pocket costs of the prescribed medical care. *Id.* ¶ 47. Ms. Gordon allegedly received $30,000 from a close friend, which enabled her to obtain this medical care without insurance coverage. *Id.* ¶ 48. Ms. Gordon received gender-affirming facial reconstruction on December 11, 2023, which allegedly cost $35,000. *Id.* ¶ 49. Since receiving GAFR, Ms. Gordon has allegedly experienced a significant decline in her symptoms of gender dysphoria and post-traumatic stress disorder. *Id.* ¶ 51.

OPM allegedly issued its determination, mostly reversing Aetna's denial, on November 21, 2023, but allegedly failed to notify Ms. Gordon of its decision until January 4, 2024. *Id.* ¶ 50. And on January 1, 2024, OPM allegedly began to require Aetna and other insurers to cover gender-affirming facial reconstruction surgeries under all Federal Employee Health Benefit Act ("FEHBA") plans administered by those insurers. *Id.* ¶ 148.

Ms. Gordon later left her employment and her FEHBA coverage allegedly lapsed effective December 31, 2023. Mot. to Dismiss at 8. Ms. Gordon allegedly retains the ability to request reimbursement for the gender-affirming facial reconstruction she received while still a member of the plan, but she allegedly has not yet made any requests. *Id.*

    ii.  <u>Kay Mayers</u>

Kay Mayers works for a public employer in Anchorage, Alaska. Compl. ¶ 52. Her plan is funded by the Anchorage School District and retains Aetna to act as claims administrator. Mot. to Dismiss at 8. Ms. Mayers has allegedly experienced gender dysphoria since childhood. Compl. ¶ 53. Ms. Mayers was diagnosed with gender dysphoria before 2021, when she began her transition. *Id.* ¶ 54. Ms. Mayers has received gender-affirming treatments including feminizing hormone therapy and gender-affirming surgical treatments. *Id.* ¶ 55. She alleges that as a child, she experienced physical violence associated with her gender presentation and has since "felt imperiled by her masculinized facial features when interacting with her community." *Id.* ¶¶ 59-60. Ms. Mayers' medical providers allegedly agree that gender-affirming facial reconstruction is medically necessary to treat her gender dysphoria. *Id.* ¶¶ 61, 63-64.

Ms. Mayers' health insurance plan covers "certain services and supplies for gender affirming (sometimes called sex change) treatment," but defers to Aetna's CPB 0615 "for detailed information about this benefit, including eligibility and medical necessity requirements." *Id.* ¶ 62. Ms. Mayers filed a pre-certification request, which Aetna denied on March 12, 2024, citing CPB 0615. *Id.* ¶ 65. Ms. Mayers appealed the decision, which Aetna again denied on October 15, 2024. *Id.* ¶ 66. In December 2024, however, Aetna allegedly reversed its denial and preauthorized coverage for certain gender-affirming facial reconstruction procedures. *Id.* Ms. Mayers has allegedly not yet received them.

### iii.   Alma Avalle

Alma Avalle has allegedly experienced gender dysphoria since childhood. Compl. ¶ 69. In July 2021, Ms. Avalle was diagnosed with gender dysphoria and began seeking treatment. *Id.* ¶ 72. In December 2021, Ms. Avalle began gender-affirming hormone replacement therapy, but her gender dysphoria allegedly persisted. *Id.* ¶ 74. In late 2022, Ms. Avalle's medical providers

found that gender-affirming facial reconstruction was medically necessary to treat her gender dysphoria. *Id.* ¶ 75.

Ms. Avalle is covered by a health benefit plan funded and sponsored by her employer, who retained Aetna to act as claims administrator. Mot. to Dismiss at 10. Ms. Avalle's plan is allegedly governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq. Id.* at 19. Ms. Avalle was allegedly aware of Aetna's CPB 0615, but she nonetheless applied for coverage. Compl. ¶ 76. Ms. Avalle allegedly began a fundraising campaign to pay for her prescribed medical care, *id.* ¶ 78, but allegedly only raised less than half of the out-of-pocket costs, *id.* ¶ 80. Aetna denied Ms. Avalle's application for prior authorization, which allegedly exacerbated her gender dysphoria and caused her to experience severe depression, eventually leading to her alleged indefinite medical leave of absence from work. *Id.* ¶¶ 81-82.

### iv.   Jamie Homnick

Jamie Homnick has allegedly suffered from gender dysphoria since she was a child. Compl. ¶¶ 84-85. In October 2023, Dr. Homnick began receiving gender-affirming treatments including hormone replacement therapy, voice therapy, and facial hair removal. *Id.* ¶ 87.

Dr. Homnick's health insurance plan is funded by her employer, Bausch & Lomb, who retained Aetna as the claims administrator. Mot. to Dismiss at 11. Dr. Homnick's plan is allegedly governed by ERISA. *Id.* at 19. Dr. Homnick's plan covers gender-affirming surgeries, subject to Aetna's CPB 0615. Compl. ¶ 89.

By June 2024, Dr. Homnick's primary care provider and therapist found that gender-affirming facial reconstruction was medically necessary. *Id.* ¶ 87. In August 2024, Dr. Morrison, a plastic surgeon, submitted a request for prior authorization to Aetna, who denied the request

the following month. *Id.* ¶ 88. Dr. Morrison allegedly appealed the decision, which Aetna once

more denied. *Id.* Dr. Morrison allegedly reached out to Dr. Homnick's employer to seek an

exception to the exclusion in her case, but the company allegedly denied Dr. Morrison's request.

*Id.* Dr. Homnick allegedly did not file a second-level appeal. Mot. to Dismiss at 12.

Dr. Homnick is unable to pay for gender-affirming facial reconstruction out-of-pocket,

and allegedly suffers from severe gender dysphoria, including severe depression and suicidality.

*Id.* ¶¶ 91-92. Dr. Homnick thus alleges that she will not be able to obtain gender-affirming facial

reconstruction so long as CPB 0615 remains in effect. *Id.* ¶ 92.

v.   <u>Gennifer Herley</u>

Gennifer Herley allegedly began experiencing gender dysphoria as a child. *Id.* ¶ 94. Dr.

Herley has received gender-affirming treatments including hormone replacement therapy, breast

augmentation, vaginoplasty surgery, facial hair removal, a hair transplant, and feminine makeup

tattooing. *Id.* ¶¶ 96-97. Despite these interventions, Dr. Herley continues to suffer from severe

and intensifying gender dysphoria. *Id.* ¶ 99.

Dr. Herley is covered under a health benefit plan sponsored by her wife's employer. Mot.

to Dismiss at 14. Her wife's employer retained Aetna to act as a third-party claims administrator.

*Id.* Dr. Herley's plan includes an administrative appeals process for the resolution of benefits that

includes two levels of appeals to Aetna as well as an external appeal to an independent external

review organization, whose decision is binding on Aetna. *Id.* at 14-15.

In November 2024, a plastic surgeon determined that gender-affirming facial

reconstruction was medically necessary for Dr. Herley. Compl. ¶ 100. Dr. Herley applied for

prior authorization for the prescribed medical care, but Aetna denied her request in mid-

December 2024. *Id.* Dr. Herley allegedly has neither appealed the denial to Aetna nor requested

external review. Mot. to Dismiss at 15. Because of the denial, Dr. Herley has allegedly experienced worsening symptoms of depression and anxiety related to her gender dysphoria. Compl. ¶ 100.

### vi.   S.N.

S.N. has allegedly experienced gender dysphoria since childhood. *Id.* ¶¶ 102-03. S.N. has paid out-of-pocket for gender-affirming treatments including hormone therapy, breast augmentation surgery, and a jaw reduction procedure. *Id.* ¶ 105. Nonetheless, S.N. allegedly continues to experience severe gender dysphoria because of her masculinized facial and vocal features. *Id.* ¶ 106. During the period in question, Ms. N was covered under a health insurance plan funded by her employer, who retained Aetna as a third-party claims administrator. Mot. to Dismiss at 15. Ms. N's plan is allegedly governed by ERISA. *Id.* at 19.

In 2019, her medical providers determined that gender-affirming facial reconstruction was medically necessary to treat her gender dysphoria. Compl. ¶ 107. In October 2022, Ms. N received GAFR, and her surgeon submitted a health insurance claim to Aetna for a total of $41,948. On December 8, 2022, Aetna denied her health insurance claim, stating that her procedures were cosmetic and therefore excluded from coverage. *Id.* ¶ 111. Ms. N's Aetna plan document allegedly covered certain gender-affirming services but relied on Aetna's clinical policy bulletins to determine eligibility and medical necessity requirements. *Id.* ¶ 112. On December 9, 2022, Ms. N allegedly appealed the claim denial and requested an external review. *Id.* ¶ 113. On January 17, 2023, Aetna allegedly relied on CPB 0615 to deny Ms. N's appeal. *Id.* ¶ 117. Because of Aetna's coverage denials, Ms. N allegedly paid for the surgery out of pocket. *Id.* ¶ 118. Ms. N allegedly left her employment and is no longer covered by an Aetna administered plan. Mot. to Dismiss at 31.

9
SA9

## B. Procedural History

On September 4, 2024, the Plaintiffs filed a Complaint on behalf of themselves and a putative class of similarly situated individuals against Aetna challenging Aetna's categorical exclusion of gender-affirming facial reconstruction procedures used to treat gender dysphoria. Complaint, ECF No. 1.

On December 3, 2024, the Plaintiffs filed an Amended Complaint. Am. Compl., ECF No. 46.

On March 3, 2025, the Plaintiffs filed a Second Amended Complaint. Second Am. Compl., ECF No. 60 ("Compl.").

On March 3, 2025, Jamie Homnick and Gennifer Herley separately filed a motion for a preliminary injunction to enjoin Aetna from enforcing the categorical exclusion of claims for gender-affirming facial reconstruction as outlined in Clinical Policy Bulletin 0615. Mot. for Prelim. Inj., ECF No. 61. On the same day, Dr. Homnick and Dr. Herley filed a memorandum in support of the motion for a preliminary injunction. Mem. in Support of Mot. for Prelim. Inj., ECF No. 62 ("Mot. for Prelim. Inj.").

On April 11, 2025, Aetna filed a motion to dismiss the Plaintiffs' Second Amended Complaint. Mot. to Dismiss, ECF No. 78 ("Mot. to Dismiss").

On April 14, 2025, Aetna filed a memorandum in opposition to Plaintiffs' motion for preliminary injunction. Mem. in Opp. to Pl. Mot. for Prelim. Inj., ECF No. 102 ("Def.'s Mem.").

On April 29, 2025, Plaintiffs filed a reply to Defendant's response. Reply to Resp. to Mot. for Prelim. Inj., ECF No. 114 ("Pl.'s Reply").

On May 9, 2025, Aetna filed a Sur-Reply to Plaintiffs' reply. Resp. re Reply to Resp. to Mot., ECF No. 120 ("Def.'s Sur-Reply").

On May 9, 2025, Plaintiffs filed a Sur-Rebuttal to Aetna's Sur-Reply. Pl.'s Sur-Rebuttal in support of Mot. for Prelim. Inj., ECF No. 121 ("Pl.'s Sur-Rebuttal").

On May 16, 2025, Plaintiffs filed a memorandum in opposition to Aetna's motion to dismiss. Pl.'s Mem. in Opp., ECF No. 123 ("Mem. in Opp.").

On June 6, 2025, Aetna filed a reply to the Plaintiff's response to the motion to dismiss. Reply to Resp., ECF No. 126 ("Reply").

On January 8, 2026, the Court held a hearing on the pending motion to dismiss, as well as the pending motion for a preliminary injunction, and ordered supplemental briefing. *See* Minute Entry, ECF No. 138.

On January 23, 2026, the parties filed supplemental memoranda. Am. Mem. in Opp., ECF No. 141; Supp. Mem., ECF No. 142.

On January 30, 2026, the parties filed their responses. Response, ECF No. 144; Response, ECF No. 145.

## II.    STANDARD OF REVIEW

### A.  Motion to Dismiss

A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). Any claim that fails "to state a claim upon which relief can be granted" will be dismissed. Fed. R. Civ. P. 12(b)(6). In reviewing a complaint under Rule 12(b)(6), a court applies a "plausibility standard" guided by "[t]wo working principles." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

First, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*; *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ("While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need

detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." (alteration in original) (citations omitted)). Second, "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal*, 556 U.S. at 679. Thus, the complaint must contain "factual amplification . . . to render a claim plausible." *Arista Records LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (quoting *Turkmen v. Ashcroft*, 589 F.3d 542, 546 (2d Cir. 2009)).

