# No. 26-820

**IN THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT**

BINAH GORDON, KAY MAYERS, ALMA AVALLE, JAMIE HOMNICK, GENNIFER HERLEY, and S.N., *individually and on behalf of all similarly situated individuals*,

*Plaintiffs-Appellees*,

v.

AETNA LIFE INSURANCE COMPANY,

*Defendant-Appellant*.

On Appeal from the United States District Court for the District of Connecticut, No. 3:24-cv-1447
Hon. Victor A. Bolden, United States District Judge

## RESPONSE BRIEF FOR PLAINTIFFS-APPELLEES

Joseph J. Wardenski
Wardenski P.C.
134 West 29th Street
Suite 709
New York, NY 10001
(347) 227-2500

Harini Srinivasan
Christine E. Webber
Sabrina S. Merold
Cohen Milstein Sellers & Toll LLP
1100 New York Avenue NW
Suite 800
Washington, DC 20005
(202) 408-4600

Nicolas A. Sansone
Allison M. Zieve
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
(202) 588-1000
nsansone@citizen.org

Kelly Parry-Johnson
Ezra Cukor
Sydney Duncan
Anya Marino
Advocates for Trans Equality Education Fund
520 Eighth Avenue, Suite 2204
New York, NY 10018
(646) 993-1688

*Counsel for Plaintiffs-Appellees*

August 12, 2026

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ..... iii

INTRODUCTION ..... 1

ISSUES PRESENTED ..... 6

STATEMENT OF THE CASE ..... 6

Factual Background ..... 6

Gender dysphoria and treatment ..... 6

Aetna's categorical coverage exclusion for GAFR ..... 10

Dr. Herley's medical need for GAFR ..... 13

Aetna's coverage denial ..... 16

Procedural Background ..... 18

SUMMARY OF ARGUMENT ..... 23

STANDARD OF REVIEW ..... 27

ARGUMENT ..... 28

I. Dr. Herley has standing. ..... 28

A. Dr. Herley's injury is fairly traceable to Aetna's application of CPB 0615. ..... 30

B. Enjoining Aetna from applying CPB 0615 is substantially likely to redress Dr. Herley's injury. ..... 33

II. Dr. Herley is likely to succeed on the merits. ..... 37

A. Aetna's policy of categorically excluding GAFR from insurance coverage, irrespective of medical necessity, discriminates on the basis of sex in violation of Section 1557. ..... 37

B. Aetna's contrary arguments are unavailing........................45

III. The remaining preliminary injunction factors favor Dr. Herley. . 60

A. Dr. Herley is suffering ongoing, irreparable harm absent injunctive relief. ................................................................60

B. Aetna has not shown that it will suffer any injury from an injunction....................................................................66

C. The public interest supports an injunction.. ........................69

CONCLUSION ..............................................................................70

CERTIFICATE OF COMPLIANCE......................................................72

CERTIFICATE OF SERVICE.............................................................73

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Abbey v. Sullivan*,
978 F.2d 37 (2d Cir. 1992) .......... 62

*Ali v. Federal Bureau of Prisons*,
552 U.S. 214 (2008) .......... 38

*Alvarez v. City of New York*,
2 F. Supp. 2d 509 (S.D.N.Y. 1998) .......... 64

*Anderson v. Crouch*,
169 F.4th 474 (4th Cir. 2026) .......... 57

*Ateres Bais Yaakov Academy of Rockland v. Town of Clarkstown*,
88 F.4th 344 (2d Cir. 2023) .......... 31

*Bergin v. New York State Unified Court System*,
— F.4th —, 2026 WL 2035593 (2d Cir. July 15, 2026) .......... 53

*Bostock v. Clayton County*,
590 U.S. 644 (2020) .......... 39, 40, 42, 44, 46, 47, 48, 51, 57

*Brandt ex rel. Brandt v. Griffin*,
147 F.4th 867 (8th Cir. 2025) .......... 57

*Cacchillo v. Insmed, Inc.*,
638 F.3d 401 (2d Cir. 2011) .......... 28, 29

*Citibank, N.A. v. Citytrust*,
756 F.2d 273 (2d Cir. 1985) .......... 65

*City of Los Angeles Department of Water & Power v. Manhart*,
435 U.S. 702 (1978) .......... 47

*E.M. ex rel. N.M. v. New York City Department of Education*,
758 F.3d 442 (2d Cir. 2014) .......... 34

*Fishman v. Paolucci*,
628 F. App'x 797 (2d Cir. 2015) .......... 61

*Food & Drug Administration v. Alliance for Hippocratic Medicine*,
602 U.S. 367 (2024) ............................................................ 33

*Geduldig v. Aiello*,
417 U.S. 484 (1974) ............................................................ 51, 55

*General Electric Co. v. Gilbert*,
429 U.S. 125 (1976) ............................................................ 52

*Gonzalez v. Justices of the Municipal Court of Boston*,
420 F.3d 5 (1st Cir. 2005) ............................................................ 58

*Guitard v. United States Secretary of the Navy*,
967 F.2d 737 (2d Cir. 1992) ............................................................ 63

*Haaland v. Brackeen*,
599 U.S. 255 (2023) ............................................................ 36

*Kadel v. Folwell*,
100 F.4th 122 (4th Cir. 2024) ............................................................ 58

*LaForest v. Former Clean Air Holding Co.*,
376 F.3d 48 (2d Cir. 2004) ............................................................ 61

*Lange v. Houston County*,
152 F.4th 1245 (11th Cir. 2025) ............................................................ 57

*Lorillard v. Pons*,
434 U.S. 575 (1978) ............................................................ 54

*Morris v. California Physicians' Service*,
918 F.3d 1011 (9th Cir. 2019) ............................................................ 39

*Murthy v. Missouri*,
603 U.S. 43 (2024) ............................................................ 28, 35, 36

*New York ex rel. Schneiderman v. Actavis PLC*,
787 F.3d 638 (2d Cir. 2015) ............................................................ 68

*Newport News Shipbuilding & Dry Dock Co. v. Equal Employment Opportunity Commission*,
462 U.S. 669 (1983) ............................................................ 52, 53

*Oneida Nation of New York v. Cuomo*,
645 F.3d 154 (2d Cir. 2011) .......... 28

*Philbrook v. Ansonia Board of Education*,
757 F.2d 476 (2d Cir. 1985) .......... 53

*Poe ex rel. Poe v. Drummond*,
149 F.4th 1107 (10th Cir. 2025) .......... 57

*Price Waterhouse v. Hopkins*,
490 U.S. 228 (1989) .......... 39, 40, 43, 44, 46

*Pritchard ex rel. C.P. v. Blue Cross Blue Shield of Illinois*,
159 F.4th 646 (9th Cir. 2025) .......... 58

*Rodde v. Bonta*,
357 F.3d 988 (9th Cir. 2004) .......... 70

*Roe v. St. John's University*,
91 F.4th 643 (2d Cir. 2024) .......... 43

*Sampson v. Murray*,
415 U.S. 61 (1974) .......... 62

*Shapiro v. Cadman Towers, Inc.*,
51 F.3d 328 (2d Cir. 1995) .......... 63

*Silber v. Barbara's Bakery, Inc.*,
950 F. Supp. 2d 432 (E.D.N.Y. 2013) .......... 65

*Singh v. Berger*,
56 F.4th 88 (D.C. Cir. 2022) .......... 68

*Stewart v. United States Immigration & Naturalization Service*,
762 F.2d 193 (2d Cir. 1985) .......... 62, 63

*Summers v. Earth Island Institute*,
555 U.S. 488 (2009) .......... 29

*T.S. ex rel. T.M.S. v. Heart of CarDon, LLC*,
43 F.4th 737 (7th Cir. 2022) .......... 38

*Tough Traveler, Ltd. v. Outbound Products*,
60 F.3d 964 (2d Cir. 1995) .......... 65

*Tovar v. Essentia Health*,
857 F.3d 771 (8th Cir. 2017) .......... 33, 37

*United States v. Gonzalez*,
520 U.S. 1 (1997) .......... 38

*United States v. Skrmetti*,
605 U.S. 495 (2025) .......... 5, 50, 51, 52, 55, 56

*West Virginia v. B.P.J. ex rel. Jackson*,
146 S. Ct. 2356 (2026) .......... 38, 46, 47, 59

*Winter v. Natural Resources Defense Council, Inc.*,
555 U.S. 7 (2008) .......... 27

*Yang v. Kosinski*,
960 F.3d 119 (2d Cir. 2020) .......... 68

*Younger v. Harris*,
401 U.S. 37 (1971) .......... 64

*Zarda v. Altitude Express, Inc.*,
883 F.3d 100 (2d Cir. 2018) .......... 44

**Statutes**

20 U.S.C. § 1681 .......... 38

21 U.S.C. § 399b .......... 54

42 U.S.C. § 18116 .......... 18, 55

42 U.S.C. § 18116(a) .......... 38, 43, 48, 51

42 U.S.C. § 2000e(k) .......... 53

42 U.S.C. § 2000e-2(a) .......... 40

Pub. L. No. 95-555, 92 Stat. 2076 (1978) .......... 53

**Regulations**

*Nondiscrimination on Basis of Sex*, 40 Fed. Reg. 24128 (June 4, 1975) ........................................................54

**Other Authorities**

Aetna, *Cosmetic Surgery and Procedures: Clinical Policy Bulletin No. 0031* (June 25, 2026)........................................................ 11, 41, 56

Aetna, *Gender Affirming Surgery: Clinical Policy Bulletin No. 0615*, "Review History" (July 17, 2026) ........................................................32

Kelsey Mumford, *Ethically Navigating the Evolution of Gender Affirmation Surgery*, 25 AMA Journal of Ethics 383 (June 2023)........7

# INTRODUCTION

Defendant-Appellant Aetna Life Insurance Company administers health insurance plans on behalf of itself and others, including on behalf of employers that sponsor and fund plans to cover their employees and their employees' families. In this role, Aetna develops policies that govern which medical treatments are eligible for coverage. It then applies these default policies to make coverage decisions in individual cases, unless a particular plan sponsor or state law affirmatively prevents Aetna from applying its policy. For various forms of facial reconstruction surgery, Aetna's policy is straightforward: The surgery is covered if it is medically necessary, irrespective of whether it also has cosmetic effects.

A notable exception applies. Under Aetna's policies, facial reconstruction surgery is deemed purely "cosmetic," and is thus categorically excluded from coverage, if performed "as a component of a gender transition." This categorical exclusion applies no matter how severely the incongruence between a patient's outward appearance and internally understood gender identity is damaging the patient's mental and physical health, and no matter how many independent medical providers conclude that the surgery is medically necessary to treat these

health effects. In instances where a plan sponsor overrides Aetna's exclusion, or where state law prohibits Aetna from applying its exclusion, Aetna makes individualized medical necessity determinations, as it would for anybody else seeking these forms of facial surgery. Otherwise, though, individuals undergoing a gender transition are left without coverage for this often essential and potentially life-saving care, functionally denying many of them the ability to receive the care at all.

Plaintiff-Appellee Gennifer Herley is such a patient. A transgender woman, she experiences severe and growing anguish stemming from the mismatch between her lifelong knowledge that she is a woman and her stereotypically masculine facial features. Her healthcare providers have unanimously determined that facial surgery is medically necessary and will profoundly alleviate the mental and physical distress caused by Dr. Herley's diagnosed gender dysphoria. But because Dr. Herley receives employer-funded health insurance through her wife's Aetna plan, she is subject to Aetna's categorical exclusion. Without coverage, she cannot pay for the treatment that her doctors have decided she urgently needs.