When reviewing a complaint under Federal Rule of Civil Procedure 12(b)(6), the court takes all factual allegations in the complaint as true. *Iqbal*, 556 U.S. at 678. The court also views the allegations in the light most favorable to the plaintiff and draws all inferences in the plaintiff's favor. *Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353, 359 (2d Cir. 2013); *see also York v. Ass'n of the Bar of N.Y.C.*, 286 F.3d 122, 125 (2d Cir. 2002) ("On a motion to dismiss for failure to state a claim, we construe the complaint in the light most favorable to the plaintiff, accepting the complaint's allegations as true.").

A court considering a motion to dismiss under Rule 12(b)(6) generally limits its review "to the facts as asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007). A court may also consider "matters of which judicial notice may be taken" and "documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993); *Patrowicz v. Transamerica HomeFirst, Inc.*, 359 F. Supp. 2d 140, 144 (D. Conn. 2005).

### B. Motion for Preliminary Injunction

The Second Circuit applies similar standards for temporary restraining orders and preliminary injunctions, "and district courts have assumed them to be the same." *See Foley v. State Elections Enforcement Comm'n*, No. 3:10CV1091 (SRU), 2010 WL 2836722, at *3 (D. Conn. July 16, 2010) (quoting *Allied Office Supplies, Inc. v. Lewandowski*, 261 F. Supp. 2d 107, 108 n.2 (D. Conn. 2003)). Preliminary injunctive relief is an extraordinary remedy and is never awarded as a matter of right. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). And when a preliminary injunction is sought, a plaintiff's burden to demonstrate standing "will normally be no less than that required on a motion for summary judgment." *Lujan v. Nat'l Wildlife Fed'n (Lujan I)*, 497 U.S. 871, 907 n.8 (1990). "In deciding a motion for preliminary injunction, a court may consider the entire record including affidavits and other hearsay evidence." *Johnson v. Newport Lorillard*, No. 01 Civ. 9587 (SAS), 2003 WL 169797, at *1 (S.D.N.Y. Jan. 23, 2003).

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *New York Progress and Prot. PAC v. Walsh*, 733 F.3d 483, 486 (2d Cir. 2013) (quoting *Winter*, 555 U.S. at 20); *see also Jolly v. Coughlin*, 76 F.3d 468, 473 (2d Cir. 1996) ("In most cases, a party seeking to obtain a preliminary injunction must establish that it will suffer irreparable harm in the absence of an injunction and demonstrate either (1) 'a likelihood of success on the merits' or (2) 'sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of the hardships tipping decidedly' in the movant's favor.") (quoting *Waldman Publ'g Corp. v. Landoll, Inc.*, 43 F.3d 775, 779–80 (2d Cir. 1994)). The moving party, however, must

also make a "clear" or "substantial" showing of a likelihood of success if the injunction sought will alter, rather than maintain the status quo. *See Jolly*, 76 F.3d at 473.

## III. DISCUSSION

### A. The Motion to Dismiss

Aetna moves to dismiss the Plaintiffs' Second Amended Complaint on four grounds: lack of standing under Article III of the United States Constitution, failure to join necessary and indispensable parties under Federal Rule of Civil Procedure 19, failure to exhaust statutory and administrative remedies, and failure to seek judicial review in accordance with the Federal Employees Health Benefit Act of 1959, 5 U.S.C. § 8901 *et seq.*, and its accompanying regulations, 5 C.F.R. § 890.101, *et seq.*

The Court addresses each argument in turn.

#### 1. Article III Standing

Article III of the Constitution provides federal courts with power that "extends only to 'Cases' and 'Controversies.'" *Spokeo, Inc. v. Robins*, 578 U.S. 330, 337 (2016) (quoting Art. III § 2). The doctrine of standing is "rooted in the traditional understanding of a case or controversy." *Id.* at 338. To establish standing, a plaintiff must have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Kearns v. Cuomo*, 981 F.3d 200, 207 (2d Cir. 2020) (quoting *Spokeo, Inc.*, 578 U.S. at 338).

Where a plaintiff seeks injunctive relief, he or she must establish "a real and immediate threat of repeated injury" demonstrated by more than "[p]ast exposure to illegal conduct." *City of L.A. v. Lyons*, 461 U.S. 95, 102 (1983). "[A]bstract injury is not enough; rather, the injury or threat of injury must be both real and immediate, not conjectural or hypothetical." *Shain v.*

14
SA14

*Ellison*, 356 F.3d 211, 215 (2d Cir. 2004) (internal quotation marks and alteration omitted). Plaintiffs seeking prospective relief "cannot rely on past injury to satisfy the injury requirement but must show a likelihood that he or she will be injured in the future." *Deshawn E. ex rel. Charlotte E. v. Safir*, 156 F.3d 340, 344 (2d Cir. 1998).

"The second and third standing requirements—causation and redressability—are often 'flip sides of the same coin.'" *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 380–81 (2024) (quoting *Sprint Communications Co. v. APCC Services, Inc.*, 554 U.S. 269, 288 (2008)). Causation requires the plaintiff to show "that the injury was likely caused by the defendant," and redressability requires the plaintiff to demonstrate "that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). The redressability prong requires that the requested relief "would provide meaningful redress for *an* injury, not that it would relieve him of *every* injury." *Knight v. City of New York*, 164 F.4th 173, 179–80 (2d Cir. 2026) (internal citations omitted) (emphasis in original). "And even when a plaintiff's requested relief 'cannot provide full redress' with respect to an injury, a federal court's 'ability to effectuate a partial remedy satisfies the redressability requirement.'" *Id.* (citing *Uzuegbunam v. Preczewski*, 592 U.S. 279, 291 (2021)); *see also Elias Bochner, 287 7th Ave. Realty LLC v. City of New York*, 118 F.4th 505, 521 (2d Cir. 2024) ("[T]he law of standing does not require that the relief sought by a plaintiff completely redress the asserted injury.").

Aetna argues that several Plaintiffs lack standing because they suffered no past injury, face no risk of future injury as required for injunctive relief, or both. Aetna also argues that the alleged injury is not traceable to it, since it is the Plaintiffs' employers, and not Aetna, who controls the terms of their plans. Aetna thus argues that the relief sought would not redress the

Plaintiffs' injuries since "Aetna has no independent power . . . to award coverage or expend plan funds for benefits not authorized by the employers." Mot. to Dismiss at 45.

i.    Injury in Fact

Aetna argues that three of the Plaintiffs, Ms. Gordon, Ms. Mayers, and Dr. Homnick have not alleged sufficient injury-in-fact to confer Article III standing because the Plaintiffs' plans now authorize coverage for some or all of the procedures they seek.

In Ms. Gordon's case, after she received gender-affirming facial reconstruction, OPM reversed Aetna's denial of coverage in her case and also revised its FEHBA plan to expressly provide coverage for the procedures she requested. Aetna argues that Ms. Gordon could now submit a reimbursement request for the cost of her procedures but has not yet done so, since she did not pay for the procedures with her own funds and therefore lacks a monetary injury. Mot. to Dismiss at 27-28.

Aetna also argues that Ms. Mayers lacks an injury because her employer eventually authorized the procedures Ms. Mayers requested, and Aetna then approved her request for coverage. Aetna thus states that Ms. Mayers is eligible to receive the procedures under her health insurance plan, but has not alleged that she has undergone the surgeries or incurred out-of-pocket costs for them. *Id.* at 28-29. Similarly, Aetna argues that Dr. Homnick's employer revised its plan to approve coverage for some of the gender-affirming facial reconstruction procedures she seeks, but that Dr. Homnick has not alleged that she has undergone these surgeries or incurred out-of-pocket costs for them. *Id.* at 29-30.

The Plaintiffs respond that Ms. Gordon, who is only seeking compensatory relief and therefore need not allege future injury, has sufficiently pled monetary damages stemming from Aetna's denial which constitutes "a traditional form of injury-in-fact for Article III standing."

Mem. in Opp. at 17. Next, the Plaintiffs argue that Ms. Mayers and Dr. Homnick, as well as the remaining injunctive relief Plaintiffs, have alleged past injuries, namely being subject to sex discrimination and increased gender dysphoria and mental distress as a result of Aetna's denials. The Plaintiffs also argue that they face a threat of future injury because they remain enrolled in Aetna-administered plans and their requests for gender-affirming facial reconstruction will continue to be subject to Aetna's policy exclusion as long as it remains in place.

In its reply, Aetna argues that because Ms. Gordon funded her gender-affirming facial reconstruction through donations, she "does not allege that she has suffered any actual past economic loss, much less any loss that would not have been paid had she simply submitted a reimbursement claim under her FEHBA plan." Reply at 3. Aetna also argues that Ms. Mayers lacks standing for both monetary relief and declaratory or injunctive relief because her coverage request has been approved and she therefore faces no actual or imminent threat of future injury. Reply at 4.

The Court disagrees.

"An injury in fact can be a physical injury, a monetary injury, an injury to one's property, or an injury to one's constitutional rights, to take just a few common examples." *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024).[1] Nonetheless, "a plaintiff does

---

[1] In *Heckler v. Mathews*, a decision relied upon by the Plaintiffs for the proposition that sex discrimination itself is a cognizable injury, the case concerned a violation of the equal protection component of the Due Process Clause of the Fifth Amendment regarding the administration of spousal benefits under the Social Security Act. There, the Supreme Court held that "discrimination itself, by perpetuating 'archaic and stereotypic notions' or by stigmatizing members of the disfavored group as 'innately inferior' and therefore less worthy participants in the political community, can cause serious noneconomic injuries to those persons who are denied equal treatment solely because of their membership in a disfavored group." 465 U.S. 728, 738 (1984). Although the Court in *Heckler* held that sex discrimination in that case constituted an injury because it violated plaintiffs' constitutional rights, the Plaintiffs note that other district courts have applied the same principle to cases involving statutory prohibitions on sex discrimination. *See Walker v. Azar*, 480 F. Supp. 3d 417, 426 (E.D.N.Y. 2020) (relying on Heckler and finding that "both plaintiffs attest that they have, based on their transgender status, suffered past discrimination in receiving healthcare. That alone constitutes an injury in fact."); *see also Tovar v. Essentia Health*, 342 F. Supp. 3d 947, 956 (D. Minn. 2018) (finding that a minor plaintiff alleging a discriminatory denial of benefits under a health plan had

17
SA17

not automatically satisfy the injury-in-fact requirement whenever a statute grants a right and purports to authorize a suit to vindicate it. Article III standing requires a concrete injury even in the context of a statutory violation." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 331 (2016). To establish past injury, Ms. Mayers and Dr. Homnick have not alleged monetary harm, but instead argue that the alleged discrimination alone and the attendant effects on their mental health constitute discrete injuries. And Ms. Mayers and Dr. Homnick's injuries are concrete: Aetna denied the Plaintiffs' requests based on an allegedly discriminatory policy, thereby delaying and/or denying access to medically necessary treatment and exacerbating the Plaintiffs' mental health symptoms.[2] Ms. Mayers and Dr. Homnick therefore have sufficiently pled an injury with respect to their claim for damages.[3] *See Baur v. Veneman*, 352 F.3d 625, 641 (2d Cir. 2003) (finding that even "exposure to a sufficiently serious risk of medical harm—not the anticipated medical harm itself" is enough to constitute injury for standing purposes).

To establish standing for prospective relief, Ms. Mayers and Dr. Homnick must show that they are likely to be injured in the future by the Defendant's challenged conduct. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983) ("The equitable remedy is unavailable absent a showing of irreparable injury, a requirement that cannot be met where there is no showing of any real or immediate threat that the plaintiff will be wronged again—a 'likelihood of substantial and

standing to sue under Section 1557, while dismissing his mother's claim because her only cognizable injury, her out-of-pocket expenses, had been reimbursed).

[2] In addition to her monetary injury, Ms. Gordon has also alleged injury in the form of discrimination that resulted in exacerbated mental health symptoms.

[3] In arguing that Ms. Mayers and Dr. Homnick lack standing for monetary relief because their coverage requests have been granted, the Defendant confuses mootness with what is actually a redressability issue. "While standing doctrine determines whether a plaintiff has a personal stake in the litigation when the complaint is filed, mootness doctrine determines what to do if an intervening circumstance deprives the plaintiff of a personal stake in the outcome of the lawsuit, at any point during litigation after its initiation." *Doe v. McDonald*, 128 F.4th 379, 384 (2d Cir. 2025) (quoting *Fed. Defs. of New York, Inc. v. Fed. Bureau of Prisons*, 954 F.3d 118, 126 (2d Cir. 2020)) (internal quotation marks omitted). Because the Plaintiffs' employers fully or partially approved coverage before the initiation of the lawsuit, the relevant inquiry is one of redressability as a part of the standing analysis, as opposed to mootness.

immediate irreparable injury.'") (quoting *O'Shea v. Littleton,* 414 U.S. 488, 502 (1974)). Aetna

argues that because Ms. Mayers and Dr. Homnick's employers have granted partial coverage for

the gender-affirming facial reconstruction requested, the Plaintiffs are free to receive these

procedures and are therefore unable to establish a likelihood of future harm.