Shortly after Aetna denied coverage, Dr. Herley joined this lawsuit to challenge Aetna's coverage exclusion under Section 1557 of the

Affordable Care Act, which prohibits restricting the provision of benefits in federally funded health programs or activities based on sex. Days later, she moved for a preliminary injunction to bar Aetna from applying the exclusion to her and to require Aetna to make an individualized assessment of her medical need, as it would for cisgender (*i.e.*, non-transgender) patients seeking the same surgeries. The district court granted the injunction. It concluded that Aetna's exclusion likely violates Section 1557; that Dr. Herley will suffer irreparable injury as long as the exclusion prevents her from receiving the care that she needs; that Aetna will not be harmed by performing the same sort of individualized medical necessity review for Dr. Herley that it regularly performs for cisgender patients seeking facial reconstruction, or for transgender patients where required by state law or the terms of a health plan; and that the public interest favors holding Aetna to its legal duties under Section 1557.[1]

[1] The district court also granted preliminary injunctive relief to Dr. Herley's co-plaintiff, Dr. Jamie Homnick. Dr. Homnick has since drawn on her own resources to receive the surgery that she needs, independent of Aetna. Because Dr. Homnick no longer requires the protection afforded by the preliminary injunction, she does not object to vacatur of the portion of the preliminary injunction that requires Aetna to perform an individualized medical necessity determination as to her, although she continues to seek all available forms of final relief in the district court. This brief accordingly addresses only Dr. Herley's claim.

This Court should affirm entry of the preliminary injunction. To begin, Aetna's contention that Dr. Herley lacks standing can quickly be rejected. Although Aetna attempts to shunt responsibility for Dr. Herley's coverage denial onto her plan sponsor, the district court found—and the record establishes—that the plan sponsor expressly delegates coverage decisions to Aetna. As such, Dr. Herley's injury is traceable to Aetna's categorical coverage exclusion and redressable by an injunction barring Aetna from applying that exclusion.

On the merits, the district court correctly held that the challenged exclusion likely violates Section 1557. Under Section 1557, which sets out a broad antidiscrimination mandate in the context of federally funded healthcare, an insurer commits actionable sex discrimination if it relies on a patient's sex as a justification for denying benefits. If Dr. Herley's birth-assigned sex had been female rather than male, the care that she seeks would not be "a component of a gender transition," and she would be eligible for medical necessity review. It is thus clear that Dr. Herley's birth-assigned sex was a decisive factor in Aetna's refusal to conduct an individualized assessment of her medical need.

Aetna's contrary arguments rest almost entirely on *United States v. Skrmetti*, 605 U.S. 495 (2025). That case, however, analyzed sex discrimination in the context of the Equal Protection Clause of the U.S. Constitution, not Section 1557, which Congress enacted specifically to ensure that one's sex should not be a factor in one's access to necessary healthcare. Moreover, *Skrmetti* addressed factual circumstances where changing the plaintiffs' birth-assigned sex would *not* have made a difference in the plaintiffs' access to the treatment that they sought.

The district court also acted well within its discretion in concluding that the remaining preliminary injunction factors favor Dr. Herley. The record amply establishes the severe and worsening mental and physical harm that Dr. Herley is experiencing without the medical care that she needs. Aetna has offered no coherent explanation of how it would be harmed by offering a single patient the medical necessity review that it routinely offers to other patients where required by state law. And the public interest is served by fulfilling Section 1557's promise of nondiscrimination in healthcare. This Court should affirm the injunction.

## ISSUES PRESENTED

1. Whether Dr. Herley, who is currently being denied insurance coverage for medically necessary surgery due to Aetna's allegedly unlawful coverage policy, has standing to seek an injunction against Aetna's continued application of that policy to her.

2. Whether the district court properly entered a preliminary injunction barring Aetna from withholding coverage for Dr. Herley's facial reconstruction surgery on the basis of Aetna's categorical policy of excluding such surgery from coverage, irrespective of medical necessity, whenever it is "performed as a component of a gender transition."

## STATEMENT OF THE CASE

### Factual Background

#### Gender dysphoria and treatment

The term "transgender" is used to describe a person whose gender identity, *i.e.*, one's internal knowledge of one's own sex, does not correspond to the sex that the person was assigned at birth. JA82. The incongruence between a transgender person's internally understood sex and the way that the general public perceives the person's sex can cause clinically significant distress or impairment known as "gender

dysphoria." *Id.* Severe gender dysphoria can be deeply disruptive to one's everyday functioning and often triggers additional serious physical and mental health conditions. *Id.*

It has long been recognized that the most effective—and often the only—treatment for a transgender person experiencing gender dysphoria is to undergo a gender transition to align the person's outward appearance with the person's gender identity. JA82–83; *see generally* Kelsey Mumford, *Ethically Navigating the Evolution of Gender Affirmation Surgery*, 25 AMA J. Ethics 383 (June 2023) (describing the steadily growing medical acceptance of gender transition as a treatment over the span of nearly a century). For mild cases, nonmedical social transition, hormone therapy, or a combination of the two can be sufficient to alleviate the symptoms of gender dysphoria. JA83. For more serious cases, surgery may be necessary to treat gender dysphoria by reconstructing a transgender person's primary or secondary sex characteristics to be congruent with the person's gender identity. *Id.*

One category of surgery used to treat gender dysphoria is gender-affirming facial reconstruction (GAFR). JA84–88. For some transgender women, testosterone produced by the body during endogenous puberty

can cause the development of facial features—such as a prominent brow or sharp jawline—traditionally associated with "male" appearance. JA84–85. Because the face is often the most visible marker of sex, such stereotypically "masculine" facial features can subject transgender women to extreme gender dysphoria, social stigma, and discrimination and harassment for failing to conform to female stereotypes. *Id.* For a transgender woman, the surgical procedures encompassed by the term "GAFR" reconstruct "crucial areas" of her face to correct otherwise permanent male-appearing facial features, JA85, enabling her more easily to present and to be perceived by herself and others as her authentic female sex. *See* JA85–87. By reducing the likelihood that a transgender woman will be erroneously assumed to be a man based on her outward appearance, GAFR can alleviate the adverse psychological effects of incongruence between her birth-assigned sex and her gender identity, as well as the risk that members of the public will reinforce that incongruence through stigmatization, harassment, and violence. JA86. Treatments like social transition and hormone therapy, in contrast,

cannot typically alter the bones and cartilage that shape an individual's facial structure and so are often inadequate substitutes for GAFR. JA87.[2]

The medical and scientific community has recognized that GAFR is a medically necessary treatment for gender dysphoria in certain cases. For example, the World Professional Association for Transgender Health—whose standards are accepted as authoritative by organizations like the American Medical Association, American Psychological Association, American College of Obstetricians and Gynecologists, and American Academy of Family Physicians—has released standards of care expressly naming GAFR procedures among the treatments that can be medically necessary to treat gender dysphoria and further a transgender person's gender transition. JA86; *see* JA84, JA782–83. Moreover, peer-reviewed scientific studies from around the world show that GAFR, like other gender-affirming surgeries, can alleviate gender dysphoria with little risk of short- or long-term complications. JA86–87, JA1100–03.

[2] Although this brief focuses on transgender women, GAFR procedures can also be medically necessary for transgender men.

**Aetna's categorical coverage exclusion for GAFR**

Aetna, a health insurance company that receives federal funding, administers health insurance plans, including plans sponsored and funded by employers to cover their employees and their employees' families. SA1–2. Although an employer that uses a health insurance plan designed, sold, or administered by Aetna can affirmatively elect to cover or deny coverage for certain forms of medical care, Aetna applies its own standards to make coverage decisions in cases where an employer has not made such an affirmative election. SA2–3. To govern the administration of health benefits for its own plans and the plans that it administers, Aetna periodically releases Clinical Policy Bulletins (CPBs) that explain to plan sponsors, plan participants, and the general public how Aetna's "professional staff" will "mak[e] clinical determinations in connection with coverage decisions." JA405. Aetna cautions plan sponsors and participants, however, that its clinical policies "may be updated and therefore [are] subject to change." JA204.

Two CPBs are relevant here. First, CPB 0031, "Cosmetic Surgery and Procedures," sets out Aetna's distinction between purely cosmetic treatment and medically necessary treatment that has cosmetic

elements. Specifically, the bulletin provides that although Aetna generally "exclude[s] coverage of cosmetic surgery and procedures that are not medically necessary," Aetna generally *does* "provide coverage when the surgery or procedure is needed to improve the functioning of a body part or [is] otherwise medically necessary even if the surgery or procedure also improves or changes the appearance of a portion of the body." Aetna, *Cosmetic Surgery and Procedures: Clinical Policy Bulletin No. 0031* (June 25, 2026), https://tinyurl.com/mudxzahz (hereinafter, CPB 0031). So, for example, Aetna typically covers procedures such as breast reductions, earlobe repairs, lip surgery, liposuction, or rhinoplasty when medically necessary to treat an underlying condition. *Id.* And Aetna typically covers the implantation or attachment of medically necessary prostheses—including in connection with breast reconstruction, facial prosthesis, or hair transplants—even where "the prosthetic device does not correct a functional deficit." *Id.*

Second, in CPB 0615, "Gender Affirming Surgery," Aetna carves out a categorical exception to CPB 0031's default rule that surgeries that could otherwise be classed as cosmetic—including facial reconstruction—are covered if they are medically necessary. CPB 0615 provides that

GAFR is per se ineligible for coverage, irrespective of whether it satisfies medical necessity criteria in an individual case. The bulletin states that all "Facial Gender Affirming Procedures" are "cosmetic" and "not medically necessary" when they are "performed as a component of a gender transition." JA159–60.

Despite this characterization, CPB 0615 repeatedly acknowledges studies supporting GAFR's efficacy as a treatment for gender dysphoria. *See, e.g.*, JA177–78 (describing a medical study showing that "patient satisfaction following facial feminization surgery [is] high" and that the "psychological and social benefits" derived from "reduc[ing] … gender dysphoria … significantly affected patient outcome"); JA178 (discussing a review of the scientific literature that concludes that "facial feminization surgery appear[s] to be safe and satisfactory for patients"); JA184 (citing a study showing that "[f]acial feminization surgery can play a prominent role in alleviating gender dysphoria"); JA185 (citing a study that "highlight[s] facial gender surgery as a medically necessary intervention" that is "not cosmetic"). CPB 0615 does not explain why, despite this contrary evidence, Aetna categorizes GAFR as cosmetic.

In fact, CPB 0615's characterization of GAFR as never medically necessary is flatly contradicted by the fact that Aetna routinely applies medical necessity criteria to individual requests for GAFR coverage where plan sponsors or state regulators demand it. For example, Aetna plans regulated by Colorado cover certain forms of GAFR "when medical necessity criteria are met." JA206. For certain Aetna plans governed by Illinois law, meanwhile, "all gender affirming care must be reviewed for medical necessity," and Aetna "will not categorically exclude coverage for treatment for gender-affirming care that falls within generally accepted standards of care, nor will it apply a cosmetic exclusion." *Id.* Aetna similarly performs medical necessity review for GAFR where necessary to comply with state law in California, Maryland, New York, and Washington, JA206–09, or where plan sponsors require Aetna to do so.