But the Plaintiffs' employers only approved coverage for some of the procedures the

Plaintiffs requested. The rest of the Plaintiffs' requested procedures remain subject to CPB 0615.

*See* Mot. to Dismiss at 29 ("Bausch & Lomb revised its plan to cover certain facial procedures,

including face and neck electrolysis, voice/communication therapy, and adult tracheal shave . . .

but they declined, however, to add coverage for additional gender affirming facial surgery

procedures."); *see also* Compl. ¶ 66 (stating that in December 2024, "Aetna reversed its denial

and preauthorized coverage for *some* GAFR procedures") (emphasis in original).

The Plaintiffs have alleged that without these procedures, they will continue to

experience gender dysphoria and related symptoms. *See* Compl. ¶ 67 ("Aetna's denials delayed

[Ms. Mayers'] access to care for approximately a year. Ms. Mayers is suffering, and will

continue to suffer, severe gender dysphoria and distress because of her inability to obtain her

planned surgeries."); *see also id.* ¶¶ 91-92 ("Dr. Homnick's gender dysphoria is severe, and she

has experienced severe depression and suicidality as a symptom of it . . . Dr. Homnick is not

presently positioned to pay for her care out of pocket and therefore has no plans to obtain her

medically necessary GAFR so long as it is excluded from her insurance plan coverage by

Aetna's CPB 0615. She will suffer unnecessary distress as a result.").

On this record, given the persistence of their symptoms and that they remain enrolled in

health insurance plans administered by Aetna, which will not authorize medical treatment to

address all of their gender dysphoria-related symptoms, Ms. Mayers and Dr. Homnick have

"establish[ed] a sufficient likelihood of future injury." *Food & Drug Admin.*, 602 U.S. at 381 (citations omitted).

Next, Aetna argues that because Ms. Gordon did not pay for her procedures herself, she has suffered no injury. But Aetna is conflating the existence of an injury with Ms. Gordon's entitlement to damages for that injury. It is well established that monetary costs are an injury for Article III standing purposes. *See Diamond Alternative Energy, LLC v. Env't Prot. Agency*, 606 U.S. 100, 111 (2025) ("Monetary costs are of course an injury.") (quoting *United States v. Texas*, 599 U.S. 670, 676 (2023)); *see also Carter v. HealthPort Techs.*, LLC, 822 F.3d 47, 55 (2d Cir. 2016) ("Any monetary loss suffered by the plaintiff satisfies this element; '[e]ven a small financial loss' suffices." (quoting *Natural Resources Defense Council, Inc. v. United States Food & Drug Administration,* 710 F.3d 71, 85 (2d Cir. 2013)). Hence, there is no doubt that Ms. Gordon suffered an injury.

She is also entitled to collect on her injury. In cases sounding in tort, "[f]ederal courts regularly apply the 'collateral source rule,' which permits a plaintiff to recover damages from a tortfeasor though the plaintiff has already received compensation for its injuries from a third-party and even when such an award would lead to double recovery." *In re State St. Bank & Tr. Co. Erisa Litig.*, 579 F. Supp. 2d 512, 517 (S.D.N.Y. 2008); *see also Hartnett v. Reiss S.S. Co.*, 421 F.2d 1011, 1016 (2d Cir. 1970) ("The general rule in the federal courts is that the collateral source rule is applied."). "[T]he principle of justice underlying the collateral source rule, is that it is the innocent victim rather than the guilty tortfeasor who is the preferable recipient of any windfall caused by outside compensation." *Yankee Gas Servs. Co. v. UGI Utilities, Inc.*, 852 F. Supp. 2d 229, 254–55 (D. Conn. 2012); *see also Williams v. Sec'y of Navy*, 853 F. Supp. 66, 72

(E.D.N.Y. 1994) (explaining that under the collateral source rule, courts decline "to use funds obtained from a source unconnected with the culpable party to reduce that party's liability").

As a result, the funds Ms. Gordon used to pay for her gender-affirming facial reconstruction, or more specifically, the source of those funds alone, does not resolve the issue of standing, and her injury is not extinguished merely because the expenses she incurred were alleviated by a collateral source. *See, e.g., Carlisle v. Bd. of Trs. of Am. Fed'n of New York State Teamsters Conf. Pension & Ret. Fund*, No. 8:21-CV-00455 (BKS/DJS), 2025 WL 438123 (N.D.N.Y. Feb. 7, 2025), *aff'd,* No. 25-511-CV, 2025 WL 3251154 (2d Cir. Nov. 21, 2025) (holding that application of collateral source rule would not run afoul of central purpose of ERISA, which was to protect beneficiaries of pension plans and stating that "the Second Circuit has relied on the principles of the collateral source rule in finding an ERISA fiduciary liable for losses caused by her breach even though others previously restored the plan's losses" (citing *Chao v. Merino*, 452 F.3d 174, 176 (2d Cir. 2006)); *see also id.* (citing *Merriam v. Demoulas*, No. 11-cv-10577, 2013 WL 2422789, at *3, 2013 U.S. Dist. LEXIS 77600 (D. Mass. June 3, 2013) to explain that a "plaintiff does not lose standing to sue a tortfeasor just because a third party has already compensated her for the injury").

Regardless of the source of her funding, because Ms. Gordon incurred monetary expenses in paying for her gender-affirming facial reconstruction procedures, she has alleged a monetary injury sufficient to confer standing for her damages claim.[4] On this record, Ms. Gordon has shown that "she has suffered or likely will suffer an injury in fact." *Food & Drug Admin.*, 602 U.S. at 382. The denial of the requested medical care has "affect[ed]" her "in a personal and individualized way"; this is not "a generalized grievance." *Id.* at 381.

---

[4] Essentially, Aetna's arguments to the contrary are merely a restatement of its causation and redressability arguments each addressed and dismissed below.

Accordingly, all of the Plaintiffs have alleged the necessary injury in fact.

### ii.  Causation and Redressability

Aetna argues that all six Plaintiffs have failed to establish the causation and redressability elements of standing. First, Aetna argues that because Ms. N left her employer and is no longer covered by an Aetna plan, her injury can no longer be redressed by Aetna. Second, because reimbursement is available to Ms. Gordon and Ms. Mayers for any approved surgeries they received, Aetna argues that their injuries are not traceable to it or redressable by this Court. Third, Aetna argues that the injuries of the Plaintiffs' injunctive class are traceable to their employers, not Aetna, and only their employers can offer proper redress. Specifically, Aetna argues that as claims administrator, it "neither controls the benefit design nor funds benefit payments under those plans," and therefore "has no power or authority to award additional benefits beyond those authorized by [the Plaintiffs'] employer[s]." Mot. to Dismiss at 30-31.

The Plaintiffs respond that "their injuries are fairly traceable to Aetna's challenged conduct, rather than resulting from the independent actions of a third party not before this court." Mem. in Opp. at 18. Regardless of the employers' ability to override CPB 0615 or expressly cover gender-affirming facial reconstruction, the Plaintiffs argue that their injuries are directly traceable to Aetna because their coverage requests were denied as a result of Aetna's enforcement of CPB 0615. *Id.* at 18-19.

Next, they argue that a favorable court decision will remedy Ms. Gordon and Ms. N's injuries by compensating for their out-of-pocket expenses. Ms. Gordon and Ms. N clarify that they, and the putative damages class, do not seek payment of plan benefits from their former employers, but rather from Aetna "stemming from *Aetna's* application of the GAFR Exclusion in CPB 0615." *Id.* at 21 (emphasis in original).

Finally, they argue that the requested declaratory and injunctive relief would redress the injunctive class's injuries by requiring Aetna to conduct individualized medical necessity assessments of the Plaintiffs' claims. Responding to Aetna's claim that it lacks the ability to make changes that affect the provision of benefits under the employers' plans, the Plaintiffs first argue that all of the employers' plan documents expressly delegate to Aetna the primary responsibility for making coverage determinations and medical necessity assessments. Additionally, the Plaintiffs note that Aetna routinely modifies its CPBs, including updating CPB 0615 five times in 2024 and once in 2025 by the time of the filing, and state that "there is simply no evidence that Aetna requires plan sponsors' sign-off every time Aetna makes such revisions or updates to its own clinical coverage criteria." *Id.* at 24.[5]

In its reply, Aetna argues that the "Plaintiffs' own pleadings make [] clear" that "the Court lacks the power to order the plan coverage and fund the medical care Plaintiffs ultimately seek," since when asked to make an exception and cover gender-affirming facial reconstruction, Dr. Homnick's employer declined to do so. Reply at 4-5. Aetna adds that "an injunction against *Aetna alone*" cannot "compel the Plaintiffs' *employers* to cover and fund the medical care they seek under a plan that specifically disallows it." *Id.* at 5 (emphasis in original). Aetna also reiterates that because Ms. Gordon, Ms. N, and Dr. Homnick may seek reimbursement for all or

---

[5] The Plaintiffs also argue that Aetna's reliance on *Murthy v. Missouri*, 603 U.S. 43, 57 (2024), is misplaced, since the case there dealt with an injury that was entirely the result of an independent action of a third party that was not before the court. Here, however, the injury is the result of Aetna's actions, because the plan documents expressly delegate coverage determinations for gender-affirming care to Aetna. Thus, the injuries are sufficiently traceable to the Defendant. *See Otoe-Missouria Tribe of Indians v. New York State Dep't of Fin. Servs.*, 974 F. Supp. 2d 353, 358 (S.D.N.Y. 2013), *aff'd,* 769 F.3d 105 (2d Cir. 2014) ("With respect to traceability and redressability, a plaintiff needs to show that its injury is 'fairly traceable to the challenged action of the defendant[—]not the result of the *independent* action of some third party' . . . However, a plaintiff 'need not show that a particular defendant is the *only* cause of their injury, and that, therefore, absent the [defendant's] activities, [the plaintiff] would enjoy undisturbed' existence.") (internal citations omitted).

some of the gender-affirming facial reconstruction they sought, their claims are not traceable to Aetna or redressable by this Court.

The Court disagrees.

Traceability requires the Plaintiffs to "demonstrate a causal nexus between the defendant's conduct and the injury." *Heldman v. Sobol*, 962 F.2d 148, 156 (2d Cir. 1992). It is "wrong[ ]" to "equate[ ] injury 'fairly traceable' to the defendant with injury as to which the defendant's actions are the very last step in the chain of causation." *Bennett v. Spear*, 520 U.S. 154, 168–69 (1997). Rather, "at [the pleading] stage of the litigation," the Plaintiffs' "burden . . . of alleging that their injury is 'fairly traceable' to" the challenged act "is relatively modest." *Id.* at 171.

Here, the Plaintiffs' injuries are traceable to Aetna and redressable by the relief requested; they allegedly suffered their respective injuries because of Aetna's enforcement of CPB 0615. If the categorical exclusion against gender-affirming facial reconstruction in CPB 0615 did not exist, each of the Plaintiffs would have received individualized medical necessity determinations, and, allegedly, grants of coverage for this prescribed medical care. Because the Plaintiffs' health insurance plans delegated coverage determinations for gender-affirming surgeries to Aetna, and Aetna's enforcement of CPB 0615 categorically excluded the Plaintiffs' claims for gender-affirming facial reconstruction, the Plaintiffs' injuries are "fairly traceable" to Aetna. *See id.* at 169 ("While, as we have said, it does not suffice if the injury complained of is the result of the independent action of some third party not before the court, that does not exclude injury produced by determinative or coercive effect upon the action of someone else." (internal citations and alterations omitted)).

The redressability inquiry focuses "on whether the injury that a plaintiff alleges is likely to be redressed through the litigation . . ." *Sprint Commc'ns Co., L.P. v. APCC Servs.*, Inc., 554 U.S. 269, 287 (2008). Ms. Gordon and Ms. N seek to recover out-of-pocket costs for the surgeries they received while members of their Aetna-administered plans, despite their plan sponsors having authorized reimbursement. A legal victory awarding Ms. Gordon and Ms. N damages thus would undoubtedly redress the monetary injuries they suffered.