**Dr. Herley's medical need for GAFR**

Dr. Gennifer Herley is a transgender woman. JA126. Despite being assigned male at birth, Dr. Herley knew herself to be female at a young age. *Id.* Growing up in a socially conservative community, however, Dr. Herley hid this knowledge throughout childhood and adolescence. *Id.*

Starting in her early adulthood, Dr. Herley began to present herself as a woman. JA126–27. By 1995, she had started seeing a psychologist, Dr. Janice Seward, to whom Dr. Herley disclosed "the intense distress [she] ha[d] always felt arising from the incongruence of [her] masculine appearing face and gender identity." JA127; *see* JA149 (Dr. Seward's testimony that, "[f]rom the outset, Dr. Herley expressed severe distress arising from the incongruence of her masculine appearing face and her gender identity"). This incongruence caused Dr. Herley to experience "symptoms of depression, anxiety, suicidal ideation, low self-esteem, … intense desire to avoid social interactions, [and] extreme focus on [her] appearance." JA127. Dr. Seward ultimately diagnosed Dr. Herley with gender dysphoria. *Id.*

Eventually, Dr. Herley began to fear that she would "miss [her] opportunity to live [her] life as [her] authentic self" if she did not complete her transition to living as a woman. *Id.* Starting in 2017, Dr. Herley underwent gender-affirming medical procedures that her healthcare providers deemed medically necessary, including hormone therapy, breast reconstruction, and genital reconstruction. *Id.*; *see* JA150. Each of

these treatments "helped [Dr. Herley] reduce [her] gender dysphoria by better aligning [her] body with [her] gender identity." JA127.

Despite the relief these procedures afforded, Dr. Herley has continued to suffer severe and intensifying gender dysphoria around her stereotypically masculine face. *Id.*; *see* JA150 (Dr. Seward's testimony about Dr. Herley's "extreme anxiety regarding her face"). Dr. Herley's "deep sense of despair that she will never achieve the external manifestation of her internally experienced gender" has caused her to experience "heightened thoughts of self-harm." JA150. As Dr. Herley attested, "When … I see my reflection in the mirror, … I do not like the stereotypically male appearance I see. My physique and features trigger distress and anxiety." JA128. Contributing to this anxiety, moreover, is Dr. Herley's constant fear that she will be involuntarily "outed" as transgender in public and consequently subjected to harm. *Id.* This fear has led Dr. Herley to "internalize the external hatred" directed against transgender people, "such that [her] pain is relentless." *Id.*

Given Dr. Herley's individual circumstances, Dr. Seward concluded that GAFR is medically necessary for her because it "will greatly reduce much of her anxiety regarding her face not aligning with her female

identity." JA150. Based on Dr. Seward's recommendation and that of an endocrinologist who has been treating Dr. Herley since 2017, Dr. Herley consulted with a plastic surgeon who specializes in gender-affirming treatment. JA128; *see* JA131. The surgeon likewise determined that GAFR is medically necessary for Dr. Herley. JA128.

**Aetna's coverage denial**

Dr. Herley receives health insurance through a health benefit plan funded and sponsored by her wife's employer, the Metropolitan Transportation Authority (MTA). JA579. At all relevant times, Aetna has administered MTA's plan. JA578–79.

MTA's contract with Aetna grants Aetna "discretionary authority to determine what Benefits are payable under the Plan" and directs Aetna to "use its own medical policies and medical policy exception processes" in making coverage decisions, as long as those policies are consistent with the terms of the plan and with the law. JA603; *see id.* (requiring Aetna to make claim payments that Aetna "determines to be due according to the … applicable law"). Unless Aetna "abuse[s] its discretion by acting arbitrarily or capriciously," MTA deems Aetna "to have properly exercised [its] authority" over coverage decisions. JA604.

In November 2024, Dr. Herley's medical providers sent Aetna a request for prior authorization to perform the GAFR procedures that they believed Dr. Herley needed. JA128. Aetna denied prior authorization the next month under its categorical classification of GAFR as cosmetic and never medically necessary. *Id.* Citing repeatedly to CPB 0615, Aetna reported, for each of the requested procedures, that it was "denying coverage for the … procedure to be performed as a component of a gender transition" because Aetna dismissed it as not "medically necessary," without assessing Dr. Herley's individual circumstances. JA137–43.

Dr. Herley's depression and anxiety have since "spiked" because of her inability to complete the gender transition needed to treat her gender dysphoria. JA128; *see* JA151 (Dr. Seward's testimony that "Dr. Herley's symptoms of gender dysphoria dramatically worsened upon learning that Aetna had rejected her request for coverage of her GAFR"). Dr. Herley has experienced ongoing and worsening mental and physical symptoms, including depression, obsessive thoughts, and panic attacks, that are interfering with her ability to work. JA151. If Dr. Herley cannot access GAFR, Dr. Seward believes that her gender dysphoria will "likely become so severe as to disable her," that her "social isolation could become so

pronounced that she is unable to work altogether," and that her "increasing thoughts of self-harm [will] likely … pose a serious risk of injury or death." *Id.*

Dr. Herley cannot afford the GAFR that she needs without insurance coverage. JA128. Consequently, "the most visible cause of [her] misgendering by others will still be there," and her mental health will continue to decline. JA129. Now in her sixties, Dr. Herley worries that, "[w]ithout the facial surgeries, … the distress … will never subside and [will] continue to prevent [her] from ever being able to fulfill [her] full human potential." *Id.*

**Procedural Background**

In September 2024, three transgender women filed this lawsuit against Aetna on behalf of themselves and all others similarly situated. Compl., D. Ct. Dkt. 1 ¶¶ 1–2. The operative complaint claims that Aetna's categorical exclusion of coverage for GAFR under CPB 0615 violates Section 1557 of the Affordable Care Act, 42 U.S.C. § 18116, which prohibits sex discrimination in every federally funded health program and activity. JA75–76.

Dr. Herley joined as a plaintiff on February 28, 2025, following Aetna's denial of her request for prior authorization for GAFR. JA12. The next business day, on March 3, Dr. Herley filed a motion for a preliminary injunction. *Id.* Specifically, Dr. Herley sought to enjoin Aetna from applying its categorical GAFR exclusion to her claim for coverage and instead to make an individualized coverage decision based on the otherwise applicable medical necessity criteria. *See* SA2.

The district court granted a preliminary injunction on March 8, 2026. *Id.* The court first held that Dr. Herley has standing to seek injunctive relief against Aetna because, contrary to Aetna's argument, Dr. Herley's harms are traceable to Aetna rather than to MTA. SA22–29, SA38. Reviewing the evidence before it, the court found, as a factual matter, that Dr. Herley's plan "delegate[s] all coverage determinations for gender-affirming procedures to Aetna." SA27. Thus, the court found, "Aetna's enforcement of CPB 0615 categorically excluded [Dr. Herley's] claims" for GAFR, making Dr. Herley's injuries traceable to Aetna. SA24.

Turning to the merits, the court held that Dr. Herley is likely to succeed on her Section 1557 claim. SA45–52. After observing that Aetna receives federal funding and is subject to Section 1557, SA49, the court

explained that CPB 0615 violates Section 1557's healthcare-specific antidiscrimination mandate because it makes a patient's sex a factor in the patient's access to medically necessary treatment. SA50–51. Reasoning by analogy to the similarly broad prohibition on sex discrimination in employment set forth in Title VII of the Civil Rights Act of 1964, the court explained that, "[w]here an employer fires a man because he was assigned female at birth, but would not have fired a man who was assigned male at birth, the employee's sex is [a] but-for cause of the employer's adverse employment action," and the action is unlawful under Title VII. SA50. A similar analysis, the court continued, directs the outcome here: Because CPB 0615 categorically excludes GAFR only when it is sought "as a component of gender transition," application of the exclusion requires Aetna to "determine whether a patient is transgender or cisgender, which necessarily considers sex." *Id.* In other words, "because the availability of a medical necessity determination" (rather than a categorical exclusion) for a given surgery "would change based on the patient's sex assigned at birth," Aetna's policy discriminates based on sex and therefore violates Section 1557. SA51.

The court acknowledged that the Supreme Court held in *Skrmetti* that a state does not violate the Equal Protection Clause of the U.S. Constitution by prohibiting minors from receiving certain gender-affirming treatments. SA51 n.15. But the district court noted that *Skrmetti* expressly declined to consider whether constitutional claims and statutory claims require the same analytical approach. *Id.* The court thus concluded that the Title VII principles on which it based its holding "remain[ed] binding on [Dr. Herley's] claim under Section 1557." *Id.*

The district court also found that the remaining preliminary injunction factors favor Dr. Herley. The court first concluded that "the delay and denial of access to gender-affirming facial reconstruction and the resulting symptoms" that Dr. Herley will continue to experience absent an injunction "constitute irreparable injuries." SA42. The court next found that the balance of the equities favors Dr. Herley because she has "demonstrated through personal affidavits, declarations from [her] treating clinicians, and expert declarations that absent an injunction, [she is] likely to experience severe harm to [her] mental and physical health." SA53. On the other hand, "[r]equiring Aetna to follow the law imposes no hardship upon it, especially where the administrative

infrastructure to conduct medical necessity determinations for [Dr. Herley's] coverage requests is already in place." *Id.* Finally, the court found that "requiring Aetna to make … Dr. Herley's coverage determinations on the basis of medical necessity, as opposed to categorically excluding [her] claims …, serves the public interest by furthering access to medically necessary care and requiring Aetna to administer its health insurance plans according to the law." *Id.*

The district court accordingly granted Dr. Herley's motion for a preliminary injunction, enjoined Aetna from "categorically excluding [her] claims under CPB 0615," and required Aetna to "make individualized coverage determinations" as to the GAFR procedures that her healthcare providers have deemed medically necessary. SA55. Aetna filed a notice of appeal and asked the district court to stay the preliminary injunction pending the appeal. JA23.

The district court declined to enter a stay. JA1262. Among other things, the court explained that Aetna had not shown that it is likely to prevail on appeal. JA1255–57. The court acknowledged Aetna's argument that sex was "not a but-for cause of [CPB 0615's] operation" in Dr. Herley's case because, "even if [her] sex were to change, [she] would

not receive a medical necessity determination because [she] would lack a qualifying medical diagnosis." JA1256. This argument, though, contradicted "the underlying facts in this case." JA1257. Based on the record here, the court explained, if "Dr. Herley's sex assigned at birth changed, and [she] sought the same procedures to affirm the same gender identity …, [she] would necessarily receive a medical necessity determination because [she] would not seek these procedures 'as a component of a gender transition.'" *Id.*

Aetna then asked this Court to stay the injunction pending appeal and to grant an administrative stay pending resolution of the stay motion. Dkt. 34. This Court declined to enter an administrative stay, referred the stay motion to a motions panel, and expedited the appeal. Dkt. 36. On July 10, 2026, the motions panel stayed the preliminary injunction in an order that did not state the panel's reasoning. Dkt. 52.