It is not relevant to the Court's standing analysis whether the Plaintiffs' injuries could also be redressed through the reimbursement scheme approved by their plan sponsors.[6] *See* 13A Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 3531.5 (3d ed. 2014) ("Failure to exhaust alternative means of redress need not break the causal chain."); *see id.* at n.72 (plaintiff "had standing even though she failed to pursue the administrative remedy designed to force a prompt decision. Standing is defeated only if the injury is so completely due to the plaintiff's own fault as to break the causal chain.") (citing *Engwiller v. Pine Plains Cent. School Dist.*, 110 F. Supp. 2d 236, 246–247 (S.D. N.Y. 2000)); *see also Oklahoma Dep't of Env't Quality v. E.P.A.*, 740 F.3d 185, 190 (D.C. Cir. 2014) ("Clearly, Oklahoma has alleged an injury caused by the rule it challenges and redressable by our vacatur of that rule. The possibility of an alternative remedy, of uncertain availability and effect, does not render its injury self-inflicted.").

It is Aetna that is subject to the non-discrimination provisions of Section 1557, and it is therefore Aetna that has violated the statute under which the Plaintiffs now seek recovery. *See Klaneski v. Bristol Hosp., Inc.*, No. 3:22-CV-1158 (VAB), 2023 WL 4304925, at *3 (D. Conn.

---

[6] Aetna argues that, unlike Ms. Gordon, Ms. N cannot receive reimbursements for surgeries she received and that her employer subsequently approved while she was covered by the Aetna plan. It is unclear to the Court why Ms. N is ineligible for reimbursement. Even if Ms. N were not eligible for reimbursement, her injuries are redressable by Aetna, making the Defendant's argument immaterial to the Court's determination of Ms. N's standing.

June 30, 2023) ("Section 1557 of the Affordable Care Act [] applies to any health program or activity that receives federal funds [and] prohibits discrimination on any of the grounds specified in Title VI of the Civil Rights Act of 1964, Title IX of the Education Amendments of 1982, the Age Discrimination Act of 1975, and the Rehabilitation Act."); Mot. for Prelim. Inj. at 8, n.3 (collecting sources demonstrating Aetna's receipt of federal funding).

Because a judgment against Aetna would fully redress Ms. Gordon and Ms. N's injuries by reimbursing them for the out-of-pocket costs expended as a result of Aetna's enforcement of CPB 0615, they have standing to pursue their claims.[7]

Similar to Ms. Gordon and Ms. N, Dr. Homnick's employer has approved coverage for certain gender-affirming surgeries, including face and neck electrolysis, voice/communication therapy, and adult tracheal shave, some of which Dr. Homnick has received. Mot. to Dismiss at 13. Aetna argues that because Dr. Homnick's employer "approved coverage for some of the procedures she seeks," she therefore "lacks Article III standing to bring this action against Aetna, as the claims administrator, because she has already been given access to the coverage her employer has authorized." *Id.* at 30. But Dr. Homnick requested additional gender-affirming facial reconstruction procedures that her employer has declined to cover and that Aetna has excluded under CPB 0615. The issue is then whether Dr. Homnick's injuries, as well as the remaining injunctive relief plaintiffs' injuries, are redressable by a decision granting the relief the Plaintiffs seek. *See California v. Texas*, 593 U.S. 659, 671 (2021) ("To determine whether an injury is redressable, a court will consider the relationship between the judicial relief requested and the injury suffered.") (internal citation and quotation marks omitted).

---

[7] To the extent that other Plaintiffs such as Ms. Mayers seek damages for out-of-pocket expenses incurred, the same conclusions apply.

The Plaintiffs seek "a declaratory judgment that Aetna's GAFR Exclusion violates Section 1557" and "a permanent injunction barring Aetna from enforcing the GAFR Exclusion, or any other policy, practice, or procedure that categorically excludes coverage for GAFR under health insurance plans offered or administered by Aetna." Compl. ¶ 19. Although Aetna argues that it does not control the design of, or payments under, the Plaintiffs' plans, a favorable decision from this Court would not modify the plans themselves. As is, the plans delegate all coverage determinations for gender-affirming procedures to Aetna. *See, e.g.,* Exhibit Homnick, Attachment C: Bausch & Lomb Americas Choice POS II medical plan, 115, ECF No. 62-3 ("Covered services include certain services and supplies for gender affirming treatment. Visit https://www.aetna.com/health-care-professionals/clinical-policy-bulletins.html for detailed information about this benefit, including eligibility and medical necessity requirements."); *see also* Conde Nast Plan Excerpts, 7, ECF No. 79-3 ("Aetna has been designated as claims administrator for benefits under the Plan with full discretion and authority to make claim and appeal determinations . . . In exercising this fiduciary responsibility, Aetna has full discretionary authority to make factual determinations, to determine eligibility for benefits, to determine the amount of benefits for each claim received, and to construe terms of the Plan with respect to benefits.").

And as the Plaintiffs note, Aetna routinely modifies the CPBs to reflect Aetna's evolving judgment. Mem. in Opp. at 24 ("Aetna has revised or updated CPB 0615 at all relevant times—including five times in 2024 alone and once (so far) in 2025"); *see also* Aetna CPB 0615 Review History, https://www.aetna.com/cpb/medical/data/disclaimer/history/600_699/0615.html. Presumably, where an employer dislikes a change Aetna has made, it retains the authority to expressly include or exclude coverage of the contested procedure in its plan. *See, e.g.,* Conde

27
SA27

Nast Plan Excerpts, 7, ECF No. 79-3 ("Your coverage can change . . . This document may have amendments too. Under certain circumstances, we, the Customer/Employer or the law may change your plan."); *see also* Decl. of Cheryl Aronson, Exhibit C, 2 ECF No. 87-3 (showing that Herley's plan sponsor modified their plan to include gender dysmorphia coverage, despite CPB 0615 still excluding it).

The injunctive and declaratory relief sought by Plaintiffs thus would redress their injuries by requiring that any denial be based on a lack of medical necessity as opposed to alleged discrimination on the basis of sex. Requiring individualized medical necessity determinations would remove a significant barrier to the Plaintiffs achieving their ultimate goal of receiving gender-affirming facial reconstruction under their health insurance plans, since if Aetna were to assess the Plaintiffs' claims under the criteria it currently uses to determine medical necessity in plans that override this policy exclusion, the Plaintiffs sufficiently allege that they are likely to receive coverage. *Cf. Food & Drug Admin.*, 602 U.S. at 385-86 ("Because the plaintiffs do not prescribe, manufacture, sell, or advertise mifepristone or sponsor a competing drug, the plaintiffs suffer no direct monetary injuries. Nor do they suffer injuries to their property, or to the value of their property, from FDA's actions. Because the plaintiffs do not use mifepristone, they obviously can suffer no physical injuries from FDA's actions relaxing regulation of mifepristone.").

As a result, there is a "substantial likelihood" that the relief requested will redress the Plaintiffs' injuries, and the Plaintiffs have standing to pursue their claims. *See id.* at 382 (holding that after establishing an injury in fact, there "is causation. The plaintiff must also establish that the plaintiff's injury likely was caused or likely will be caused by the defendant's conduct."); *Duke Power Co. v. Carolina Env't Study Grp., Inc.*, 438 U.S. 59, 74-75, 75 n.20 (1978) (Our

recent cases have required no more than a showing that there is a "substantial likelihood" that the relief requested will redress the injury claimed to satisfy the second prong of the constitutional standing requirement. (citing *Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 262 (1977), *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 38 (1976), and *Warth v. Seldin*, 422 U.S. 490, 504, 506–507 (1975))).

Accordingly, Aetna's motion to dismiss will be denied on these grounds.

### 2. Rule 19 Joinder

A party is "necessary" under Rule 19 if:

(1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest.

Fed. R. Civ. P. 19(a); *see also Mastercard Int'l Inc. v. Visa Int'l Serv. Ass'n Inc.*, 471 F.3d 377, 385 (2d Cir. 2006) ("A party is necessary under Rule 19(a)(1) only if in that party's absence 'complete relief cannot be accorded *among those already parties.*'") (emphasis in original). "If a party does not qualify as necessary under Rule 19(a), then the court need not decide whether its absence warrants dismissal under Rule 19(b)." *Viacom Int'l, Inc. v. Kearney*, 212 F.3d 721 (2d Cir. 2000) (citing *Associated Dry Goods Corp. v. Towers Fin. Corp.,* 920 F.2d 1121, 1123 (2d Cir.1990)). But where the court determines that a party is necessary and joinder is not feasible for jurisdictional or other reasons, there are "four considerations that will ordinarily be among those relevant to the analysis of whether a party is 'indispensable.'" *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 133 (2d Cir. 2013). They are:

> (1) whether a judgment rendered in a person's absence might prejudice that person or parties to the action, (2) the extent to which any prejudice could be alleviated, (3) whether a judgment in the person's absence would be adequate, and (4) whether the plaintiff would have an adequate remedy if the court dismissed the suit.

*Id.* (quoting *CP Sols. Ltd. v. Gen. Elec. Co.,* 553 F.3d 156, 159 (2d Cir. 2009)). Where an indispensable party cannot be joined, the court must dismiss the action. *Viacom Int'l*, 212 F.3d at 725.

Aetna argues that the Plaintiffs' plan sponsors are necessary parties because "the Court cannot award the individual relief each Plaintiff seeks without the presence of these missing parties." Mot. to Dismiss at 37. Specifically, Aetna argues that each plan is "a creation of each Plaintiff's respective employer" and Aetna alone cannot modify the terms of the plans or the benefits offered under them. *Id.* at 38. Because the employers "have the sole and final authority for the terms and funding of [the] plans," Aetna argues that proceeding without the employers may "impair or impede [the employers'] ability to protect [their] interest[s]." *Id.* Next, Aetna argues that the plan sponsors and plan administrators cannot feasibly be joined because "it is highly unlikely that . . . [they] are subject to either venue or personal jurisdiction in this district." *Id.* at 39. Finally, Aetna argues that the plan sponsors and administrators are indispensable parties under Rule 19(b) because only they can award plan benefits or reform the terms of their plans. Without these parties, Aetna argues that a judgment against Aetna "would be no more than an advisory opinion in contravention of the case-or-controversy requirements of the U.S. Constitution with no binding effect on [the plans] themselves." *Id.* at 42.

The Plaintiffs respond that Aetna is the proper defendant in this suit because complete relief may be obtained from Aetna alone and the plan sponsors have claimed no legally protected interest in the litigation.

First, the Plaintiffs assert that they "seek relief from *Aetna's* own policies and practices," namely "declaratory judgment that *Aetna's* GAFR Exclusion in CPB 0615 is unlawful; compensatory damages for harm resulting from *Aetna's* discriminatory conduct; and injunctive relief enjoining the enforcement of *Aetna's* GAFR Exclusion." Mem. in Opp. at 27 (emphasis in original). Because Aetna may provide complete redress for its own violations of Section 1557, the Plaintiffs argue that the plan sponsors are not necessary under Rule 19(a)(1)(A). Second, the Plaintiffs argue that the absent parties have no "legally protected interest related to the subject matter of the action" and therefore Aetna cannot assert compulsory joinder under Rule 19(a)(1)(B). *Id.* at 31. The Plaintiffs add that "the absent parties' interests are not legally impaired" because they "are not being asked to change their plan designs, being demanded to pay out benefits, or bound to do anything based on the outcome of this lawsuit." *Id.* at 32. Rather, the Plaintiffs argue that "the absent parties will continue as they were—paying for services not expressly excluded by their plans that Aetna deems medically necessary." *Id.*

Aetna replies that because "the end result Plaintiffs seek is *payment* for GAFR coverage under their respective employer's plans," the absent parties "are plainly and inextricably impacted by the outcome of this litigation." Reply at 7 (emphasis in original). Aetna states that the ACA "creates no freestanding right to plan benefits" and "any entitlement Plaintiffs may have to GAFR benefits arises solely by virtue of the plans their employers created and fund." *Id.* Aetna argues that the ultimate relief the Plaintiffs seek "can be afforded only by the employers themselves, with direct and inevitable impact to their plans and coffers" and the employers therefore have a "vital interest" in the litigation that must be protected by compulsory joinder under Rule 19.

The Court disagrees.

As discussed above, Plaintiffs have sufficiently alleged that their injuries are redressable by Aetna. While the Plaintiffs may ultimately desire coverage for all requested gender-affirming facial reconstruction procedures, that is not the specific relief they seek in this suit. Rather, they seek compensatory damages from Aetna for Aetna's alleged violation of Section 1557 and injunctive and declaratory relief to prevent Aetna from enforcing CPB 0615. This Court thus can provide complete relief among the existing parties, and the plan sponsors and administrators are not necessary parties under Rule 19(a)(1)(A).