## SUMMARY OF ARGUMENT

**I.** Dr. Herley has standing to seek an injunction against Aetna's categorical exclusion of coverage for GAFR under CPB 0615. Dr. Herley has shown that application of the exclusion to her is injuring her by depriving her of the individualized medical necessity review that she

would otherwise receive. This injury is traceable to Aetna, which created the policy and applied it in Dr. Herley's case, and the injury can therefore be redressed by an injunction against Aetna.

Aetna's argument that Dr. Herley's undisputed injury is instead traceable to MTA—and therefore incapable of redress absent an injunction against MTA—finds no support in the record and contradicts the district court's factual findings. As the district court correctly found, Aetna's agreement with MTA leaves Aetna discretion to make coverage decisions, and MTA has agreed not to disturb those decisions unless they are arbitrary and capricious. If Aetna is enjoined from applying its exclusion, no evidence suggests that MTA would take independent action to bar Dr. Herley from receiving coverage—or even that MTA has authority to do so under the terms of the health plan.

**II.** The district court correctly held that Dr. Herley is likely to prevail on the merits of her Section 1557 claim. Section 1557 guarantees, without exception, that one's sex should not play a role in one's access to federally funded healthcare. In line with the provision's text and purpose, then, this Court must ask—as the district court did—whether Dr. Herley's sex was one factor (even if not the only factor) that caused Aetna

to withhold individualized review for medical necessity in her case. It plainly was. Because Dr. Herley's birth-assigned sex is male, the surgery that she seeks is "a component of a gender transition" and so triggers CPB 0615's categorical exclusion. Had her birth-assigned sex been female, the exclusion would not apply and, like anyone else, she would have received an individual assessment of medical need.

Although CPB 0615 is expressly limited to patients undergoing "gender transition," Aetna nonetheless argues that a patient's sex is not a factor in the policy's application. This is so, Aetna contends, because the policy is triggered not by sex but by a particular "medical use." Aetna, though, fails to ask whether discrimination based on the "medical use" that triggers CPB 0615—"gender transition"—necessarily *also* discriminates based on sex. It does. Again, one's birth-assigned sex, and its congruence with one's internally understood sex, is a necessary factor in determining whether a given treatment is part of a "gender transition." And Section 1557 makes consideration of that factor unlawful in the provision of access to medically necessary healthcare.

Although Aetna purports to find support for its position in *Skrmetti*, that constitutional case casts no light on the statutory requirements of

Section 1557. *Skrmetti* held that discrimination based on a "medical use" that is inherently based on a patient's sex does not trigger heightened scrutiny under the Constitution, but the text and purpose of Section 1557 establish that such discrimination *is* unlawful sex discrimination when it comes to accessing federally funded healthcare programs. *Skrmetti*'s discussion of whether sex or "medical use" was the but-for cause of the state law that was challenged in that case is thus immaterial here.

**III.** The district court acted well within its discretion in holding that the remaining preliminary injunction factors support relief.

First, unrebutted testimony from Dr. Herley and her medical providers establish the severe, ongoing medical harm that Dr. Herley is experiencing—and will continue to experience—absent injunctive relief. Aetna attempts to recharacterize this harm as economic harm, but it ignores record evidence that Dr. Herley cannot pay out-of-pocket for the care she needs. And although Aetna characterizes Dr. Herley's diagnosed gender dysphoria as garden-variety anxiety, this effort to trivialize her condition is at odds with the medical evidence.

Second, the district court properly found that an injunction will not harm Aetna, which routinely conducts medical necessity review for

GAFR when required by state law. Aetna contends that the injunction will impair its contractual and business relationship with MTA, but it offers no evidence to support this contention. Aetna also voices concern that the injunction could moot Dr. Herley's claim before it can reach final judgment, but the district court properly determined that the harm to Dr. Herley from withholding relief outweighs that risk.

Third, having concluded that Aetna's application of its categorical coverage exclusion to Dr. Herley constituted unlawful discrimination, the district court properly determined that enjoining the discrimination serves the public interest. Aetna's contrary arguments on this issue simply repackage its merits arguments and should likewise be rejected.

## STANDARD OF REVIEW

In seeking a preliminary injunction, Dr. Herley was required to establish that she "is likely to succeed on the merits, that [s]he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in h[er] favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). In addition, she was required to "make a 'clear showing' that she

is 'likely' to establish each element of standing." *Murthy v. Missouri*, 603 U.S. 43, 58 (2024) (quoting *Winter*, 555 U.S. at 22).

This Court reviews the district court's grant of a preliminary injunction for abuse of discretion. *Oneida Nation of N.Y. v. Cuomo*, 645 F.3d 154, 164 (2d Cir. 2011). "An abuse of discretion occurs if the district court '(1) based its ruling on an erroneous view of the law, (2) made a clearly erroneous assessment of the evidence, or (3) rendered a decision that cannot be located within the range of permissible decisions.'" *Id.* (quoting *Lynch v. City of N.Y.*, 589 F.3d 94, 99 (2d Cir. 2009)). In conducting this review, this Court assesses the district court's legal conclusions de novo and reviews its factual findings for clear error. *Id.*

## ARGUMENT

### I. Dr. Herley has standing.

Dr. Herley has properly "demonstrate[d] standing for each claim and form of relief sought." *Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 404 (2d Cir. 2011) (citation omitted). In particular, Dr. Herley has shown that she "is under threat of suffering 'injury in fact' that is concrete and particularized; the threat [is] actual and imminent, not conjectural or hypothetical; it [is] fairly traceable to the challenged action of the

defendant; and it [is] likely that a favorable judicial decision will prevent or redress the injury." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009). Dr. Herley has done so, moreover, not by "rest[ing] on … mere allegations" but by "set[ting] forth by affidavit or other evidence specific facts" that support the elements of standing. *Cacchillo*, 638 F.3d at 404 (internal quotation marks and citation omitted).

Affidavits from Dr. Herley and her psychologist, Dr. Seward, detail the concrete, non-conjectural injuries that Dr. Herley has experienced—and will continue to experience—without the GAFR that her healthcare providers have determined is medically necessary. *See, e.g.*, JA129 (Dr. Herley's testimony that, "[w]ithout the facial surgeries that I need, my mental health will continue to decline" and "the distress … will never subside"); JA150 (Dr. Seward's testimony that "GAFR will greatly reduce much of [Dr. Herley's] anxiety regarding her face not aligning with her female identity"). These injuries are directly traceable to Aetna's application of CPB 0615 to categorically bar coverage for treatments that would alleviate them. *See* JA136–43 (correspondence from Aetna repeatedly invoking the policy to deny Dr. Herley coverage for every form of GAFR that she seeks). And, as the district court properly found, there

is a substantial likelihood that injunctive relief will redress Dr. Herley's injuries because enjoining Aetna from relying on its categorical exclusion "would remove a significant barrier to [Dr. Herley] achieving [her] ultimate goal of receiving gender-affirming facial reconstruction." SA28.

Indeed, Aetna does not dispute that Dr. Herley faces "a 'concrete' and 'particularized' injury in fact" absent injunctive relief. Aetna Br. 34. Instead, Aetna contends that Dr. Herley's injuries are traceable to MTA, not to CPB 0615, and that enjoining the policy's application thus would not redress those injuries. *Id.* at 34–35. Aetna's traceability and redressability arguments contradict the district court's factual findings—which Aetna has not shown to be clearly erroneous—and distort the record evidence. This Court should reject them.

### A. Dr. Herley's injury is fairly traceable to Aetna's application of CPB 0615.

Aetna admits that it "played [a] role … in the denial of [Dr. Herley's] claims." Aetna Br. 43. Aetna could hardly argue otherwise. The letter that Aetna sent to Dr. Herley to inform her of the denial, after all, stated that, "*we* have made a decision about coverage for the [requested] health care services" and "*we're* denying coverage" for those procedures. JA136–37 (emphases added). The letter further indicated that Aetna's decision

was based on Aetna's own policy, CPB 0615. *See id.* And in making its decision, Aetna exercised the "discretionary authority to determine what Benefits are payable" that MTA has conferred on Aetna by contract. JA603. Aetna's direct responsibility for the denial of Dr. Herley's claim easily satisfies this Court's "*de facto* causality" test for traceability, which "does not create an onerous standard." *Ateres Bais Yaakov Acad. of Rockland v. Town of Clarkstown*, 88 F.4th 344, 352–53 (2d Cir. 2023).

Aetna contends that "independent decisions by employer plan sponsors … break the causal chain enough to destroy traceability." Aetna Br. 43. Tellingly, though, Aetna does not point to *any* independent decision that MTA has made to deny Dr. Herley coverage. Aetna claims that MTA "directed" it to apply CPB 0615, *id.*, but this claim is misleading. Although Aetna's agreement with MTA provides that Aetna "shall use its own medical policies" to make coverage decisions, JA603, the *content* of those policies—as to GAFR or any other procedure—is left entirely up to Aetna under the terms of the agreement.

Accordingly, Aetna's CPBs, including CPB 0615, warn plan sponsors and others that they "may be updated and therefore [are] subject to change." JA204. In fact, as the district court found, "Aetna

routinely modifies [its] CPBs," SA27, and Aetna has introduced no evidence that plan sponsors authorize or play any other role in these updates. *See* Aetna, *Gender Affirming Surgery: Clinical Policy Bulletin No. 0615*, "Review History" (July 17, 2026), https://tinyurl.com/4k4jrnmw (reflecting that CPB 0615 has been updated four times in 2026 alone). Put simply, the record is devoid of any indication that MTA intended any given coverage outcome with respect to GAFR. To the contrary, as the district court correctly found, the plan "delegate[s] all coverage determinations for [such] procedures to Aetna." SA27.

Aetna also emphasizes that MTA "exercise[s] final authority over benefit design, coverage, and funding." Aetna Br. 43. Aetna overlooks, however, that MTA has already exercised that authority and, in doing so, decided that Aetna shall have "discretionary authority" to make coverage decisions, that Aetna "shall be deemed to have properly exercised such authority unless it has abused its discretion by acting arbitrarily or capriciously," and that Aetna's decisions must comply with the law. JA603–04. Aetna argues that "even if *Aetna* approved coverage," MTA could theoretically "exercise [its] independent judgment" to override the approval. Aetna Br. 44. But Aetna offers no evidence that this speculative

possibility is likely, and MTA's imagined response to a hypothetical set of facts does nothing to alter Aetna's direct responsibility for the *actual* coverage denial that forms the basis for Dr. Herley's claim. *See Tovar v. Essentia Health*, 857 F.3d 771, 778 (8th Cir. 2017) (holding that a plaintiff had standing to raise a Section 1557 claim against a plan administrator where "allegedly discriminatory [plan] terms originated" with the administrator, even though the non-party employer that funded the plan "adopted the plan and maintained control over its terms").[3]

### B. Enjoining Aetna from applying CPB 0615 is substantially likely to redress Dr. Herley's injury.

Aetna's redressability arguments fail for similar reasons. After all, traceability and redressability "are often 'flip sides of the same coin.'" *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 380 (2024) (quoting *Sprint Comms. Co. v. APCC Servs., Inc.*, 554 U.S. 269, 288 (2008)). Because Dr. Herley's injury is traceable to CPB 0615, enjoining Aetna from applying

[3] It is likewise irrelevant to standing that Aetna could theoretically deny coverage for the requested procedures even if it were enjoined from relying on CPB 0615. Aetna Br. 44. Aetna *did* deny coverage based on the GAFR exclusion, and that decision is directly traceable to Aetna. Moreover, the record evidence from Dr. Herley's healthcare providers supports a strong probability that she would receive coverage if Aetna were to apply medical necessity criteria. *See supra* pp. 14–16.

the bulletin is substantially likely to redress that injury. *See E.M. ex rel. N.M. v. N.Y.C. Dep't of Educ.*, 758 F.3d 442, 450 (2d Cir. 2014) (explaining that "[a] plaintiff need not demonstrate with certainty that her injury will be cured by a favorable decision" but need only "make a showing that there is a 'substantial likelihood that the relief requested will redress the injury claimed'" (quoting *Duke Power Co. v. Carolina Envtl. Study Grp., Inc.*, 438 U.S. 59, 75 n.20 (1978))).