Aetna also asserts that the plan sponsors and administrators are necessary parties under Rule 19(a)(1)(B). But "[i]t is not enough under Rule [19(a)(1)(B)] for a third party to have an interest, even a very strong interest, in the litigation. Nor is it enough for a third party to be adversely affected by the outcome of the litigation. Rather, necessary parties under Rule [19(a)(1)(B)] are only those parties whose ability to protect their interests would be impaired *because of* that party's absence from the litigation." *MasterCard Int'l Inc. v. Visa Int'l Serv. Ass'n, Inc.*, 471 F.3d 377, 387 (2d Cir. 2006) (emphasis in original). The employers and plan administrators may have an interest in the outcome of this litigation. For example, if the Court grants the relief sought, the employers and plan administrators may decide to modify the terms of their plans. But such an interest does not suffice to make the employers and plan administrators necessary parties, because "the harm [they] may suffer is not *caused by* [their] absence from this litigation." *Id.* (emphasis in original). Because the plan sponsors and administrators are not necessary parties, the Court need not decide whether joinder is feasible.

Accordingly, Aetna's motion to dismiss will be denied on these grounds.

### 3. Exhaustion

Aetna argues that because Ms. Avalle failed to exhaust the administrative remedies under her ERISA-governed plan, her claim must be dismissed. Mot. to Dismiss at 32-35.[8]

Ms. Avalle responds that she need not exhaust her administrative remedies because her claim does not fall under ERISA's statutory scheme, and is therefore not subject to ERISA's exhaustion requirements. Mem. in Opp. at 37. She also argues that ERISA's text expressly states that it shall not be construed to preempt other federal claims. *Id.*

In its reply, Aetna reasserts that the benefits of Ms. Avalle's plan are "expressly subject to [ERISA's] mandatory administrative review process." Reply at 6. Aetna thus argues that her claim should be dismissed without prejudice until she exhausts her administrative remedies. *Id.*

The Court disagrees.

"District courts in this Circuit have drawn a distinction between claims relating to violations of the terms of a benefit plan, and claims relating to statutory violations of ERISA, finding that the former, but not the latter, [] must be administratively exhausted." *Diamond v.*

---

[8] Aetna argues, albeit vaguely, that because Ms. N, Dr. Homnick, and Dr. Herley allegedly did not exhaust all of the administrative remedies available to them, their claims should be dismissed, Mot. to Dismiss at 35, but cites to no precedent in this Circuit requiring individuals to exhaust the remedies in their health insurance plans before bringing suit to vindicate their rights under Section 1557. Understandably, exhaustion of administrative remedies serves to put plan sponsors on notice of the alleged discrimination and allow them an opportunity to rectify it themselves. Where a policy is facially discriminatory, however, such notice may be presumed. *See, e.g., Tovar v. Essentia Health*, 342 F. Supp. 3d 947, 953-54 (D. Minn. 2018) ("Plaintiffs allege that the Plan was facially discriminatory, and therefore, Defendants had actual notice that the Plan violated Section 1557's nondiscrimination requirements. The Court agrees."). And here, Plaintiffs allege that CPB 0615's discriminatory nature is apparent on its face, since it only withholds a medical necessity determination where the procedure is sought to treat gender dysphoria, a condition that can only be experienced by transgender individuals. In any case, however, Section 1557 claims based on sex discrimination do not require exhaustion of administrative remedies seeking judicial review. *See Rumble v. Fairview Health Servs.*, No. 14-CV-2037 SRN/FLN, 2015 WL 1197415, at *11 (D. Minn. Mar. 16, 2015) ("[A] plaintiff bringing a Section 1557 age discrimination claim would have to exhaust administrative remedies and would be barred from recovering damages, but plaintiffs bringing Section 1557 race, disability, or sex discrimination claims would not have to exhaust administrative remedies and would not be barred from recovering damages.").

*Loc. 807 Lab. Mgmt. Pension Fund*, 595 F. App'x 22, 24 (2d Cir. 2014) (internal citation and quotation marks omitted).

Here, however, Ms. Avalle asserts neither a violation of the terms of her ERISA-governed plan nor a statutory violation of ERISA. Rather, she brings a claim against Aetna for violating Section 1557 of the ACA, which contains no exhaustion requirement. And the text of ERISA is clear that it does not preempt other federal claims. *See* 29 U.S.C. § 1144(d) ("Nothing in this subchapter shall be construed to alter, amend, modify, invalidate, impair, or supersede any law of the United States."); *see also Hogan v. Metromail*, 107 F. Supp. 2d 459, 473 (S.D.N.Y. 2000) ("While ERISA claims often preclude state common law claims, it does not pre-empt related claims under the ADEA. ERISA specifically does not 'alter, amend, modify, invalidate, impair, or supersede any law of the United States . . .'" (citing 29 U.S.C. § 1144(d))); *cf.* 29 U.S.C. § 1144(a) ("the provisions of this subchapter . . . shall supersede any and all State laws insofar . . .").

If Ms. Avalle were arguing that she was owed benefits that were denied in violation of her ERISA-governed plan, she would be required to exhaust administrative remedies. *See id.* at 25 ("Because Diamond was seeking only to receive benefits under the Plan that he contends were withheld in violation of the terms of the Plan, he was required to exhaust his administrative remedies."). While she seeks individualized review and hopes for a grant of benefits, it is neither the injury asserted nor the relief sought that dictates whether exhaustion is necessary. Rather, it is the cause of action under which the suit is brought. *See, e.g., Wheeler v. Prudential Fin., Inc.*, 499 F. Supp. 2d 219, 220 (N.D.N.Y. 2007) ("Before a plan participant can litigate under *ERISA*, he or she must exhaust the claim procedures in place." (citing *Eastman Kodak Co. v. STWB, Inc.*, 452 F.3d 215, 219 (2d Cir. 2006)); *Michael E. Jones, M.D., P.C. v. Aetna, Inc.*, No. 19-CV-9683

(JPO), 2020 WL 5659467 (S.D.N.Y. Sept. 23, 2020) (requiring administrative exhaustion where Plaintiff alleged a violation of "the terms of its insureds' plans, thereby entitling Plaintiff — the insureds' assignee — to damages and injunctive relief under ERISA § 502(a)(1) and (3), 29 U.S.C. § 1132(a)(1) and (3)"); *Peppiatt v. Aetna Life Ins. Co.*, No. 217CV02444ADSAKT, 2017 WL 6034641, at *1 (E.D.N.Y. Dec. 4, 2017) (requiring exhaustion where Plaintiff asserted violations of ERISA § 502(a)(1)(B) and ERISA § 502(a)(3) seeking unpaid benefits and interest); *Blessing v. J.P. Morgan Chase & Co.*, No. 02 CIV. 3874 (LMM), 2003 WL 470338, at *2 (S.D.N.Y. Feb. 24, 2003) (finding that the exhaustion requirement varies between the subsections of ERISA under which the claim is brought).

Because Ms. Avalle is not bringing suit under ERISA for a violation of the terms of her plan, but rather under Section 1557 of the ACA for a violation of its non-discrimination mandate, she was not required to exhaust the administrative remedies prescribed by her plan.

Accordingly, Aetna's motion to dismiss will be denied on these grounds.

### 4. FEHBA's Exclusive Remedy

Health insurance plans governed by the FEHBA are subject to regulations established by OPM. Under these regulations, "[a] covered individual may seek judicial review of OPM's final action on the denial of a health benefits claim" by bringing suit "against OPM and not against the carrier or the carrier's subcontractors." 5 C.F.R. § 890.107(c). Aetna is a "carrier" under the governing statute. *See* 5 U.S.C. § 8901(7) (defining a carrier as a "corporation . . . which is lawfully engaged in providing, paying for, or reimbursing the cost of . . . a health benefits plan duly sponsored or underwritten by an employee organization . . .").

Ms. Gordon was previously enrolled in an Aetna plan as part of her FEHB plan. Aetna argues that under OPM's regulations, its contract with Aetna, and the relevant plan documents,

Ms. Gordon was subject to the requirements for judicial review set out in 5 C.F.R. § 890.107(c). Because Ms. Gordon's suit is against Aetna, and not OPM, Aetna argues that her claim is barred by federal law and must be dismissed.

Ms. Gordon argues that she is not challenging OPM's final decision on her appeal, but rather Aetna's discrimination in violation of Section 1557. She thus argues that the relevant regulation does not apply to her claim, and that the FEHBA "is silent on suits against FEHB carriers in their own right for their own actions." Aetna replies that because Ms. Gordon's claim is, at its core, challenging Aetna's handling of a claim for benefits, the claim "implicates the FEHBA and necessitates OPM's participation."

The Court disagrees.

OPM regulations require an individual to exhaust administrative remedies before bringing suit. 5 C.F.R. § 890.107(d)(1). Exhaustion requires a covered individual to submit a claim to the carrier of the health benefits plan, which if denied can be submitted for reconsideration. If the carrier affirms its denial or fails to respond as required by the regulations, the individual may solicit review from OPM. 5 C.F.R. § 890.105(a)(1). If OPM affirms the denial, the covered individual may seek judicial review of "OPM's final action on the denial of a health benefits claim" and such suit may be brought only "against OPM and not against the carrier or carrier's subcontractors." 5 C.F.R. § 890.107(c).

There are few cases, if any, discussing whether a plaintiff under a health insurance plan governed by the FEHBA may sue an insurance carrier, instead of OPM, for a violation of Section 1557's non-discrimination provision.[9] The cases cited by both the Plaintiffs and the Defendant

---

[9] Courts routinely analyze Section 1557 claims similarly to those brought under Section 504 of the Rehabilitation Act of 1973 because the former explicitly incorporates the latter. *See Hejmej v. Peconic Bay Med. Ctr.*, No. 17-CV-782 (JMA) (SIL), 2022 WL 5429675, at *9 (E.D.N.Y. July 5, 2022), *report and recommendation adopted*, No. 17-

are not analogous to this one. *See Empire Healthchoice Assur., Inc. v. McVeigh*, 547 U.S. 677, 677 (2006) (concerning the preemption provision of the FEHBA, § 8902(m)(1)); *HCA Genesis, Inc. v. Grp. Health Inc.*, No. 7:06-CV-150, 2006 WL 561243 (N.D.N.Y. Mar. 6, 2006) (granting motion to dismiss where there was no evidence of exhaustion); *Roach v. Mail Handlers Ben. Plan*, 298 F.3d 847 (9th Cir. 2002) (distinguishing medical malpractice claim from denial of benefits claim); *In re Anthem, Inc. Data Breach Litig.*, 162 F. Supp. 3d 953, 1005–06 (N.D. Cal. 2016) (finding that third party beneficiary claims related to breach of data privacy obligations under federal law did not constitute a health benefits claim that was subject to 5 C.F.R. § 890.107(c)).

Ms. Gordon was covered by a FEHBA plan. Compl. ¶ 39. Aetna denied her initial claim for preauthorization, *id.* ¶ 41, which Ms. Gordon appealed, *id.* ¶ 42. Aetna denied her claim on appeal, *id.* ¶ 43, and Ms. Gordon sought OPM's review, *id.* ¶ 45. While waiting for OPM's decision, Ms. Gordon underwent the GAFR procedures. *Id.* ¶ 49. Unbeknownst to her, OPM had issued its determination reversing Aetna's denial prior to her surgery. *Id.* ¶ 50. Under the allegations here, Ms. Gordon fully exhausted her administrative remedies, and received a favorable decision from OPM. And Ms. Gordon does not appeal "OPM's final action on the denial of a health benefits claim," because OPM did not deny her claim. Rather, she alleges that Aetna, the carrier under her plan, independently violated Section 1557, resulting in repeated denials of her claims for GAFR. Because Ms. Gordon's claim does not stem from an appeal of

---

CV-782 (JMA) (SIL), 2022 WL 4551696 (E.D.N.Y. Sept. 29, 2022) ("Section 1557 claims are typically analyzed identically to Rehabilitation Act Section 504 claims.") (citing *Vega-Ruiz v. Montefiore Med. Ctr.*, No. 17-CV-1804-LTS-SDA, 2019 WL 3080906, at *3 (S.D.N.Y. July 15, 2019)). And courts have found that "[u]nder section 504 of the Act, when a government procurement contract is involved, it is the procuring agency (OPM), and not the contractor (the Association), that is responsible for compliance." *Dodd v. Blue Cross & Blue Shield Ass'n*, 835 F. Supp. 888, 891 (E.D. Va. 1993); *see also Modderno v. King*, 871 F. Supp. 40, 41 (D.D.C. 1994), aff'd, 82 F.3d 1059 (D.C. Cir. 1996) (Plaintiff alleging discrimination in violation of Section 504 of the Rehabilitation Act of 1973 brought suit against the Director of OPM).