As with traceability, Aetna contends that it "does not ultimately control what coverage [Dr. Herley] … receive[s]" and that her injury flows from the "decisions of an independent actor," MTA. Aetna Br. 35–36. Here too, though, Aetna identifies no independent decisions of MTA that stand between Dr. Herley and the redress she seeks. And here too, Aetna cites no record evidence to support its suggestion that MTA might use its "control" over the plan to deny coverage for Dr. Herley's GAFR if Aetna conducts a medical necessity review and decides that her GAFR is eligible for coverage. To the contrary, under the plan, MTA could reverse Aetna's decision only if it were arbitrary or capricious. *See* JA604.

Aetna's delegated—and generally determinative—role in making coverage decisions sets this case apart from cases where standing was

lacking because any effective redress would need to run against an absent third party. For example, in *Murthy*, the Supreme Court held that the plaintiffs lacked standing to seek injunctive relief against government defendants that were allegedly pressuring social media platforms to restrict certain content. *See* 603 U.S. at 48–50. On the record before the Court, it was unclear that the government communications meaningfully informed the platforms' independent content-moderation choices: "[T]he platforms moderated similar content long before any of the Government defendants engaged in the challenged conduct," and, in fact, "the platforms, acting independently, had strengthened their pre-existing content-moderation policies before the Government defendants got involved." *Id.* at 60. Moreover, the platforms, which regularly sought input from "outside experts" unaffiliated with the government, "continued to exercise their independent judgment even after communications with the defendants began." *Id.* Although the evidence reflected that communications with the government defendants had "played a role in at least some of the platforms' [prior] moderation choices," *id.*, the Court observed that the government's communications had since "slowed to a trickle," *id.* at 71. Absent evidence of "an ongoing

pressure campaign," the Court found it "entirely speculative that the platforms' future moderation decisions [would] be attributable, even in part, to the defendants." *Id.* at 69.

Contrary to Aetna's suggestion, *see* Aetna Br. 36–37, this case is entirely dissimilar. Unlike the government defendants in *Murthy*, Aetna is not an outsider seeking to influence a third party's independent decisions. Rather, it is a company that MTA has contractually empowered with "discretionary authority" to make coverage decisions based on Aetna's own policies. JA603. And unlike the social media platforms in *Murthy*, MTA has agreed to accept Aetna's decisions, except in the unusual case where Aetna abuses its discretion. JA603–04.

Aetna's attempts to analogize this case to *Haaland v. Brackeen*, 599 U.S. 255 (2023), *see* Aetna Br. 37, also fail. In *Brackeen*, the petitioners raised a constitutional challenge to a federal statute that governs certain state-court family-law proceedings. *See* 599 U.S. at 265–68. Because the state officials responsible for applying the statutory provisions that the petitioners challenged were not party to the suit, however, the Court recognized that the suit could not redress any injury flowing from those provisions. *Id.* at 292–94. Here, in contrast, it is the defendant, Aetna,

that applies the challenged policy: CPB 0615's categorical exclusion. *Brackeen* is therefore inapposite.

Ultimately, Aetna's redressability arguments, like its traceability arguments, boil down to speculation that even if Aetna is enjoined from engaging in unlawful and injurious action, MTA might independently decide to engage in similar unlawful and injurious action in the future. *See* Aetna Br. 42 (arguing that if Aetna is enjoined from applying CPB 0615, MTA "could re-enact [that] policy tomorrow as a matter of [its] individual plan[]"). As the district court correctly found, that speculation finds no support in the record. In any event, consistent with the Eighth Circuit's standing analysis in *Tovar*, *see* 857 F.3d at 778, the prospect of hypothetical unlawful future action by a third party does not deprive the district court of jurisdiction to grant relief against the party that is the source of Dr. Herley's injury and the one able to provide relief now: Aetna.

## II. Dr. Herley is likely to succeed on the merits.

### A. Aetna's policy of categorically excluding GAFR from insurance coverage, irrespective of medical necessity, discriminates on the basis of sex in violation of Section 1557.

Section 1557 of the Affordable Care Act provides that "an individual shall not[] … be excluded from participation in, be denied the benefits of,

or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance," on "the ground" of sex. 42 U.S.C. § 18116(a); *see id.* (specifying that Section 1557 incorporates the protected characteristics from Title IX of the Education Amendments of 1972, which include sex, *see* 20 U.S.C. § 1681).

In sweeping widely to prohibit sex discrimination in "any" health program receiving "any" federal funding, Section 1557 creates "broad" protections against allowing a patient's sex to limit the patient's access to healthcare. *Ali v. Fed. Bur. of Prisons*, 552 U.S. 214, 218–19 (2008); *see United States v. Gonzalez*, 520 U.S. 1, 5 (1997) (explaining that, "[r]ead naturally, the word 'any' has an expansive meaning"). This broad statutory scope—together with the lack of exceptions in Section 1557's text—makes clear that, in the provision of access to federally funded medical benefits, Section 1557 broadly proscribes discrimination and "generally requires that men and women be treated without regard to their sex." *West Virginia v. B.P.J. ex rel. Jackson*, 146 S. Ct. 2356, 2373 (2026); *see T.S. ex rel. T.M.S. v. Heart of CarDon, LLC*, 43 F.4th 737, 741 (7th Cir. 2022) (explaining that Section 1557's "language makes clear" that the statute "seeks to prevent federal resources from supporting

discriminatory conduct" and to "provide individuals a means of protecting themselves from such conduct"); *cf. Price Waterhouse v. Hopkins*, 490 U.S. 228, 240 (1989) (plurality opinion) (construing the similarly worded Title VII "to mean that [sex] must be irrelevant to employment decisions"). This guarantee, in turn, promotes "[t]he purpose of the [Affordable Care Act], as demonstrated by the content of its provisions and … implementing regulations, as well as its history," which is "to broaden access to health care." *Morris v. Cal. Physicians' Serv.*, 918 F.3d 1011, 1016 (9th Cir. 2019).

Aetna does not dispute that, as a recipient of federal funding, it is subject to Section 1557. *See* SA49. At issue in this appeal is whether Aetna's categorical exclusion of coverage for facial reconstruction surgery, irrespective of medical necessity, when (and only when) the surgery is performed "as a component of a gender transition," JA159, denies benefits to or discriminates against individuals based on their sex. The district court correctly held that it does.

**1.** In *Bostock v. Clayton County*, 590 U.S. 644 (2020), the Supreme Court explained that similar language in Title VII, which prohibits employment-related discrimination "because of [an] individual's … sex,"

42 U.S.C. § 2000e-2(a), "incorporates the simple and traditional standard of but-for causation." 590 U.S. at 656 (internal quotation marks and citation omitted). Under this well-established standard, "[s]o long as the plaintiff's sex was one but-for cause" of a defendant's action, "that is enough to trigger the law." *Id.* Because events "[o]ften[] … have multiple but-for causes," sex need not be the only, or even the "main," cause. *Id.* A defendant "cannot avoid liability," in other words, "just by citing some *other* factor that contributed to its challenged … decision." *Id.*

To determine "whether a particular factor was a but-for cause of a given event," this Court must "begin by assuming that that factor was present at the time of the event, and then ask whether, even if that factor had been absent, the event nevertheless would have transpired in the same way." *Price Waterhouse*, 490 U.S. at 240 (plurality opinion); *see Bostock*, 590 U.S. at 656 (instructing courts to assess but-for causation by "chang[ing] one thing at a time and see[ing] if the outcome changes"). Applying this test, Dr. Herley's sex was plainly a but-for cause of Aetna's categorical denial of her request for insurance coverage for GAFR, irrespective of medical necessity.

In general, Aetna covers facial reconstruction surgeries "despite [their] cosmetic aspects" where those surgeries are "needed to improve the functioning of a body part or [are] otherwise medically necessary." CPB 0031, *supra* p. 11. For example, for facial prostheses or hair transplants, such treatments are covered when medical necessity criteria are satisfied, even where the treatments "do[] not correct a functional deficit." *Id.* And surgeries such as earlobe repair and lip surgery are covered when necessary to correct the effects of physical trauma. *Id.*

CPB 0615, however, forecloses inquiry into medical necessity when the same or similar procedures are "performed as a component of a gender transition." JA159. As a result, a woman's access to medical necessity review materially changes depending on her birth-assigned sex. If a woman assigned female at birth seeks facial surgery, she will generally receive an individualized inquiry into medical necessity—and will receive a finding of medical necessity if, for example, the surgery is needed to correct her appearance after a traumatic accident. A woman assigned male at birth, however, will *not* receive a medical necessity assessment for facial reconstruction surgery that is needed to correct the incongruence between the woman's outward appearance and her female

sex—no matter how instrumental the surgery could be in treating the symptoms of her diagnosed gender dysphoria. In those latter cases, CPB 0615 deems the surgery "cosmetic," irrespective of medical need, because of the woman's birth-assigned sex. *Id.*

This policy violates Section 1557's assurance that one's sex has no legitimate role to play in one's eligibility for federally funded health benefits. The application of CPB 0615, and the resulting determination of whether a medical necessity determination is permitted or foreclosed, depends unambiguously on an individual's sex. A cisgender woman with a diagnosed medical need for facial surgery will never run into CPB 0615 (and its categorical bar on medical necessity review) as an obstacle to coverage access: CPB 0031 guarantees her an individualized review. A transgender woman for whom facial surgery is a medically necessary component of her gender transition, though, will *never* be able to receive individualized review because CPB 0615 forecloses it. By "chang[ing] one thing"—the woman's birth-assigned sex—"the outcome changes." *Bostock*, 590 U.S. at 656. Sex is accordingly "a but-for cause" of Aetna's refusal to inquire into medical necessity. *Id.*

**2.** What is more, "even if" it were uncertain whether Aetna would have deprived Dr. Herley of medical necessity review had her sex "not been taken into account"—and it is not—Dr. Herley has, at a minimum, shown that sex "was a factor in the [challenged] decision." *Price Waterhouse*, 490 U.S. at 241 (plurality opinion). That showing is alone sufficient to support the district court's finding of discrimination. *See id.*

This conclusion flows directly from Section 1557's text. After all, "[t]he present, active tense of the [statute's] operative verbs"—to "be excluded," to "be denied," and to "be subjected to discrimination," 42 U.S.C. § 18116(a)—turns this Court's "attention to the actual moment of the event in question, the adverse [healthcare] decision." *Price Waterhouse*, 490 U.S. at 240–41 (plurality opinion). Thus, "[t]he critical inquiry, the one commanded by the words of [the statute], is whether gender was a factor in the [challenged] decision *at the moment it was made*." *Id.* at 241; *see Roe v. St. John's Univ.*, 91 F.4th 643, 652 (2d Cir. 2024) (holding that Title IX's prohibition on sex discrimination in education incorporates *Price Waterhouse*'s "motivating factor" standard even though Title IX, like Section 1557, does not reference the standard by name). As the Supreme Court has recognized, this standard is "more

forgiving" than the but-for causation standard described above, *Bostock*, 590 U.S. at 657, and it creates an independent basis for affirming the district court's holding that Dr. Herley is likely to succeed on the merits.