OPM's denial of her claim, Ms. Gordon is not subject to 5 C.F.R. § 890.107(c) and her suit may proceed against Aetna.[10]

Accordingly, Aetna's motion to dismiss will be denied on these grounds.

## B. The Motion for Preliminary Injunction

To obtain a preliminary injunction, the movant must demonstrate: "(1) that [she] is likely to succeed on the merits, (2) that [she] is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of the equities tips in [her] favor, and (4) that an injunction is in the public interest." *Nat'l Inst. of Fam. & Life Advocs. v. James*, 160 F.4th 360, 373 (2d Cir. 2025) (citing *Winter*, 555 U.S. at 20) (cleaned up).

Dr. Homnick and Dr. Herley argue that they are entitled to a preliminary injunction to enjoin Aetna from enforcing CPB 0615 because they satisfy the requirements for such extraordinary relief. Aetna argues that Dr. Homnick and Dr. Herley cannot satisfy the requirements for a preliminary injunction and also that they cannot establish the causation or redressability requirements for Article III standing.

Because the Court has already determined that Dr. Homnick and Dr. Herley have standing to proceed in their claim, the Court will only address the merits of their preliminary injunction motion.

### 1. Irreparable Harm

Because irreparable harm is "the single most important prerequisite for the issuance of a preliminary injunction," this requirement must be satisfied before the remaining requirements are

---

[10] Despite the lack of guiding caselaw, the Court finds that allowing Ms. Gordon's suit to proceed against Aetna, the alleged offender, comports with Congress's intent in creating a private right and private remedy in Section 1557 for violations of its nondiscrimination provision by expressly incorporating the enforcement provisions of the four federal civil rights statutes. *See Ass'n of New Jersey v. Horizon Healthcare Servs., Inc.*, No. CV 16-08400(FLW), 2017 WL 2560350, at *4 (D.N.J. June 13, 2017) (collecting cases).

considered. *State Farm Mut. Auto. Ins. Co. v. Tri-Borough NY Med. Prac. P.C.*, 120 F.4th 59, 80 (2d Cir. 2024) (internal quotation marks and citation omitted). To show irreparable harm, the movant "must demonstrate that absent a preliminary injunction, [it] will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009).

Dr. Homnick and Dr. Herley argue that they are likely to suffer irreparable harm because they are experiencing extreme gender dysphoria as a result of Aetna's implementation of CPB 0615 and this harm will continue in the absence of an injunction, thereby exacerbating their already severe symptoms. Mot. for Prelim. Inj. at 19. They state that the harm to their health is "actual, ongoing, significant" and "more than likely" to recur as long as CPB 0615 remains in place. *Id.* They also argue that their delayed medical care and the attendant symptoms cannot be remedied by monetary damages, thereby requiring injunctive relief. *Id.* at 19-20.

In response, Aetna argues that Dr. Homnick and Dr. Herley have not exhausted their administrative remedies and "[t]here is no need for injunctive relief where the plaintiff has an adequate legal or administrative remedy to address the same alleged injury." Def.'s Mem. at 30. The "Plaintiffs' most immediate—and effective—remedy," Aetna argues, "is the ERO review that awaits only their election to pursue it." *Id.* at 32.

Dr. Homnick and Dr. Herley reply that the availability of administrative remedies does not undermine their showing of harm. Pl.'s Reply at 11. They argue that Aetna's stance "disregards the harm and suffering Plaintiffs have already experienced from receiving adverse benefits determinations from Defendant." *Id.* at 12. They also argue that the federal regulations governing the external review process explicitly mandate that the independent review

organization apply "'any applicable clinical review criteria developed and used by the plan or issuer' to the extent the [independent review organization] considers them appropriate," making any such review futile. *Id.* at 12-13 (quoting 45 C.F.R. § 147.136(d)(2)(iii)(B)(5)(vi)). Next, they argue that because of the statute of limitations on administrative appeals, the external review process is not available to Plaintiffs unless they start their claims anew. *Id.* at 13. Finally, they note that the cases "Aetna cites to support its assertion that the ERO process is equivalent to injunctive relief" were brought "under statutes the courts found required administrative exhaustion before seeking judicial review," but Section 1557 sex discrimination claims do not require administrative exhaustion. *Id.* at 13-14.

Aetna argues that "both Plaintiffs presently have the ability to seek an external review" and notes that from 2023 to the time of the filing, eight of nine appeals requesting a reversal of a coverage denial for GAFR were granted, thereby making an external review not futile. Def.'s Sur-Reply at 4-5. Finally, Dr. Homnick and Dr. Herley state that Aetna's data on the rate of reversals through the external review process "underscores Plaintiff's point: independent reviewers overwhelmingly find GAFR medically necessary, undermining Aetna's persistent and discriminatory assertion, as memorialized in CPB 0615, that GAFR is never medically necessary." Pl.'s Sur-Rebuttal at 4.

The Court agrees.

The lack of access to medically necessary gender-affirming care and the attendant health risks meet the standard for irreparable harm. *See Edmo v. Corizon, Inc.*, 935 F.3d 757, 798 (9th Cir. 2019) (finding that plaintiff will "suffer irreparable harm—in the form of ongoing mental anguish and possible physical harm—if [gender confirmation surgery] is not provided"); *Clark v. Quiros*, No. 3:19-CV-575 (VAB), 2024 WL 3552472, at *21 (D. Conn. July 26, 2024) (holding

that prison's failure to treat inmate's gender dysphoria constituted deliberate indifference under the Eighth Amendment and inmate therefore satisfied irreparable harm prong for injunctive relief because she faced imminent risk to her health, safety, and life); *Koe v. Noggle*, 688 F. Supp. 3d 1321, 1358 (N.D. Ga. 2023) (finding that risks of depression, anxiety, disordered eating, self-harm, and suicidal ideation flowing from state's ban on certain medical procedures for minors experiencing gender dysphoria presented imminent risks of irreparable harm to plaintiffs); *Flack v. Wis. Dep't of Health Servs.*, 328 F. Supp. 3d 931, 942−46 (W.D. Wis. 2018) (plaintiffs had presented sufficient evidence, through personal allegations and physician statements, to show that failure to access gender confirming surgery constituted irreparable harm); *Hicklin v. Precynthe*, No. 4:16-cv-01357-NCC, 2018 WL 806764, at *9−10 (E.D. Mo. Feb. 9, 2018) (finding irreparable harm where Plaintiff has shown she will continue suffering from depression, anxiety, and intrusive thoughts of self-castration without gender dysphoria treatment); *Brown v. Coombe*, No. 96-CV-476 (RSP/RWS), 1996 WL 507118, at *3 (N.D.N.Y. Sept. 5, 1996) (collecting cases recognizing that "gender dysphoria may be a serious medical need"); *Cano v. S.C. Dep't of Corr.*, No. 922-cv-04247-DCCMHC, 2023 WL 10286851, at *20 (D.S.C. July 31, 2023) ("Courts have described the deprivation of a prisoner's constitutional rights under the Eighth Amendment, including the denial of gender-affirming care, as sufficient to establish irreparable harm."); *see also LaForest v. Former Clean Air Holding Co.*, 376 F.3d 48, 55 (2d Cir. 2004) (reductions in medical coverage that cause substantial risk to plaintiffs' health and anxiety associated with uncertainty are irreparable harm that is non-compensable in terms of money damages).

And the Second Circuit has held, in a different but related context, that the availability of insurance coverage through alternative means is not fatal to the irreparable injury prong; "[s]o

41
SA41

long as plaintiffs demonstrated injury non-compensable in terms of money damages, they have demonstrated irreparable injury." *LaForest*, 376 F.3d 48, 56 (2d Cir. 2004) (internal citation and quotation marks omitted).

Dr. Homnick and Dr. Herley have sufficiently alleged that the delay and denial of access to gender-affirming facial reconstruction and the resulting symptoms constitute irreparable injuries. Both plaintiffs are experiencing severe gender dysphoria that has been exacerbated by the delay in receipt of medical services. Dr. Homnick and Dr. Herley experience "daily distress, anxiety, and depression," and fear an increased risk of discrimination and harassment. Mot. for Prelim. Inj. at 1.

Dr. Homnick has experienced "severe depression and suicidality" and "finds it necessary to take safety precautions in her home." Compl. ¶ 91; *see* Mot. for Prelim. Inj. at 11 ("Dr. Homnick's severe gender dysphoria persists . . . and triggers distress, anxiety, depression, fearfulness, irritability, hopelessness, interference with relationships, low self-esteem, and feelings of self-loathing."); *see also id.* at 13 ("She has experienced profound depression and distress because of the denial and her inability to complete her gender transition."). Dr. Herley reports that the symptoms of her gender dysphoria include depression, anxiety, hypervigilance, suicidal thinking, low self-esteem, an intense desire to avoid social interactions, emotional fatigue, as well as an extreme focus on her appearance. Mot. for Prelim. Inj. at 15; *see* Compl. ¶ 99 (noting that her typically masculine facial features "often trigger distress and anxiety"). Since her requests for coverage have been denied, Dr. Herley alleges that "[h]er depression and anxiety have spiked, and she has experienced heightened feelings of dysphoria, social isolation, obsessive thoughts, as well as an increased risk of self-harm, feelings of impending danger, panic, or doom, and trouble concentrating or making decisions." *Id.* at 17. She also reports

physical symptoms including "panic attacks, dizziness, and a rash of unknown origins that worsens when she experiences distress from her gender dysphoria." *Id.*

Dr. Homnick and Dr. Herley's physicians have attested that gender-affirming facial reconstruction is necessary to treat their symptoms. Dr. Homnick's clinical psychologist, Dr. Amanda Shaw, specializes in treating adults with anxiety, depression, and trauma, and has been treating Dr. Homnick since September 2023. Decl. of Dr. Amanda M. Shaw, Ph.D. ¶¶ 3-4, ECF No. 62-4 ("Shaw Decl."). Her practice includes transgender and non-binary patients with gender dysphoria. *Id.* ¶ 3. Dr. Shaw has observed that "Dr. Homnick's gender dysphoria consistently fluctuates in severity based on whether she can access appropriate medical care. When access to medical care is restricted or threatened, Dr. Homnick's gender dysphoria, particularly her hopelessness and depressive symptoms, increase." *Id.* ¶ 11. Dr. Shaw's professional opinion is that GAFR is medically necessary to treat Dr. Homnick's gender dysphoria. *Id.* ¶ 14. Dr. Shaw states that "Dr. Homnick's mental health is harmed from being denied a medical procedure— deemed necessary by her treating providers—that would provide her with relief." *Id.* ¶ 17.

Dr. Herley's psychologist, Dr. Janice Seward, has worked with patients experiencing gender dysphoria since at least 1995, when she first became Dr. Herley's mental health provider. Decl. of Dr. Janice Stefanacci Seward, Psy D. ¶¶ 3-4, ECF No. 62-6 ("Seward Decl."). Dr. Seward has attested that gender-affirming facial reconstruction is medically necessary to treat Dr. Herley's gender dysphoria. *Id.* ¶ 15. She also states that "Dr. Herley's symptoms of gender dysphoria dramatically worsened upon learning that Aetna had rejected her request for coverage of her GAFR[.]" *Id.* ¶ 17. Since the denial, Dr. Herley's "mental and physical symptoms related to her severe gender dysphoria" have "continued to deteriorate[.]" *Id.* ¶ 19. In Dr. Seward's professional opinion, "If Dr. Herley were unable to access GAFR entirely, it is likely that her

symptoms would not only continue to worsen but would likely become so severe as to disable her. Her social isolation could become so pronounced that she is unable to work altogether. Her increasing thoughts of self-harm are likely to pose a serious risk of injury or death." *Id.* ¶ 25.

Nonetheless, Aetna argues that the Plaintiffs' injuries need not persist "in the absence of preliminary relief" because both plaintiffs may pursue the administrative remedies described in their insurance plans. *See Walsh*, 733 F.3d at 486; *see* Def.'s Resp. at 32 ("Plaintiffs' most immediate—and effective—remedy is the ERO review that awaits only their election to pursue it.").