**3.** *Price Waterhouse* further reinforces the district court's holding on likelihood of success under either the but-for or motivating-factor standard because it held that a plaintiff can establish sex discrimination by showing that "stereotyping" contributed to a challenged action. *Price Waterhouse*, 490 U.S. at 251–52 (plurality opinion). As this Court has recognized, "the question of whether there has been improper reliance on sex stereotypes can sometimes be answered by considering whether the behavior or trait at issue would have been viewed more or less favorably if the [plaintiff] were of a different sex." *Zarda v. Altitude Express, Inc.*, 883 F.3d 100, 120 (2d Cir. 2018) (en banc), *aff'd*, 590 U.S. 644 (2020).

The disparate treatment that Aetna's policies afford cisgender and transgender women in the provision of medically necessary healthcare supports a probability that Dr. Herley will prevail in establishing, as a factual matter, that the discrepancy arises from discriminatory stereotypes. As explained above, if a cisgender woman requires facial surgery to correct the effects of a disfiguring accident, CPB 0031 would

require individualized assessment of whether the surgery is medically necessary. But if a transgender woman seeks facial reconstruction to correct stereotypically masculine facial features that exacerbate severe gender dysphoria, CPB 0615 categorically trivializes the treatment as “cosmetic” and automatically dismisses her claim for coverage. Given the widespread clinical recognition of GAFR’s efficacy as a treatment, *see supra* p. 9, Dr. Herley will likely be able to establish that stereotypes, rather than medical science, undergird Aetna’s policy that facial surgery can sometimes be medically necessary to give a cisgender woman a female appearance that is accepted as “normal,” but is never medically necessary to do the same for a transgender woman. *See* JA1257 (district court’s finding that if Dr. Herley had been assigned female at birth and she “sought the same procedures to affirm the same gender identity …, [she] would necessarily receive a medical necessity determination”).

**B. Aetna’s contrary arguments are unavailing.**

**1.** Aetna attempts to defend its policy by contending that CPB 0615 withholds medical necessity review for GAFR based on the “medical use” for which the surgery is sought, not on the patient’s sex. Aetna Br. 29. The “medical use” that triggers the policy’s application, however, is

"gender transition." JA159. And, again, whether a facial surgery that is otherwise eligible for medical necessity review contributes to a "gender transition" necessarily depends on the alignment between the sex of the patient seeking it and the patient's birth-assigned sex. *See Bostock*, 590 U.S. at 656 (explaining that a defendant cannot evade the result of "the traditional but-for causation standard … just by citing some *other* factor that contributed to its challenged … decision"); *Price Waterhouse*, 490 U.S. at 241 (plurality opinion) (observing that "the words 'because of'" sex "do not mean '*solely* because of'" sex). Aetna's policy therefore violates Section 1557's promise that, in the healthcare context, "men and women [must] be treated without regard to their sex." *B.P.J.*, 146 S. Ct. at 2373.

Despite Aetna's suggestion to the contrary, it is irrelevant that "[n]o one—male or female—c[an] obtain the treatments at issue" as part of a gender transition. Aetna Br. 23. *Bostock* expressly rejected this reasoning, explaining that it "does [not] matter that, when a[] [defendant] treats [an individual] worse because of that individual's sex, other factors may contribute to the decision." *Bostock*, 590 U.S. at 661. An employer thus cannot evade liability by contending that "it is equally happy to fire male *and* female employees who are … transgender"

because in "each instance" the employee's sex would be a but-for cause of the termination. *Id.* at 662; *see id.* (explaining that "an employer who fires both Hannah and Bob" for being transgender "doubles rather than eliminates … liability"). Section 1557, like Title VII, "works to protect individuals of both sexes from discrimination, and does so equally." *Id.* at 659. Aetna, then, cannot avoid the conclusion that its categorical coverage exclusion is based on sex by observing that the exclusion applies to both transgender women and transgender men. *Cf. B.P.J.*, 146 S. Ct. at 2378 (noting that, "if a school had a co-ed sports team but prohibited all transgender individuals from participating on the team, that would be a distinct transgender classification"); *Bostock*, 590 U.S. at 660 ("[I]t is impossible to discriminate against a person for being … transgender without discriminating against that individual based on sex.").

It is also irrelevant that Aetna covers *other* components of a gender transition, not at issue here, when medically necessary. A discriminatory policy need not be motivated by animus toward a disfavored class to violate a statutory prohibition on sex discrimination. *See, e.g.*, *City of L.A. Dep't of Water & Power v. Manhart*, 435 U.S. 702, 704 (1978) (holding that an employer's policy of requiring female employees to make larger

pension-fund contributions than male employees violated Title VII even though it was driven by the actuarial fact that, "[a]s a class, women live longer than men"). What matters is that Aetna treated "*this*" plaintiff, and others like her, "worse in part because of her sex" by refusing to conduct an individualized medical necessity review that she would have received had her birth-assigned sex been female. *Bostock*, 590 U.S. at 659; *see* 42 U.S.C. § 18116(a) (protecting "individual[s]" from the denial of healthcare access based on sex).

Aetna is ultimately left to defy the record by suggesting that GAFR is *never* a medically necessary component of a gender transition in the first place. *See* Aetna Br. 28. But the district court did not clearly err by concluding, based on the record before it, that this factual argument is unlikely to succeed. After all, the prevailing professional standards of care and a robust body of medical literature—portions of which are cited by Aetna itself in CPB 0615—recognize GAFR as a safe and effective treatment for gender dysphoria. *See supra* pp. 9, 12. Dr. Herley presented sworn expert testimony from healthcare providers attesting to the medical necessity of GAFR in certain cases. *See* JA80–92; D. Ct. Dkt. 62-2. Moreover, Aetna conducts individualized medical necessity review

for GAFR where state law or the terms of a plan require it to do so. *See supra* p. 13. Aetna has produced no evidence that this review uniformly results in coverage denial for lack of medical necessity in every case.

Aetna is thus wrong to claim that faithful enforcement of Section 1557 "would endanger transgender patients" by barring covered entities from prohibiting "demonstrably dangerous or fringe" treatments for gender dysphoria. Aetna Br. 28; *see also id.* at 27 (arguing that although prostate cancer "arises only in [birth-assigned] males," insurers should be able to "deem[] a procedure experimental, unsafe, or ineffective to treat prostate cancer"). Dr. Herley has not argued—and the district court did not hold—that an insurer must cover every procedure that a patient requests to treat gender dysphoria, prostate cancer, or any other condition that is associated with a patient's sex or transgender status. Rather, Section 1557 requires that such patients receive what all other patients receive: an individual assessment of medical need. Unsafe and ineffective treatments will flunk that assessment. The record here shows that GAFR is safe and effective—and Aetna's experience conducting medical necessity review for this form of treatment when required by state law or the terms of a plan only underscores that point.

**2.** Unable to demonstrate that its policy comports with the plain terms of Section 1557, Aetna hinges the bulk of its merits argument on the Supreme Court's opinion in *Skrmetti*—an opinion that did not address Section 1557 and its promise of nondiscriminatory healthcare access. *See, e.g.*, Aetna Br. 22–24. *Skrmetti* involved an Equal Protection Clause challenge to a state law that banned certain gender-affirming medical treatments for minors. *See* 605 U.S. at 500. In rejecting the challenge, the Court placed dispositive weight on the fact that the law at issue "classifie[d]" on the constitutionally permissible bases of "medical use" and age by authorizing specified forms of medical care "to treat certain conditions but not to treat gender dysphoria, gender identity disorder, or gender incongruence" in minors. *Id.* at 511. Emphasizing that legislatures generally have broad latitude under the Constitution to regulate medical practice as long as they do not "*target*[] a suspect class," the Court explained that "the Constitution presumes that even improvident decisions will eventually be rectified by the democratic process." *Id.* at 510 (emphasis added; citations omitted).

In Section 1557, though, Congress exercised its "wide discretion to pass legislation" in areas related to medical practice and specifically

prohibited sex discrimination in access to medically necessary care, *id.* at 524 (citation omitted), by commanding that "an individual shall not" be denied the benefits of federally funded health programs "on the ground" of sex. 42 U.S.C. § 18116(a). *Skrmetti* had no occasion to consider—and did not consider—whether Congress intended this prohibition to cover discrimination "based on medical use," 605 U.S. at 517, where, as here, discrimination based on a given procedure is necessarily also based on sex. *Cf. Bostock*, 590 U.S. at 665 (rejecting the idea that "the plaintiff's sex need … be the sole or primary cause" of the defendant's challenged action for liability to attach under Title VII).

To be sure, after concluding that the state law at issue posed no constitutional problem, the Court in *Skrmetti* went on to say that *Bostock* "d[id] not alter" the Court's analysis. 605 U.S. at 519. Explicitly declining to "consider[] whether *Bostock*'s reasoning reaches beyond the Title VII context," the Court opined that even if *Bostock*'s but-for causation test were to apply, the state law would nonetheless classify based on "diagnosis." *Id.* at 520. This observation, however, was relevant only because of the constitutional context in which it appeared. In *Skrmetti*, the Court read its prior opinion in *Geduldig v. Aiello*, 417 U.S. 484 (1974),

to establish that the Equal Protection Clause—which applies to sex discrimination across a range of contexts—does not demand heightened judicial scrutiny where a state "regulat[es] a medical procedure," such as a procedure related to pregnancy, that is inherently associated with members of a particular sex, "unless the regulation is a mere pretext for invidious sex discrimination." 605 U.S. at 518. Accordingly, having concluded that the state law at issue classified based on diagnosis, the Court did not go on to determine whether sex, in turn, was a necessary component of the diagnosis-based classification. In the constitutional setting, the Court did not need to do so.

Critically, Congress has explicitly rejected importing *Geduldig*'s constitutional principles into federal antidiscrimination statutes like Section 1557. In 1976, in *General Electric Co. v. Gilbert*, 429 U.S. 125 (1976), the Supreme Court relied on *Geduldig* to hold that "an exclusion of pregnancy from a disability-benefits plan providing general coverage is not a gender-based discrimination at all" under Title VII. 429 U.S. at 136. Just two years later, Congress amended Title VII to "overrule [that] decision." *Newport News Shipbuilding & Dry Dock Co. v. EEOC*, 462 U.S. 669, 670 (1983). But rather than adding a separate antidiscrimination

protection for pregnant employees, Congress made clear that the relevant protection was already "include[d]" in Title VII's prohibition on sex discrimination. Pub. L. No. 95-555, 92 Stat. 2076, 2076 (1978), *codified at* 42 U.S.C. § 2000e(k). In so doing, Congress "not only overturned the specific holding in [*Gilbert*], but also rejected the test of discrimination employed by the Court in that case." *Newport News*, 462 U.S. at 676; *see Philbrook v. Ansonia Bd. of Educ.*, 757 F.2d 476, 483 (2d Cir. 1985) (citing *Newport News*), *abrogated on other grounds by Bergin v. N.Y. State Unified Ct. Sys.*, — F.4th —, 2026 WL 2035593 (2d Cir. July 15, 2026).