The concepts of administrative exhaustion and irreparable injury are doctrinally linked, but where administrative exhaustion is mandatory, it may generally be excused where the plaintiff can show that exhaustion would result in irreparable harm. And courts dismissing a motion for a preliminary injunction for lack of exhaustion generally do so because the administrative exhaustion regime is mandatory. *See, e.g., Green Haven Prison Preparative Meeting of Religious Soc'y of Friends v. New York State Dep't of Corr. & Cmty. Supervision*, 16 F.4th 67, 81-83 (2d Cir. 2021) (affirming denial of preliminary injunction where underlying claims were unexhausted, noting that administrative exhaustion under the Prison Litigation Reform Act is generally mandatory). But where exhaustion would result in irreparable harm, it is routinely excused. *See, e.g., Abbey v. Sullivan,* 978 F.2d 37, 44 (2d Cir. 1992) (noting that in order to waive mandatory exhaustion for social security appeals, claimant must show they would suffer irreparable harm if required to exhaust their administrative remedies before obtaining relief); *see also Benten v. Kessler*, 799 F. Supp. 281 (E.D.N.Y. 1992) (waiving administrative exhaustion due to irreparable harm and proceeding to analyze the merits of the preliminary

44
SA44

injunction motion without referencing the alleged availability of an administrative remedy to disprove the irreparable injury element).

More pointedly, requiring exhaustion of an administrative remedial process would exacerbate the irreparable injury in question, even when it is not mandatory. *See Rumble v. Fairview Health Servs.*, No. 14-CV-2037 SRN/FLN, 2015 WL 1197415, at *11 (D. Minn. Mar. 16, 2015) ("[P]laintiffs bringing Section 1557 race, disability, or sex discrimination claims would not have to exhaust administrative remedies and would not be barred from recovering damages.").

On this record, Dr. Homnick and Dr. Herley's injuries have been exacerbated by Aetna's denials. Requiring the Plaintiffs to exhaust their optional administrative remedies will only worsen their conditions. *See, e.g.,* Seward Decl. ¶ 27 ("It is my view that the longer Dr. Herley has to wait to access gender affirming facial surgery, the more likely her condition may deteriorate even further."). Put another way, "to require plaintiffs to exhaust administrative remedies would be to place them in danger of the same imminent and irreparable injury that motivated this court to grant the preliminary injunction." *Able v. United States*, 870 F. Supp. 468, 471 (E.D.N.Y. 1994).

Accordingly, Dr. Homnick and Dr. Herley have satisfied the irreparable injury prong of the preliminary injunction standard.

### 2. The Likelihood of Success on the Merits

Section 1557 of the Affordable Care Act prohibits a "health program or activity, any part of which is receiving Federal financial assistance" from violating the non-discrimination mandate of Title IX of the Education Amendments of 1972 ("Title IX"). 42 U.S.C. § 18116(a). Title IX elaborates that "no person in the United States shall, on the basis of sex, be excluded

from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance," subject to a few exceptions. 20 U.S.C. § 1681(a).

The Plaintiffs argue that because Aetna receives federal financial assistance, including Medicare and Medicaid reimbursements, it is covered under Section 1557 of the Affordable Care Act and Aetna must comply with Title IX's anti-discrimination mandates. Mot. for Prelim. Inj. at 23-24. As a covered entity, the Plaintiffs argue that Aetna is violating Section 1557 because CPB 0615's categorical exclusion of gender-affirming facial reconstruction to treat gender dysphoria impermissibly discriminates on the basis of sex.

Specifically, they argue that, under Aetna's policy, the exclusion of an individual's claim depends on whether the person is seeking facial reconstruction surgery to affirm a gender inconsistent with their sex assigned at birth. In their view, the policy cannot be applied without reference to the individual's sex assigned at birth, which is discriminatory under the Supreme Court's decision in *Bostock v. Clayton County*, 590 U.S. 644, 669 (2020). Mot. for Prelim. Inj. at 25-26.

The Plaintiffs argue that because the policy applies only to those experiencing gender dysphoria, which, by definition, can only be experienced by transgender individuals, the policy is facially discriminatory. The impermissible sex classification thus is "embedded within a classification based on transgender status or gender dysphoria," since CPB 0615 "cannot be applied without determining whether the patient is transgender or cisgender, which necessarily considers sex." Mot. for Prelim. Inj. at 26-27. Additionally, the Plaintiffs argue that CPB 0615 discriminates against transgender individuals based on sex stereotypes, namely that "those who

46
SA46

are assigned male at birth ought not seek facial features that are more typically feminine, even when necessary for their health[.]" *Id.* at 27-28.

Alternatively, even if the policy does not constitute facial discrimination, the Plaintiffs argue that "it, combined with Aetna's other actions and policies, would still present overwhelming direct and circumstantial evidence of having acted on the basis of sex." Mot. for Prelim. Inj. at 25. First, the Plaintiffs point to the text of the policy, which excludes the use of facial reconstruction procedures when they are a "component of gender transition." *Id.* at 30. Second, they argue that Aetna's conclusion that gender-affirming facial reconstruction is never medically necessary is contrary to medical evidence and Aetna's own state-specific policies. *Id.* at 30-31. Finally, the Plaintiffs argue that Aetna routinely conducts medical necessity assessments for facial reconstruction claims when certain criteria are met, but refuses to do so when needed to treat gender dysphoria solely because the care is needed by transgender people. *Id.* at 31.

In response, Aetna argues that CPB 0615 "necessarily and appropriately reflects the evolving state of medical science on these issues and evaluates the evidence using the same evidentiary standards it uses for all clinical policy questions." Def.'s Mem. at 35. Therefore, in Aetna's view, gender-affirming facial reconstruction is not medically necessary, a result not based on the claimants' transgender status, but rather on the inconclusive and "equivocal" nature of medical evidence and literature on the topic. *Id.* at 32-35. As Aetna states it, "[t]he operative factor is not the status of the member requesting the procedure but, rather, whether there is sufficient, high-quality evidence and medical consensus establishing that the requested procedure is medically necessary as an effective treatment for the member's condition." *Id.* at 35.

Next, Aetna argues that it did not intentionally discriminate against transgender people under the relevant standard, Section 1557 of the Affordable Care Act. *See Doe v. Columbia Univ.*, 831 F.3d 46, 55-56 (2d Cir. 2016) (stating that the Second Circuit has imported Title VII's discriminatory intent requirement into Title IX claims); *see also* 42 U.S.C. § 18116(a) (incorporating Title IX's anti-discrimination mandate into Section 1557). Finally, Aetna argues that because there are disputed questions of fact, including "complex questions that require expert testimony or that turn on intent or state of mind," the Court should not resolve the preliminary injunction on affidavits alone. *Id.* at 36.[11] [12]

The Court disagrees.

The party seeking the preliminary injunction bears the burden of establishing the likelihood "to succeed on the merits[.]" *Winter*, 555 U.S. at 20. "[A]t core," this prong "asks courts to predict how likely it is that a party seeking preliminary relief will ultimately prevail on

---

[11] The parties' remaining arguments on this prong focus on the validity of the medical evidence on gender-affirming facial reconstruction surgery.

[12] On November 13, 2025, the Court held a telephonic status conference to schedule a hearing on the pending motion to dismiss and motion for a preliminary injunction, and to determine whether an evidentiary hearing would be required to resolve the pending motions. *See* Minute Entry, ECF No. 130 ("The purpose of the conference is to determine whether both motions can be addressed at a single proceeding, and if so, how much time would be needed, and whether the taking of testimony would be required."). At the telephonic status conference, both parties indicated that an evidentiary hearing was not necessary, and that they rested on their submissions. Because the Defendant waived its right to an evidentiary hearing, and because the Court finds that the parties' submissions do not create disputed issues of fact regarding Aetna's role in the claims denial process, this preliminary injunction motion may be resolved on the legal memoranda, affidavits, and evidence submitted by the parties. *See Charette v. Town of Oyster Bay*, 159 F.3d 749, 755 (2d Cir. 1998) ("[A]n evidentiary hearing is not required when the relevant facts either are not in dispute or have been clearly demonstrated at prior stages of the case, or when the disputed facts are amenable to complete resolution on a paper record. However, the motion should not be resolved on the basis of affidavits which evince disputed issues of fact. A party may, of course, waive its right to an evidentiary hearing, but it is not entitled to have the court accept its untested representations as true if they are disputed.") (cleaned up); *see also State Farm Mut. Auto. Ins. Co. v. Tri-Borough NY Med. Prac. P.C.*, 120 F.4th 59, 83 (2d Cir. 2024) ("Defendants do not appear to have requested an evidentiary hearing on the preliminary injunction motion in the district court, and they have thus forfeited their right to such a hearing."); *Edwards v. Ruffner*, 623 F. Supp. 511, 512 (S.D.N.Y. 1985) ("The parties have submitted legal memoranda, supporting affidavits and numerous exhibits. The parties agreed that the Court should resolve the preliminary injunction motion based on these submissions, and further agreed that an evidentiary hearing was not required.").

the merits of their claims." *Starbucks Corp. v. McKinney*, 602 U.S. 339, 362–63 (2024) (Jackson, J. concurring in part) (citing 11A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2948.3, p. 197 (3d ed. 2013)) (additional citation omitted).

Because Aetna is an entity that receives federal funding, it is subject to the non-discrimination provision contained in Section 1557, which directly imports Title IX's ban against sex-based discrimination. And it is well-established in this Circuit that "Title VII cases provide the proper framework for analyzing Title IX discrimination claims." *Doe v. Columbia Univ.*, 831 F.3d at 55-56; *see also Yusuf v. Vassar Coll.*, 35 F.3d 709, 714 (2d Cir. 1994) ("Because the statutes share the same goals and because Title IX mirrors the substantive provisions of Title VII of the Civil Rights Act of 1964, courts have interpreted Title IX by looking to the body of law developed under Title VII, as well as the caselaw interpreting Title VII.").

Indeed, the Second Circuit has adopted Title VII's requirement of proof of discriminatory intent, as well as the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), into Title IX jurisprudence. *Doe v. Columbia Univ.*, 831 F.3d at 55-56. As a result, the Plaintiffs rightly rely on *Bostock v. Clayton County*, where employees sued their employers for terminating them after the employers learned of their employees' homosexuality or transgender status. The Supreme Court interpreted Title VII's language prohibiting discrimination "because of sex," language similar to Title IX's anti-discrimination provision, to encompass discrimination against transgender individuals. 590 U.S. 644, 660 (2020) ("[I]t is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex."); 20 U.S.C. § 1681 ("No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits

of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance[.]").

"Title VII's 'because of' test incorporates the 'simple' and 'traditional' standard of but-for causation" that is established "whenever a particular outcome would not have happened 'but for' the purported cause." 590 U.S. at 656. The "but-for test directs [the Court] to change one thing at a time and see if the outcome changes." *Id.* In other words, where an employer fires a man because he was assigned female at birth, but would not have fired a man who was assigned male at birth, the employee's sex is the but-for cause of the employer's adverse employment action. As a result, "when an employer fires an employee for being homosexual or transgender, it necessarily and intentionally discriminates against that individual in part because of sex." *Id.* at 664-66. Importantly, "the adoption of the traditional but-for causation standard means a defendant cannot avoid liability just by citing some other factor that contributed to its challenged employment decision. So long as the plaintiff's sex was one but-for cause of that decision, that is enough to trigger the law." *Id.* at 656.

Under CPB 0615, if the patient is seeking GAFR "as a component of gender transition," CPB 0615 would exclude their claim as cosmetic and not medically necessary. *See* Exhibit CPB, 5-6, ECF No. 62-7 ("Aetna considers the following procedures that may be performed as a component of a gender transition as not medically necessary and cosmetic (not an all-inclusive list) []: . . . Facial Gender Affirming Procedures"). And to determine if the procedures are requested as a component of gender transition, Aetna must determine whether a patient is transgender or cisgender, which necessarily considers sex. *See* Decl. of Jens Berli, M.D., ¶ 11 ("Transgender is a term used to describe people whose self-identified gender identity differs from their birth assigned sex.").