The broad language of Section 1557, which specifically targets the problem of the unequal provision of and access to healthcare, cannot be read to contain an unwritten exception that permits discrimination based on sex as long as it is framed as discrimination based on an inherently sex-linked treatment or condition. When Congress enacted the Affordable Care Act in 2010, Congress's express rejection of *Gilbert*'s Title VII analysis had been established for over thirty years. And it had been clear for just as long that Title IX, too, is properly interpreted to bar discrimination based on sex-linked medical conditions. *See, e.g.*, *Nondiscrimination on Basis of Sex*, 40 Fed. Reg. 24128, 24131 (June 4,

1975) (interpreting Title IX to prohibit discrimination based on pregnancy and related conditions). When Congress enacted Section 1557, it used language that echoes the substantive antidiscrimination provisions in these earlier statutes, and it expressly incorporated Title IX's baseline prohibition on sex discrimination. *See, e.g.*, *Lorillard v. Pons*, 434 U.S. 575, 581 (1978) ("[W]here, as here, Congress adopts a new law incorporating sections of a prior law, Congress normally can be presumed to have had knowledge of the interpretation given to the incorporated law, at least insofar as it affects the new statute."). In doing so, Congress knew that consideration of a patient's sex can properly inform healthcare decisions. *See, e.g.*, 21 U.S.C. § 399b (Affordable Care Act provision establishing an Office of Women's Health within the Food and Drug Administration). But while a patient's sex may be relevant to a provider's treatment decisions, Congress decided to enact a broad antidiscrimination provision to ensure that sex is never relevant to a patient's *access* to the treatment that her provider determines she needs.

Aetna's argument that Section 1557 permits discrimination based on "medical use[s]," even where those uses are inherently based on a patient's sex, Aetna Br. 29, would eviscerate long-established statutory

protections. Despite Congress's decision to reject *Gilbert*'s reasoning, an insurer could carve out pregnancy-related conditions (or prostate cancer or gender dysphoria) from coverage and defend against a claim of sex discrimination on the grounds that the coverage exclusion is based on an unauthorized "medical use" or the lack of a "qualifying diagnosis." While such a carveout (if effected by a state actor) may not trigger heightened scrutiny under the Constitution, *see Geduldig*, 417 U.S. at 496–97; *Skrmetti*, 605 U.S. at 518 (applying *Geduldig*), Aetna cannot square it with a statute specifically aimed at ensuring an individual's access to federally funded health programs or activities irrespective of sex. *See* 42 U.S.C. § 18116. Put another way, even if Aetna is right that, under *Skrmetti*, CPB 0615 discriminates based on the "medical use" of gender transition, *Skrmetti* is silent on the critical question whether that medical use is, in turn, based on sex within the meaning of Section 1557.

Even on its own terms, moreover, *Skrmetti*'s causation analysis is inapplicable to the facts here. The state law at issue in *Skrmetti* did not discriminate based on sex or transgender status, the Court held, because changing the sex of a minor who was denied treatment under the state law would not alter the denial. 605 U.S. at 520. As the Court construed

the law, a minor required a "qualifying diagnosis" to receive treatment, and changing the sex of a minor who was denied care would not generate the required diagnosis. *See id.* Under Aetna's policies, in contrast, medical necessity—rather than a "qualifying diagnosis," Aetna Br. 24—is the touchstone that determines whether a cisgender woman's facial surgery is covered. *See* CPB 0031, *supra* p. 11. Accordingly, unlike in *Skrmetti*, changing Dr. Herley's birth-assigned sex from male to female *would* change the result: Rather than being categorically barred from receiving the requested surgeries, she would be eligible for an individual determination as to medical need because the surgeries would no longer be sought "as a component of a gender transition." JA159. Such a determination is precisely what Dr. Herley seeks and precisely what the district court's injunction requires Aetna to provide.

Moreover, *Skrmetti*'s discussion of how *Bostock*'s but-for causation standard might apply in the constitutional context has no bearing on Dr. Herley's statutory claim for the additional reason that Section 1557 also incorporates the broader motivating-factor standard. *See supra* pp. 43–44. Dr. Herley's sex was explicitly a factor in Aetna's decision to deny coverage based on a categorical exclusion for facial surgeries "performed

as a component of a gender transition," JA159, and the denial accordingly violated Section 1557. Nothing in *Skrmetti*'s discussion of *Bostock* calls this reasoning into question. *Cf. Bostock*, 590 U.S. at 657 (stating that "nothing in [*Bostock*'s] analysis depends on the motivating factor test"). Nor did the Court in *Skrmetti* confront a factual record that it viewed as "evinc[ing] sex-based stereotyping." *Skrmetti*, 605 U.S. at 516. Here again, *see supra* pp. 44–45, Dr. Herley's likeliness of showing that CPB 0615 classifies based on stereotypes about transgender patients provides still further support for the district court's merits analysis.

The nonbinding opinions from other courts of appeals that Aetna cites to support its reading of *Skrmetti*, *see* Aetna Br. 22, 33, do not address these points. Indeed, three of them did not interpret Section 1557 at all. *See Brandt ex rel. Brandt v. Griffin*, 147 F.4th 867, 877 (8th Cir. 2025) (en banc); *Poe ex rel. Poe v. Drummond*, 149 F.4th 1107, 1118–19 (10th Cir. 2025); *Lange v. Houston Cnty.*, 152 F.4th 1245, 1250 (11th Cir. 2025) (en banc). And although the remaining two opinions address Section 1557, they do not analyze the full range of issues presented here. *See Anderson v. Crouch*, 169 F.4th 474, 492–94 (4th Cir. 2026); *Pritchard ex rel. C.P. v. Blue Cross Blue Shield of Ill.*, 159 F.4th 646, 669–71 (9th

Cir. 2025). For example, neither addresses the "motivating factor" standard or the role of sex stereotyping, and neither comprehensively analyzes whether discrimination based on a given diagnosis or "medical use" violates Section 1557's healthcare-specific antidiscrimination mandate where the diagnosis or use itself depends on sex.[4]

**3.** In a footnote, Aetna seeks support from the Supreme Court's recent decision in *B.P.J.*, which, Aetna suggests, undermines *Bostock*'s guidance on how to assess claims of sex discrimination. Aetna Br. 31 n.3. Aetna misreads *B.P.J.* There, the Supreme Court confronted the question whether Title IX's athletics-specific framework barred West Virginia from basing eligibility for women's and girls' sports team on a

---

[4] Aetna also makes the baseless argument that the Supreme Court "signaled that *Skrmetti* controls under section 1557" when the Court vacated and remanded the Fourth Circuit's opinion in *Kadel v. Folwell*, 100 F.4th 122 (4th Cir. 2024) (en banc), following the decision in *Skrmetti*. Aetna Br. 33 n.4. An order from the Supreme Court "granting certiorari, vacating the judgment below, and remanding a case to the lower court for further consideration" is "merely a device that allows a lower court that had rendered its decision without the benefit of an intervening clarification to have an opportunity to reconsider that decision and, if warranted, to revise or correct it." *Gonzalez v. Justices of Mun. Ct. of Bos.*, 420 F.3d 5, 7 (1st Cir. 2005). And although *Kadel* held that a coverage exclusion violated Section 1557, it *also* held that the exclusion violated the Equal Protection Clause. *See* 100 F.4th at 164. *Skrmetti* was clearly pertinent to the latter holding.

participant's birth-assigned sex. *See B.P.J.*, 146 S. Ct. at 2369. In answering "no," the Court emphasized that a 1974 amendment to Title IX expressly carved out "athletic activities" as a distinct area for regulation and directed the relevant executive agency to promulgate "reasonable" rules "considering the nature of particular sports." *Id.* at 2370 (citation and emphasis omitted). The rules that were promulgated in 1975 and that have remained in place ever since authorized schools to maintain separate teams for "members of each sex." *Id.* (citation omitted). Concluding that "[s]eparate sports teams for [birth-assigned] males and [birth-assigned] females are reasonable" given "the distinctiveness of competitive sports" and the unique "safety and competitive fairness issues" that arise in that context, *id.* at 2372, the Court held that West Virginia had not violated Title IX. Far from holding that *Bostock* does not apply to Title IX claims—or saying anything about Section 1557—*B.P.J.* explains that *Bostock* does not address "the sports context," where Title IX and its regulations expressly "permit[] separate teams." *Id.* at 2373. In Section 1557, in contrast, Congress "require[d] that men and women be treated without regard to their sex," without *any* statutory exception, when it comes to access to federally funded healthcare. *Id.*

## III. The remaining preliminary injunction factors favor Dr. Herley.

The district court properly exercised its discretion in concluding that the remaining preliminary injunction factors—irreparable harm, balance of the equities, and the public interest—support the entry of preliminary relief. Aetna's arguments to the contrary are meritless.

### A. Dr. Herley is suffering ongoing, irreparable harm absent injunctive relief.

The district court correctly found that Dr. Herley's "lack of access to medically necessary gender-affirming care and the attendant health risks" constitute irreparable harm that merits an injunction. SA40 (citing cases). As the district court explained, SA42–44, both Dr. Herley and her psychologist testified to the severe and worsening impact that continued inability to receive GAFR is having on Dr. Herley's mental and physical health. *See, e.g.*, JA129 (Dr. Herley's testimony that, "[w]ithout the facial surgeries, I'm worried that[] … the distress … will never subside"); JA151 (Dr. Seward's testimony as to how "Dr. Herley has continued to deteriorate since Aetna's denial of coverage"). The district court's finding that this undisputed evidence establishes irreparable harm was correct—and certainly not clearly erroneous. *See LaForest v. Former Clean Air*

*Holding Co.*, 376 F.3d 48, 55–58 (2d Cir. 2004) (affirming a district court's finding of irreparable harm arising from the loss of medical coverage and the consequent health risks); *see also, e.g.*, *Fishman v. Paolucci*, 628 F. App'x 797, 801 (2d Cir. 2015) (summary order) ("A lack of medical services is exactly the sort of irreparable harm that preliminary injunctions are designed to address.").

Aetna does not dispute that Dr. Herley will continue to experience serious medical harm without GAFR or that such harm is irreparable. Instead, Aetna attempts to recast Dr. Herley's physical and mental harm as compensable economic harm by suggesting that she could pay out-of-pocket for GAFR and recover monetary damages at the end of the suit. Aetna Br. 46–48. Aetna's suggestion is irreconcilable with this Court's decision in *LaForest*, which held that a reduction in medical coverage can constitute irreparable harm even though such a reduction can also be framed in terms of "increased costs of maintaining benefit levels." 376 F.3d at 56. Aetna's suggestion also contradicts Dr. Herley's unrebutted testimony that, "[w]ithout insurance coverage, [she] cannot afford to pay for the surgery" that she "need[s]" and is "desperate" to receive. JA128.