To be clear, the issue is not whether Aetna's policy exclusion prohibits this type of gender-affirming care[13], but rather that Aetna's policy exclusion prohibits only transgender individuals, the only individuals who can experience gender dysphoria[14], from receiving this type of gender-affirming care. Thus, when Aetna decided that facial gender-affirming procedures "performed as a component of a gender transition [were] not medically necessary and cosmetic," Aetna prohibited only transgender individuals from seeking this medical care, and thus discriminated on the basis of sex. *See* Exhibit CPB, 5-6, ECF No. 62-7; *see Bostock,* 590 U.S. at 660 ("[I]t is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex."). In other words, because the availability of a medical necessity determination would change based on the patient's sex assigned at birth, the "but-for" test to establish sex discrimination set forth in *Bostock* has been satisfied.[15] *Cf. id.* at 661 ("There is simply no escaping the role intent plays here: Just as sex is necessarily a but-for *cause* when an employer discriminates against homosexual or transgender employees, an employer who discriminates on these grounds inescapably *intends* to rely on sex in its decision making.") (emphasis in original).

---

[13] *See* Theodore E. Schall & Jacob D. Moses, Gender-Affirming Care for Cisgender People, 53 HASTINGS CTR. REP. 15 (2023) (discussing how gender-affirming care extends beyond transgender individuals, such as a breast reconstruction following a double mastectomy or a breast reduction surgery to treat gynecomastia).

[14] *See* Decl. of Nicholas Gordon ¶ 14, ECF No. 62-2 (gender dysphoria "occurs when a person's internal gender identity differs from their gendered body and/or the sex they were assigned at birth.").

[15] The initial briefing in this matter preceded the Supreme Court's *Skrmetti* decision, in which the Court held that several states' statutes prohibiting minors from receiving certain gender-affirming medical treatments did not facially discriminate on the basis of sex in violation of the Equal Protection Clause of the Fourteenth Amendment. *United States v. Skrmetti*, 605 U.S. 495 (2025). In reaching this conclusion, the Supreme Court declined to consider how the logic articulated in *Bostock* affected its analysis. *Id.* at 520 ("We have not yet considered whether *Bostock's* reasoning reaches beyond the Title VII context, and we need not do so here."). As a result, the Supreme Court's reasoning in *Skrmetti* does not change this Court's analysis here; the "but-for" analysis articulated in *Bostock* remains binding on Plaintiffs' claim under Section 1557. *See Jennings v. Rodriguez*, 583 U.S. 281, 296 (2018) ("When 'a serious doubt' is raised about the constitutionality of an Act of Congress, 'it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided.'") (quoting *Crowell v. Benson,* 285 U.S. 22, 62 (1932)).

Accordingly, Dr. Homnick and Dr. Herley have demonstrated a likelihood of success on the merits.

### 3.   The Balance of Equities and the Public Interest

Finally, the Court must determine whether "the balance of equities tips in [Plaintiffs'] favor" and whether "an injunction is in the public interest." *Walsh*, 733 F.3d at 486. In doing so, the Court "'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'" *Winter*, 555 U.S. at 24 (quoting *Amoco Production Co. v. Village of Gambell, AK,* 480 U.S. 531, 542 (1987)).

Dr. Homnick and Dr. Herley argue that "the value of receiving GAFR is tremendous while the harm they are suffering without it is immense." Mot. for Prelim. Inj. at 31. If the injunction is granted, they argue they will gain access to care, which is likely to alleviate the distress related to their gender dysphoria. *Id.* at 32. They also state that Aetna cannot suffer any harm from an injunction that requires it to comply with Section 1557, and any costs Aetna may incur are far outweighed by the harm to the Plaintiffs of enforcing CPB 0615. *Id.* And because Aetna already covers gender-affirming facial reconstruction in several states, "[a]ny administrative or practical burdens on Aetna would be de minimis[.]" *Id.* at 33. Finally, they argue that the public interest is best served by the injunction because "it would ensure that Plaintiffs receive medically necessary care," it would "prevent Aetna from acting unlawfully," and "it would ensure that the judgment of Plaintiffs' health care providers is respected." *Id.* at 33-34.

Aetna replies that "the balance of the equities decisively disfavors Plaintiffs" because an injunction would not bind the plan sponsors, making it "wholly ineffectual and a waste of judicial resources." Def.'s Mem. at 37. Aetna argues that the Court "must consider the impact on,

and interests of, the *absent employers* from whose coffers any benefits would be paid." *Id.* at 37-38 (emphasis in original). For these reasons, Aetna argues that the injunction will not serve the public interest. *Id.* at 39.[16]

The Plaintiffs reply that the injunction would only impose an obligation on Aetna to conduct individualized medical necessity determinations for Dr. Herley and Dr. Homnick's claims. Pl.'s Reply at 19. If their claims are found to satisfy the medical necessity requirements, they argue that "the plan sponsors will, just as they have agreed to under their Aetna contracts for all other medically necessary treatments approved by Aetna." *Id.* at 19.

The Court agrees.

Dr. Homnick and Dr. Herley have demonstrated through personal affidavits, declarations from their treating clinicians, and expert declarations that absent an injunction, they are likely to experience severe harm to their mental and physical health. *See supra* Section III(B)(1). Requiring Aetna to follow the law imposes no hardship upon it, especially where the administrative infrastructure to conduct medical necessity determinations for the Plaintiffs' coverage requests is already in place. *See L.V.M. v. Lloyd*, 318 F. Supp. 3d 601, 620 (S.D.N.Y. 2018) (defendant "cannot suffer any harm from an injunction that terminates an unlawful practice") (citing *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013)). And granting the injunction and requiring Aetna to make Dr. Homnick and Dr. Herley's coverage determinations on the basis of medical necessity, as opposed to categorically excluding their claims under CPB 0615, serves the public interest by furthering access to medically necessary care and requiring Aetna to administer its health insurance plans according to the law.

---

[16] Aetna also argues that because Dr. Homnick is enrolled in an ERISA-governed plan, and Congress designed ERISA with its own public policy concerns in mind, the Court's issuance of an injunction would be inappropriate. Since the Court finds that the administrative exhaustion requirements of ERISA do not apply to Dr. Homnick's plan, *see supra* Section III(A)(3), the Court declines to address this point.

Accordingly, Dr. Homnick and Dr. Herley's motion for a preliminary injunction will be granted.

### 4. Bond Requirement

While Fed. R. Civ. P. 65(c) states that "[a] court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained[,]" the amount of any bond "rests within the sound discretion of the trial court" and "the district court may dispense with the filing of a bond" altogether. Fed. R. Civ. P. 65(c); *Clarkson Co. v. Shaheen*, 544 F.2d 624, 632 (2d Cir. 1976) (internal citations omitted); *see also Doctor's Assocs., Inc. v. Distajo*, 107 F.3d 126, 136 (2d Cir. 1997) (noting that bond is not required "where there has been no proof of likelihood of harm . . .").

Dr. Herley and Dr. Homnick argue that waiver of the bond requirement is "necessary for the relief sought to be effective, given that Plaintiffs cannot afford the surgeries they require." Mot. for Prelim. Inj. at 34. They also note that waiver is appropriate "given the high likelihood of Plaintiffs' ultimate success on the merits and minimal harm to Aetna from a preliminary injunction." *Id.*

Aetna responds that the bond requirement should not be waived because of the potential harm to the plan sponsors' funds. Def.'s Mem. at 40.

In reply, the Plaintiffs argue that "Aetna–the party–would suffer no financial loss and is not entitled to a security bond on behalf of the plan sponsors." Pl.'s Reply at 20.

The Court agrees.

Accordingly, given the likelihood of Plaintiffs' success on the merits, and the lack of proof that Aetna will be harmed from issuance of the injunction, the Court will not require the

issuance of a bond. *See Golden Krust Patties, Inc. v. Bullock*, 957 F. Supp. 2d 186, 203

(E.D.N.Y. 2013) ("Some courts have considered the strength of a movant's case in analyzing the

likelihood of harm to a potentially wrongfully enjoined nonmovant.") (collecting cases); *see also*

*G.F.F. v. Trump*, No. 25 CIV. 2886 (AKH), 2025 WL 1301052, at *11 (S.D.N.Y. May 6,

2025) ("Here, there is no proof of likelihood of harm to Respondents that would result from the

issuance of this preliminary injunction, and thus, Petitioners need not post bond.").

## IV.    CONCLUSION

For the foregoing reasons, Aetna's motion to dismiss is **DENIED** and the motion for a

preliminary injunction brought by Dr. Homnick and Dr. Herley is **GRANTED**.

As a result of this Ruling and Order, Aetna is required to make individualized coverage

determinations as to Dr. Homnick and Dr. Herley only, on the basis of medical necessity, as

opposed to categorically excluding their claims under CPB 0615.

**SO ORDERED** at New Haven, Connecticut, this 8th day of March, 2026.

/s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE

**20 U.S.C. § 1681. Sex**

**(a)    Prohibition against discrimination; exceptions**

No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance, except that:

**(1)    Classes of educational institutions subject to prohibition**

in regard to admissions to educational institutions, this section shall apply only to institutions of vocational education, professional education, and graduate higher education, and to public institutions of undergraduate higher education;

**(2)    Educational institutions commencing planned change in admissions**

in regard to admissions to educational institutions, this section shall not apply (A) for one year from June 23, 1972, nor for six years after June 23, 1972, in the case of an educational institution which has begun the process of changing from being an institution which admits only students of one sex to being an institution which admits students of both sexes, but only if it is carrying out a plan for such a change which is approved by the Secretary of Education or (B) for seven years from the date an educational institution begins the process of changing from being an institution which admits only students of only one sex to being an institution which admits students of both sexes, but only if it is carrying out a plan for such a change which is approved by the Secretary of Education, whichever is the later;

**(3)    Educational institutions of religious organizations with contrary religious tenets**

this section shall not apply to an educational institution which is controlled by a religious organization if the application of this subsection would not be consistent with the religious tenets of such organization;

**(4)    Educational institutions training individuals for military services or merchant marine**

this section shall not apply to an educational institution whose primary purpose is the training of individuals for the military services of the United States, or the merchant marine;

SA56

**(5) Public educational institutions with traditional and continuing admissions policy**

in regard to admissions this section shall not apply to any public institution of undergraduate higher education which is an institution that traditionally and continually from its establishment has had a policy of admitting only students of one sex;

**(6) Social fraternities or sororities; voluntary youth service organizations**

this section shall not apply to membership practices—

(A) of a social fraternity or social sorority which is exempt from taxation under section 501(a) of title 26, the active membership of which consists primarily of students in attendance at an institution of higher education, or

(B) of the Young Men's Christian Association, Young Women's Christian Association, Girl Scouts, Boy Scouts, Camp Fire Girls, and voluntary youth service organizations which are so exempt, the membership of which has traditionally been limited to persons of one sex and principally to persons of less than nineteen years of age;

**(7) Boy or Girl conferences**

this section shall not apply to—

(A) any program or activity of the American Legion undertaken in connection with the organization or operation of any Boys State conference, Boys Nation conference, Girls State conference, or Girls Nation conference; or

(B) any program or activity of any secondary school or educational institution specifically for—

(i) the promotion of any Boys State conference, Boys Nation conference, Girls State conference, or Girls Nation conference; or

(ii) the selection of students to attend any such conference;

**(8) Father-son or mother-daughter activities at educational institutions**

this section shall not preclude father-son or mother-daughter activities at an educational institution, but if such activities are provided for students

SA57

of one sex, opportunities for reasonably comparable activities shall be provided for students of the other sex; and

**(9)  Institution of higher education scholarship awards in "beauty" pageants**

this section shall not apply with respect to any scholarship or other financial assistance awarded by an institution of higher education to any individual because such individual has received such award in any pageant in which the attainment of such award is based upon a combination of factors related to the personal appearance, poise, and talent of such individual and in which participation is limited to individuals of one sex only, so long as such pageant is in compliance with other nondiscrimination provisions of Federal law.

\*     \*     \*

## 29 U.S.C. § 1104.  Fiduciary duties

### (a) Prudent man standard of care

(1) Subject to sections 1103(c) and (d), 1342, and 1344 of this title, a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—

\*     \*     \*

(D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter and subchapter III.

\*     \*     \*

## 42 U.S.C. § 18116.  Nondiscrimination

### (a)  In general

Except as otherwise provided for in this title (or an amendment made by this title), an individual shall not, on the ground prohibited under title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d et seq.), title IX of the Education Amendments of 1972 (20 U.S.C. 1681 et seq.), the Age Discrimination Act of 1975 (42 U.S.C. 6101 et seq.), or section 794 of title 29, be excluded from participation in, be denied the benefits of, or be subjected to discrimination

SA58

under, any health program or activity, any part of which is receiving Federal financial assistance, including credits, subsidies, or contracts of insurance, or under any program or activity that is administered by an Executive Agency or any entity established under this title (or amendments). The enforcement mechanisms provided for and available under such title VI, title IX, section 794, or such Age Discrimination Act shall apply for purposes of violations of this subsection.

*    *    *