This case is not like *Stewart v. INS*, 762 F.2d 193 (2d Cir. 1985), on which Aetna relies. *See* Aetna Br. 46–47. There, this Court reversed a district court's finding that a government employee who had been suspended without pay faced irreparable harm absent an injunction. *Id.* at 195. Relying on the "particularly stringent standard for irreparable injury in government personnel cases" that the Supreme Court announced in *Sampson v. Murray*, 415 U.S. 61 (1974), this Court held that the plaintiff had not made the requisite showing of "extraordinary circumstances" that would render the injury caused by a temporary loss of income irreparable. *Stewart*, 762 F.2d at 199. Here, though, Dr. Herley's injury is not the loss of a government paycheck but deteriorating physical and mental health stemming from delayed access to medically necessary care. *Cf. Abbey v. Sullivan*, 978 F.2d 37, 46 (2d Cir. 1992) (observing that Medicare beneficiaries who face "deteriorating health" due to a coverage denial suffer "irreparable harm" that justifies waiving administrative exhaustion requirements that would prolong the path to relief). *Stewart* is accordingly inapposite.

Aetna also attempts to minimize the gravity of Dr. Herley's ongoing medical injury by characterizing her severe, diagnosed gender dysphoria

as mere "[d]istress and anxiety." Aetna Br. 47. Dr. Seward's testimony, however, establishes that if medically necessary care continues to be withheld, Dr. Herley's gender dysphoria will "likely become so severe as to disable her," her "social isolation could become so pronounced that she is unable to work altogether," and her "increasing thoughts of self-harm [will] likely … pose a serious risk of injury or death." JA151.

This unrebutted testimony from Dr. Herley's medical provider strongly supports the district court's finding of irreparable harm. *Cf. Shapiro v. Cadman Towers, Inc.*, 51 F.3d 328, 332 (2d Cir. 1995) (affirming a finding of irreparable harm based on a treating physician's testimony that the plaintiff's medical condition would cause "humiliation and discomfort," as well as "stress[] and ensuing fatigue" absent an injunction requiring her apartment building to accommodate the condition). And it sets this case apart from the cases that Aetna cites, Aetna Br. 47–48, which involve garden-variety emotional harms that are unrelated to a diagnosed medical issue. *See Guitard v. U.S. Sec'y of the Navy*, 967 F.2d 737, 742 (2d Cir. 1992) (observing that "loss of reputation" due to a military discharge is not irreparable); *Stewart*, 762 F.2d at 199–200 (holding that "humiliati[on]" and loss of "self-esteem" due to a

suspension from work is not irreparable); *Alvarez v. City of N.Y.*, 2 F. Supp. 2d 509, 514 (S.D.N.Y. 1998) (finding that the "emotional harm" of being subject to an internal investigation is not irreparable); *cf. Younger v. Harris*, 401 U.S. 37, 46 (1971) (holding that the "cost, anxiety, and inconvenience" experienced by most criminal defendants cannot "by themselves" justify a departure from the "fundamental policy" against federal injunctions of state-court criminal proceedings).

Despite Aetna's argument to the contrary, *see* Aetna Br. 48–49, the timing of Dr. Herley's motion for preliminary relief does not render the district court's finding of irreparable harm clearly erroneous. Aetna denied Dr. Herley's coverage request on December 13, 2024. JA135. Dr. Herley joined this suit on February 28, 2025, and moved for a preliminary injunction one business day later. *See* JA12. The fact that a brief interval following the coverage denial was needed to allow Dr. Herley to retain counsel, secure authorization to file an amended complaint within an existing lawsuit, and file a motion for preliminary relief casts no doubt on the gravity of Dr. Herley's undisputed medical condition.

Aetna cites a handful of cases that, it says, establish that this brief interval was excessive. Aetna Br. 49. The plaintiffs in two of Aetna's

cases, however, were sophisticated businesses seeking to protect their commercial interests, not private parties facing urgent health risks. *See Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985) (addressing "delay in applying for injunctive relief *in a trademark case*" (emphasis added)); *see also Tough Traveler, Ltd. v. Outbound Prods.*, 60 F.3d 964, 968 (2d Cir. 1995) (addressing an injunction against the sale of infringing products). In the third case, *Silber v. Barbara's Bakery, Inc.*, 950 F. Supp. 2d 432 (E.D.N.Y. 2013), the plaintiffs—unlike Dr. Herley—"waited more than four months after filing their complaint to move for a preliminary injunction" on their false-advertising claims. *Id.* at 442. These cases cast no doubt on the district court's well-supported finding of irreparable harm, still less establish that the court's finding was clearly erroneous.[5]

[5] In tension with its argument that Dr. Herley waited too long to seek a preliminary injunction, Aetna also suggests that Dr. Herley should have administratively appealed Aetna's coverage denial prior to filing suit. Aetna Br. 48–49. But as the district court correctly found, "[r]equiring [Dr. Herley] to exhaust [her] optional administrative remedies w[ould] only worsen [her] condition[]" by prolonging the interval before she could access medically necessary care. SA45. Aetna makes no argument that this finding was clearly erroneous.

### B. Aetna has not shown that it will suffer any injury from an injunction.

As against the "severe harm to … mental and physical health" that the district court found that Dr. Herley is "likely to experience" absent an injunction, the district court found that "[r]equiring Aetna to follow the law imposes no hardship upon it, especially where the administrative infrastructure to conduct medical necessity determinations for [Dr. Herley's] coverage request[] is already in place." SA53. Aetna identifies three purported harms that the district court supposedly overlooked, Aetna Br. 50–53, but none of them find support in the evidence.

First, Aetna maintains that the preliminary injunction that the district court entered—which requires Aetna to conduct medical necessity review for Dr. Herley's coverage request—"threatens to place Aetna in violation of its contractual obligations" to MTA. *Id.* at 50. The district court, however, found that the agreement between MTA and Aetna "delegate[s] all coverage determinations for gender-affirming procedures to Aetna." SA27. This finding was, to say the least, not clearly erroneous, *see supra* Part I, and, tellingly, Aetna identifies no provision in its contract with MTA that is inconsistent with the injunction's terms. Far from making a "reasoned choice not to provide" coverage for

medically necessary GAFR, Aetna Br. 50, the record reflects that MTA empowered *Aetna* to formulate the applicable coverage policies. *See* JA603. Aetna is free to change those policies at any point, *see* JA204, whether in response to a court order or for any other reason. Indeed, MTA's agreement with Aetna *requires* Aetna to follow the law. JA603.[6]

Second, Aetna claims that the injunction will injure its relationship with employers whose plans it administers. Aetna Br. 51–52. This argument fails for similar reasons. Aetna has produced no evidence that MTA would be "alienate[d]," *id.* at 51, if Aetna reviews Dr. Herley's coverage request for medical necessity, just as it reviews other requests (including, in some states, requests for GAFR coverage, *see supra* p. 13). Again, the evidence shows (and the district court found) the opposite: MTA *expects* Aetna to adopt and apply its own clinical coverage policies, which will evolve over time without MTA's input. *See supra* pp. 31–32.

[6] Aetna also argues that the preliminary injunction is inconsistent with its obligations under the Employee Retirement Income Security Act of 1974, but this argument is limited to the portion of the injunction that addresses Dr. Herley's co-plaintiff, Dr. Homnick. *See* Aetna Br. 50–51. Because that portion of the injunction is no longer at issue, *see supra* p. 3 n.1, the Court need not address that argument.

Third, Aetna expresses concern that the preliminary injunction could afford Dr. Herley complete relief, thereby mooting the case before it reaches final judgment. Aetna Br. 52–53. This Court will reach this argument, however, only if it affirms the district court's conclusion that Aetna's application of CPB 0615 is likely unlawful and will inflict irreparable injury on Dr. Herley if not enjoined. The cases that Aetna cites offer no basis for holding that the district court abused its discretion in determining that the injurious medical effects on Dr. Herley of Aetna's likely unlawful practice outweigh any harm that potential mootness as to one plaintiff could inflict on Aetna. *See Yang v. Kosinski*, 960 F.3d 119, 127–28 (2d Cir. 2020) (affirming entry of a preliminary injunction after noting that a risk of mootness is a factor for a court to consider but is not dispositive); *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 650–51 (2d Cir. 2015) (same); *cf. Singh v. Berger*, 56 F.4th 88, 97 (D.C. Cir. 2022) (*reversing* the denial of a preliminary injunction even though the requested injunction was "potentially claim-concluding").

Here, moreover, claims for compensatory damages by plaintiffs who received GAFR but incurred out-of-pocket expenses due to Aetna's categorical coverage exclusion are pending in the district court. *See* JA76.

Resolution of those claims will afford Aetna the opportunity to receive a final judgment on the exclusion's lawfulness, irrespective of whether Dr. Herley's claim for injunctive relief becomes moot.

### C. The public interest supports an injunction.

The district court also found that preliminary relief "serves the public interest by furthering access to medically necessary care and requiring Aetna to administer its health insurance plans according to the law." SA53. In urging this Court to reverse that finding, Aetna simply repackages arguments that this Court necessarily will have rejected if it reaches this preliminary injunction factor. Aetna observes that the public interest favors application of controlling Supreme Court precedent, Aetna Br. 53, but, as explained above, *see supra* Part II, the district court faithfully applied Supreme Court precedent and correctly concluded that Dr. Herley is likely to prevail on the merits. And although Aetna contends that an injunction will disserve the public interest by imposing costs on MTA that will supposedly "frustrate [its] contracted-for expectations," Aetna Br. 54, the district court correctly found that MTA expects *Aetna* to make appropriate and lawful coverage decisions. SA27; *see supra* Parts I, III.B. Besides, Aetna does not explain why cost savings derived

from a likely unlawful practice serve the public interest, particularly where those savings come at the expense of inflicting irreparable injury on an individual who is unable to access medically necessary care to treat her severe and worsening diagnosed health condition. To the contrary, "delays in treatment and prolonged suffering" *disserve* the public interest. *Rodde v. Bonta*, 357 F.3d 988, 999 (9th Cir. 2004).

## CONCLUSION

This Court should affirm the district court's entry of a preliminary injunction.

Respectfully submitted,

/s/ Nicolas A. Sansone
Nicolas A. Sansone
Allison M. Zieve
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
(202) 588-1000
nsansone@citizen.org

Joseph J. Wardenski
Wardenski P.C.
134 West 29th Street
Suite 709
New York, NY 10001
(347) 227-2500

Kelly Parry-Johnson
Ezra Cukor
Sydney Duncan
Anya Marino
Advocates for Trans Equality
Education Fund
520 Eighth Avenue, Suite 2204
New York, NY 10018
(646) 993-1688

Harini Srinivasan
Christine E. Webber
Sabrina S. Merold
Cohen Milstein Sellers & Toll LLP
1100 New York Avenue NW
Suite 800
Washington, DC 20005
(202) 408-4600

*Counsel for Plaintiffs-Appellees*

August 12, 2026

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Second Circuit Rule 32.1(a)(4)(A) because, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and the Rules of this Court, it contains 13,985 words.

This brief also complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook.

/s/ Nicolas A. Sansone
Nicolas A. Sansone
*Counsel for Plaintiffs-Appellees*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing Response Brief for Plaintiffs-Appellees with the Clerk of the Court for the United States Court of Appeals for the Second Circuit on August 12, 2026, using the ACMS system. I certify that all participants in this case are registered ACMS users and that service will be accomplished by the ACMS system.

/s/ Nicolas A. Sansone
Nicolas A. Sansone
*Counsel for Plaintiffs-Appellees*