# No. 26-820

## In the United States Court of Appeals for the Second Circuit

BINAH GORDON, KAY MAYERS, ALMA AVALLE, JAMIE HOMNICK, GENNIFER HERLEY, and S.N., individually and on behalf of all similarly situated individuals,

*Plaintiffs-Appellees*,

v.

AETNA LIFE INSURANCE COMPANY,

*Defendant-Appellant*.

On Appeal from the United States District Court for the District of Connecticut, No. 3:24-cv-1447, Hon. Victor A. Bolden

**BRIEF OF LAMBDA LEGAL DEFENSE AND EDUCATION FUND, INC. AS *AMICUS CURIAE***

Omar Gonzalez-Pagan
Nephetari Smith
**Lambda Legal Defense and Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY 10005
(212) 809-8585
ogonzalez-pagan@lambdalegal.org
nsmith@lambdalegal.org

*Counsel for Amicus Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, *amicus curiae* Lambda Legal Defense and Education Fund, Inc. certifies that it is a nonprofit organization, that it has no parent corporation, and that no corporation owns 10% or more of its stock.

**TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENT .......... I

TABLE OF CONTENTS .......... II

TABLE OF AUTHORITIES .......... III

INTEREST OF *AMICUS CURIAE* .......... 1

INTRODUCTION .......... 3

ARGUMENT .......... 5

I. *United States v. Skrmetti* does not apply in the statutory context. .......... 5

A. The reasoning of *Geduldig* and *Skrmetti* has never been applicable in the Title VII context, as Congress has expressly demarcated. .......... 6

B. The statutory and legislative histories of Title IX and Section 1557 of the Affordable Care Act demonstrate that *Geduldig*'s and *Skrmetti*'s reasoning cannot be extended to such contexts. .......... 12

C. The Court must consider the purpose and congressional intent behind the Affordable Care Act, and extending *Skrmetti*'s reasoning this context would undermine the Affordable Care Act's protections. .......... 15

D. Importing *Skrmetti's* reasoning would create a "transgender exception" inconsistent with the Affordable Care Act's statutory purpose and plain text. .......... 18

E. The Court should not join the Fourth and Ninth Circuits in extending *Skrmetti*'s reasoning to the statutory context. .......... 19

II. Even under *Skrmetti,* proxy discrimination may be actionable under Section 1557 of the Affordable Care Act if a plaintiff can show the use of a proxy or pretext for intentional discrimination against transgender persons. .......... 20

CONCLUSION .......... 24

CERTIFICATE OF COMPLIANCE .......... 26

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Crouch*,
169 F.4th 474 (4th Cir. 2026) .............................................................. 1, 11

*Arce v. Douglas*,
793 F.3d 968 (9th Cir. 2015) ............................................................... 21

*Bostock v. Clayton County*,
590 U.S. 644 (2020)................................................................................ 3

*Campbell v. Drexel Univ.*,
785 F.Supp.3d 48 (E.D. Pa. 2025).......................................................... 13

*Cmty. Servs., Inc. v. Wind Gap Mun. Auth.*,
421 F.3d 170 (3d Cir. 2005) ............................................................ 22, 24

*Coleman v. Ct. of Appeals of Md.*,
566 U.S. 30 (2012) .................................................................................. 7

*Conley v. Nw. Fla. State Coll.*,
145 F.Supp.3d 1073 (N.D. Fla. 2015) .................................................. 13

*Connell v. Lima Corp.*,
988 F.3d 1089 (9th Cir. 2021)................................................................ 12

*Cross by & through Cross v. State*,
2024 MT 303, 419 Mont. 290, 560 P.3d 637 ............................................ 1

*Cummings v. Missouri*,
71 U.S. 277 (1867)................................................................................. 20

*Cummings v. Premier Rehab Keller, P.L.L.C.*,
596 U.S 212 (2022)................................................................................. 18

*Davis v. Guam*,
932 F.3d 822 (9th Cir. 2019) ................................................................ 22

*Dekker v. Weida*,
679 F. Supp. 3d 1271 (N.D. Fla. 2023) ................................................... 1

*Dino V. v. Collins*,
EEOC Appeal No. 2023002331, 2025 WL 1565797 (Apr. 15, 2025) ............ 21

*Doe v. Snyder*,
28 F.4th 103 (9th Cir. 2022) ............ 13

*Geduldig v. Aiello*,
417 U.S. 484 (1974) ............ 4

*Gen. Elec. Co. v. Gilbert*,
429 U.S. 125 (1976) ............ 4

*Gerdom v. Cont'l Airlines*,
692 F.2d 602 (9th Cir. 1982) ............ 24

*Hammons v. Univ. of Md. Med. Sys. Corp.*,
649 F. Supp. 3d 104 (D. Md. 2023) ............ 15

*Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am., UAW v. Johnson Controls, Inc.*,
499 U.S. 187 (1991) ............ 23

*King v. Burwell*,
576 U.S. 473 (2015) ............ 17

*League of Women Voters of Fla. Inc. v. Fla. Sec'y of State*,
66 F.4th 905 (11th Cir. 2023) ............ 21

*Lorillard v. Pons*,
434 U.S. 575 (1978) ............ 14

*Mayweathers v. Newland*,
314 F.3d 1062 (9th Cir. 2002) ............ 5

*McWright v. Alexander*,
982 F.2d 222 (7th Cir. 1992) ............ 24

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
567 U.S. 519 (2012) ............ 18

*Newport News Shipbuilding and Dry Dock Co. v. E.E.O.C.*,
462 U.S. 669, (1983) ............ 7, 9, 11

*Pac. Shores Props., LLC v. City of Newport Beach*,
730 F.3d 1142 (9th Cir. 2013) .................................................................. 21

*Pers. Adm'r of Massachusetts v. Feeney,*
442 U.S. 256 (1979)................................................................................ 20

*Pfeiffer by Pfeiffer v. Marion Ctr. Area Sch. Dist.*,
917 F.2d 779 (3d Cir. 1990) ...................................................................... 13

*PFLAG, Inc. v. Trump,*
769 F.Supp.3d 405 (D. Md. 2025).................................................................. 1

*Pritchard on behalf of C.P. v. Blue Cross Blue Shield of Illinois*,
159 F.4th 646 (9th Cir. 2025) ........................................... 1, 11, 19, 22

*Ratzlaf v. United States*,
510 U.S. 135 (1994) ................................................................................ 10

*Rice v. Cayetano*,
528 U.S. 495 (2000)................................................................................ 24

*Schmitt v. Kaiser Found. Health Plan of Wash.*,
965 F.3d 945 (9th Cir. 2020) .................................................................... 18

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,
600 U.S. 181 (2023)........................................................................... 23, 24

*United States v. Gordon*,
875 F.3d 26 (1st Cir. 2017) .......................................................................... 8

*United States v. Koutsostamatis*,
956 F.3d 301 (5th Cir. 2020)........................................................................ 6

*United States v. Skrmetti,*
605 U.S. 495 (2025)......................................................................... passim

*Van Wyhe v. Reisch*,
581 F.3d 639 (8th Cir. 2009) ........................................................................ 5

*Village of Arlington Heights v. Metropolitan Housin Development Corp.*,
429 U.S. 252 (1977)................................................................................ 20

*W. Virginia v. B.P.J. by Jackson*,
146 S. Ct. 2356 (2026) (Gorsuch, J., concurring) .......................................3, 24

*Washington v. Davis*,
426 U.S. 229 (1976).........................................................................................20

*Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs.*,
485 F.Supp.3d 1 (D.D.C. 2020)..........................................................................2

*Williams v. Kincaid,*
45 F.4th 759 (4th Cir. 2022) .............................................................................19

**Statutes**

20 U.S.C. § 1681(a)(1)-(9) .................................................................................12

29 C.F.R. § 1604.10(b) (1982)..............................................................................8

42 U.S.C. § 18022(4)(B), (D) .............................................................................16

42 U.S.C. § 18116..................................................................................................3

42 U.S.C. § 18116(a) ....................................................................................16, 17

42 U.S.C. § 300gg-3(b)(1) ...................................................................................15

42 U.S.C. § 300gg-4.............................................................................................15

45 Fed. Reg. 30955 (May 9, 1980).......................................................................13

*Nondiscrimination in Health and Health Education Programs or Activities*, 85 Fed. Reg. 37,160 (June 19, 2020)............................................14

*Nondiscrimination in Health Programs and Activities*, 81 Fed. Reg. 31,375 (May 18, 2016).........................................................................14

*Nondiscrimination in Health Programs and Activities*, 89 Fed. Reg. 37,522 (May 6, 2024)...........................................................................14

*Nondiscrimination on the Basis of Sex*, 40 Fed. Reg. 24128 (June 4, 1975) ...............................................................................................13

**Other Authorities**

Erwin Chemerinsky, *Constitutional Law* 759 (3d ed. 2006) .................................... 7

Kenneth L. Karst, *The Supreme Court 1976 Term Foreword: Equal Citizenship Under the Fourteenth Amendment*, 91 Harv. L. Rev. 1 (1977) ........................................................................................ 7

Steven L. Lapidus, *Pregnancy Discrimination, Equal Compensation and the Ghost of Gilbert: Medical Insurance Coverage for Spouses of Employees*, 51 Fordham L. Rev. 696 (1983) ........................................................................................ 8

Sylvia A. Law, *Rethinking Sex and the Constitution*, 132 U. Pa. L. Rev. 955 (1984) ........................................................................ 7

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* (2012) ................................................ 12

**Rules**

Fed. R. App. P. 29(a)(2) ........................................................................ 2

Fed. R. App. P. 29(a)(5) ........................................................................ 26

Fed. R. App. P. 32(a)(5) ........................................................................ 26

Fed. R. App. P. 32(a)(6) ........................................................................ 26

Fed. R. App. P. 32(a)(7) ........................................................................ 26

Fed. R. App. P. 32(f) ............................................................................ 26

Fed. R. App. P. 32(g) ............................................................................ 26

Local Rule 29.1(c) ................................................................................ 26

Local Rule 32.1(a)(4) ............................................................................ 26

**Congressional Committee Materials**

111 Cong. Rec. H1855 (March 21, 2010) .............................................. 16

111 Cong. Rec. Vol. 156, No. 45, E462 (March 23, 2010) ...................... 16

123 Cong. Rec. 10581, 10582 (1977)) ........................................ 9

123 Cong. Rec. 29385 (1977) ........................................ 9

123 Cong. Rec. 29641 (1977) ........................................ 9

124 Cong. Rec. 21435 (1978) ........................................ 9

H.R. Rep. 95-948, 1978 U.S.C.C.A.N. 4749, 1978 WL 8570 .......................... 9, 10

## INTEREST OF *AMICUS CURIAE*[1]

*Amicus curiae* Lambda Legal Defense and Education Fund, Inc. is the nation's oldest and largest legal organization dedicated to achieving full recognition of the civil rights of LGBTQ+ people and everyone living with HIV through impact litigation, education, and policy advocacy. Since its founding, Lambda Legal has sought to eliminate discriminatory barriers to healthcare for LGBTQ+ people, particularly transgender people. *See*, *e.g.*, *United States v. Skrmetti,* 605 U.S. 495 (2025); *Anderson v. Crouch*, 169 F.4th 474 (4th Cir. 2026); *Pritchard on behalf of C.P. v. Blue Cross Blue Shield of Illinois*, 159 F.4th 646 (9th Cir. 2025); *Coe By & Through Coe v. Blanche*, No. 26 CIV. 4641 (KPF), 2026 WL 1951390 (S.D.N.Y. July 6, 2026); *PFLAG, Inc. v. Trump,* 769 F. Supp. 3d 405 (D. Md. 2025); *Dekker v. Weida*, 679 F. Supp. 3d 1271 (N.D. Fla. 2023), *appeal docketed*, No. 23-12155 (11th Cir., argued Nov. 22, 2024); *Cross by & through Cross v. State*, 2024 MT 303, 419 Mont. 290, 560 P.3d 637. In addition, Lambda Legal has served as counsel of record or *amicus curiae* in cases concerning the scope of the substantive protections contained within the Affordable Care Act. *See*, *e.g.*, *California v. Texas*,

---

[1] No party's counsel authored this brief in whole or in part, and no party or party's counsel contributed money to fund preparing or submitting this brief. No person other than *amicus*, its members, or its counsel made a monetary contribution to its preparation or submission.

593 U.S. 659 (2021); *Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 485 F. Supp. 3d 1 (D.D.C. 2020); *Rumble v. Fairview Health Servs.*, No. 14-CV-2037 SRN/FLN, 2015 WL 1197415 (D. Minn. Mar. 16, 2015).

Given Lambda Legal's experience involving litigation related to transgender healthcare as well as the substantive protections contained within the Affordable Care Act, Lambda Legal offers a unique perspective regarding *Skrmetti's* limited reach, particularly as it pertains to Section 1557 of the Affordable Care Act.

*Amici* file this brief pursuant to Federal Rule of Appellate Procedure 29(a)(2). All parties to this appeal consent to its filing.

## INTRODUCTION

When federally funded health programs deny coverage for health services or procedures because they are being prescribed for the treatment of gender dysphoria or because they relate to a transgender person's gender transition, such health programs unlawfully discriminate against transgender individuals on the basis of sex, in violation of Section 1557 of the Affordable Care Act, 42 U.S.C. § 18116. The Supreme Court's decision in *United States v. Skrmetti*, 605 U.S. 495 (2025), does not undercut this commonsense conclusion—one that is supported by the purpose, history, and text of statutory sex discrimination protection, including those incorporated in Section 1557.

*Skrmetti* does not apply in the statutory context. In *Skrmetti*, the Supreme Court expressly reaffirmed the validity of *Bostock v. Clayton County*, 590 U.S. 644 (2020). *See Skrmetti*, 605 U.S. at 519-20. And the Supreme Court has reaffirmed the *Bostock*'s holding post-*Skrmetti*. *See W. Virginia v. B.P.J. by Jackson*, 146 S. Ct. 2356, 2373 (2026); *id.* at 2383 (Gorsuch, J., concurring) (reiterating that "discriminating against a person for being … transgender necessarily entails discriminating against that person at least in part because of his biological sex"). Indeed, the Supreme Court specifically preserved *Bostock*'s clear holding that "it is impossible to discriminate against a person for being … transgender without discriminating against that individual based on sex." 590 U.S. at 660; *see also*

*Skrmetti*, 605 U.S. at 519-20. Ultimately, *Skrmetti* only addressed a challenge to *legislative* action under constitutional equal protection, concluding that deference to the legislative process was required. It does not apply to statutory civil rights cases like this one for myriad reasons.

First, foundational to *Skrmetti*'s reasoning was the legal fiction adopted in *Geduldig v. Aiello*, 417 U.S. 484 (1974), that a medical condition (pregnancy) cannot be a proxy for sex (women) under constitutional equal protection. But Congress has expressly and repeatedly rejected this fiction in the statutory context, including the Affordable Care Act. The connected legislative history of Title VII, Title IX, and the Affordable Care Act illustrate that Section 1557 of the Affordable Care Act recognizes that medical diagnoses can serve as a proxy for discrimination against certain protected classes. And Congress explicitly rejected the Supreme Court's ruling in *Geduldig* and *Gen. Elec. Co. v. Gilbert*, 429 U.S. 125 (1976), *Geduldig*'s statutory counterpart, that a medical diagnosis is not a proxy stand in for sex-based discrimination by subsequently amending Title VII. This same intention to prohibit proxy discrimination is integrated in Title IX and the Affordable Care Act.

Second, extending *Skrmetti's* sex and transgender discrimination analysis to the Affordable Care Act would not only undermine the Affordable Care Act's protections but insert a nonexistent "transgender exception" into the statute.

In any event, even under *Skrmetti*, as recognized in *Pritchard*, proxy discrimination may be actionable under Section 1557 of the Affordable Care Act if a plaintiff can show pretext for intentional discrimination.

Once the legislative history, purpose, and context of the statutory sex discrimination provisions are properly considered, one must conclude that *Skrmetti*'s reasoning should not be imported to the statutory context. Accordingly, *Amicus* respectfully urges the Court to reject Defendant's attempt to import *Skrmetti* to such context.

## ARGUMENT

### I. *United States v. Skrmetti* does not apply in the statutory context.

The Constitution sets a floor, not a ceiling—federal statutes like the Affordable Care Act may establish civil rights that rise above that established under the Constitution. *Cf. Van Wyhe v. Reisch*, 581 F.3d 639, 651 (8th Cir. 2009); *Mayweathers v. Newland*, 314 F.3d 1062, 1070 (9th Cir. 2002). For this reason, the Supreme Court's sex discrimination analysis in *Skrmetti* should be cabined to the equal protection context.

In *Skrmetti*, the Court was focused on what the Supreme Court determined to be a facially neutral classification that required "reconcil[ing] the principle of equal protection with the reality of legislative classification," and granting "wide latitude" to a legislative classification, subject to only a highly deferential "rational basis"

review unless the classification was afforded a "heightened" level of scrutiny. 605 U.S. at 509. Based on *Geduldig*, the Supreme Court concluded that Tennessee's law classified only based on age and medical use, and not sex or transgender status. Such is not the case here. *See infra*.

Unlike congressional statutes, policies from private health programs or health organizations do not receive the same level of deference as democratically elected officials, and the scope of the equal protection guarantee in our Constitution and statutory sex protections is similarly different, as the latter is substantively often broader. Put simply, the analysis in this context is and must be different. So long as a health program receives federal funding, discrimination like that at issue here is prohibited by Section 1557 of the Affordable Care Act.

### A. The reasoning of *Geduldig* and *Skrmetti* has never been applicable in the Title VII context, as Congress has expressly demarcated.

It is well established in statutory construction that "[t]ext should never be divorced from context." *United States v. Koutsostamatis*, 956 F.3d 301, 306 (5th Cir. 2020). Yet, Defendant Aetna and the Fourth and Ninth Circuit's decisions in *Anderson* and *Pritchard*, respectively, ignore a critical point about Congress's response to *Gilbert*, which inappropriately imported *Geduldig* to Title VII. When Congress enacted the Pregnancy Discrimination Act, Congress did *two* things: One, it corrected the *outcome* of *Gilbert*, in which the Court *misinterpreted* Title VII to exclude discrimination based on pregnancy or childbirth-related conditions. Two, it

"*unambiguously*" rejected "the *reasoning*" of *Gilbert* and *Geduldig*. *Newport News Shipbuilding and Dry Dock Co. v. E.E.O.C.*, 462 U.S. 669, 678 (1983) (emphasis added).

There can be little question that *Geduldig* and *Gilbert* are anomalies in sex discrimination jurisprudence. Since its inception, *Geduldig* has been widely criticized as an illogical aberration that inappropriately diminished sex discrimination protections under the United States Constitution's Fourteenth Amendment. *See*, *e.g.*, *Coleman v. Ct. of Appeals of Md.*, 566 U.S. 30, 54-59, n.6 (2012) (Ginsburg, J., dissenting); Kenneth L. Karst, *The Supreme Court 1976 Term Foreword: Equal Citizenship Under the Fourteenth Amendment*, 91 Harv. L. Rev. 1, 54, n.304 (1977) ("[T]he constitutional sport of *Geduldig* … and last Term's even sillier statutory counterpart, ... *Gilbert*, … with their Alice-in-Wonderland view of pregnancy as a sex-neutral phenomenon, are good candidates for early retirement.").[2] When these decisions were issued, they deviated from the well-established understanding that adverse treatment based on a condition or procedure that only a specific group of people may experience or undergo constitutes discrimination against said group. For

---

[2] *See also* Erwin Chemerinsky, *Constitutional Law* 759 (3d ed. 2006); Sylvia A. Law, *Rethinking Sex and the Constitution*, 132 U. Pa. L. Rev. 955, 983-84 (1984) ("Even the principal scholarly defense of *Geduldig* admits that the Court was wrong in refusing to recognize that the classification was sex-based[.]").

example, prior to *Geduldig* or *Gilbert*, the Equal Employment Opportunity Commission had issued guidelines interpreting Title VII as prohibiting discrimination based on pregnancy or other medical conditions.[3] Eighteen federal district courts and all federal appeals courts to have considered the issue reached the same conclusion.[4] As such, the reasoning of *Geduldig* and *Gilbert* represented grave deviations from the well-settled understanding of Title VII.

Congress's response underscored just how far these decisions strayed from Title VII's intended aims. "Statutory history and legislative context furnish additional sources of insight that a court may inspect when attempting to discern congressional purpose." *United States v. Gordon*, 875 F.3d 26, 33 (1st Cir. 2017). And here, the Pregnancy Discrimination Act sought not just to correct the outcome produced by *Gilbert* but also served as Congress's means to expressly disavow the application of *Geduldig*'s reasoning and animating principle to the statutory context.

*Gilbert* did not simply reach an unintended harmful result. Rather, it was wrong when it was decided because it applied a principle that was inapposite for

---

[3] *See* Steven L. Lapidus, *Pregnancy Discrimination, Equal Compensation and the Ghost of Gilbert: Medical Insurance Coverage for Spouses of Employees*, 51 Fordham L. Rev. 696, 696 n.2 (1983) (citing 29 C.F.R. § 1604.10(b) (1982)).

[4] *Id.* at 696 n. 3 & 4 (collecting cases).

statutory sex discrimination prohibitions. As House Report No. 95-948 explained, "[i]n enacting Title VII, Congress mandated equal access to employment," but "the Supreme Court's narrow interpretations of Title VII tend to erode our national policy of nondiscrimination in employment." H.R. Rep. 95-948, 1978 U.S.C.C.A.N. 4749, at 4751, 1978 WL 8570, at *3. Indeed, the House Report observed that the dissenting Justices in *Gilbert* "correctly interpreted" federal civil rights law, rejecting *Geduldig*'s reasoning. *Id.* at 4750, at *2; *see also Newport News*, 462 U.S. at 678-79 ("Proponents of the bill repeatedly emphasized that the Supreme Court had *erroneously interpreted congressional intent* and that amending legislation was necessary to *re-establish the principles of Title VII law*." (emphasis added)).[5] After all, as Representative Augustus Hawkins explained, "[t]his view—that a classification which harms only women and does so on the basis of a factor inextricably linked to gender—is contrary to any sensible approach to what constitutes discrimination." 123 Cong. Rec. 10581, 10582. So too is the case here with regards to the exclusion at issue and transgender people. Put simply the animating rationale of *Geduldig*, *Gilbert*, and *Skrmetti*—that

---

[5] *See* 123 Cong. Rec. 10581, 10582 (1977) (statement by Rep. Hawkins); 123 Cong. Rec. 29385 (1977) (statement by Sen. Williams); *id*. at 29387 (statement by Sen. Javits); 123 Cong. Rec. 29641 (1977) (statement by Sen. Bayh); *id.* at 29647 (statement by Sen. Williams); 124 Cong. Rec. 21435 (1978) (statement by Rep. Hawkins); *id.* at 21439 (statement by Rep. Corrada); *id.* at 21440 (statements of Reps. Thompson and LaFalce); *id.* at 21441 (statement by Rep. Whalen); *id.* at 21442 (statement by Rep. Myers).

regulation of a medical condition or procedure that only a specific group people may experience or undergo does not constitute discrimination against said group—is anathema to statutory sex discrimination prohibitions.

Indeed, in rejecting the reasoning of *Gilbert*, Congress explained that if it "were not to clarify its *original intent*, and the Supreme Court's interpretations of Title VII were allowed to stand, Congress would yield to an intolerable potential trend in employment practices." H.R. Rep. 95-948, 1978 U.S.C.C.A.N. 4749, at 4752, 1978 WL 8570, at *4. Unfortunately, by urging the Court to extend *Skrmetti*'s reasoning and animating principle, which are the same as *Geduldig*'s and *Gilbert*'s, to statutory discrimination claims, Defendant urges the Court to erroneously repeat and contribute to this intolerable trend.[6]

Nothing in the committee reports or floor statements noted above serves "to cloud a statutory text that is clear." *Ratzlaf v. United States*, 510 U.S. 135, 147-48 (1994). Instead, they represent simply a recognition that Congress was responding to

---

[6] For the same reasons, the Eleventh Circuit's decision in *Lange*, which did not engage with the arguments here (or in the dissents) explaining that *Skrmetti*'s reasoning is inapplicable in the statutory context, was wrongly decided. *See Lange v. Houston Cnty.*, 152 F.4th 1245, 1275 (11th Cir. 2025) (Rosenbaum, J., concurring in judgment) ("*Skrmetti* is based on *Geduldig*, whose application both Congress and the Court have emphatically rejected in the Title VII context"); *id.* at 1276 (J. Pryor, J., dissenting) ("[I]n Title VII cases, this reasoning has been rejected, first by Congress and then by the Supreme Court.").

a specific type of reasoning from the Supreme Court and rejecting it based on concerns that it deviated from the longstanding understanding that adverse treatment based on a medical condition or procedure that only a specific group people may experience or undergo constitutes discrimination against said group. Relying on such statutory context and statutory history to reject the extension of reasoning to the statutory context that Congress expressly rejected is a permissible use of legislative history.

In a way, *Anderson*'s and *Pritchard*'s reasoning acknowledging only Congress's correction of the outcome in *Gilbert*, but not Congress's rejection of *Gilbert*'s reasoning and animating principle (*see Anderson*, 169 F.4th at 493 n.17; *Pritchard*, 159 F.4th at 670), perverts the prior-construction and legislative acquiescence canons of statutory construction by holding that the Supreme Court's interpretation of Title VII in *Gilbert* still governs notwithstanding the amendments to Title VII and Congress's express and unambiguous rejection of the reasoning of *Gilbert* and *Geduldig*. Their reasoning resurrects a prior interpretation by the Supreme Court that not only Congress subsequently unambiguously rejected, but that the Supreme Court itself recognized was rejected in the Title VII context in *Newport News*. 462 U.S. at 678. And their reasoning ignores that Congress, by expressly rejecting the holding and reasoning of *Gilbert*, Congress did not acquiesce in the mode of analysis the Supreme Court employed in *Geduldig*, *Gilbert*, and now

*Skrmetti*—it repudiated it. The reasoning of *Anderson* and *Pritchard* also violates the settled rule that a statutory construction "that furthers rather than obstructs the [statute's] purpose should be favored." *Connell v. Lima Corp.*, 988 F.3d 1089, 1101 (9th Cir. 2021) (quoting Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 63 (2012)). And here the clear purpose of Title VII's broad sex discrimination prohibition was clarified when Congress, in no uncertain terms, rejected *Gilbert*'s reasoning and adopted the Pregnancy Discrimination Act.

In sum, the statutory history of Title VII illustrates that the principle that animated *Geduldig*, *Gilbert*, and *Skrmetti* (*i.e.*, that regulation of a medical condition or procedure that only a specific group people may experience or undergo does not constitute discrimination against said group) is not applicable in the statutory context.

### B. The statutory and legislative histories of Title IX and Section 1557 of the Affordable Care Act demonstrate that *Geduldig*'s and *Skrmetti*'s reasoning cannot be extended to such contexts.

What is more, the text and legislative histories of Title IX and Section 1557 demonstrate that *Geduldig*'s and *Gilbert*'s reasoning does not apply. Title IX's sweeping antidiscrimination rule broadly prohibits sex discrimination absent an express carveout in the statute. *See* 20 U.S.C. § 1681(a)(1)-(9). No carveout authorizes the discrimination at issue here.

For example, Title IX's unique statutory history reveals the error in extending *Skrmetti*'s reasoning to statutory discrimination claims like Plaintiffs' Section 1557

claim, despite courts' general practice to "interpret[] Title IX [and therefore Section 1557] by looking to … the caselaw interpreting Title VII." *Yusuf v. Vassar Coll.*, 35 F.3d 709, 714 (2d Cir. 1994); *see also Doe v. Snyder*, 28 F.4th 103, 114 (9th Cir. 2022) ("We construe Title IX's protections consistently with those of Title VII.").

Consistent with Congress's reaffirmation *after Gilbert* that Title VII prohibits discrimination based on pregnancy as a form of sex-based discrimination, Title IX's regulations have expressly prohibited discrimination based on pregnancy as a form of sex discrimination since their first formulation. *See Nondiscrimination on the Basis of Sex*, 40 Fed. Reg. 24128 (June 4, 1975); *see also* 45 Fed. Reg. 30955, 30,959, 30,962-63 (May 9, 1980). Indeed, the first set of Title IX regulations were issued in 1975, one year after *Geduldig* and one year prior to *Gilbert*. And though the Pregnancy Discrimination Act only amended Title VII, courts around the country have held that discrimination based on pregnancy is discrimination based on sex under Title IX. *See, e.g.*, *Campbell v. Drexel Univ.*, 785 F. Supp. 3d 48, 54 n.23 (E.D. Pa. 2025) (citing *Pfeiffer by Pfeiffer v. Marion Ctr. Area Sch. Dist.*, 917 F.2d 779, 784 (3d Cir. 1990)); *Conley v. Nw. Fla. State Coll.*, 145 F. Supp. 3d 1073, 1076 (N.D. Fla. 2015).

Thus, Title IX's own statutory history reveals the understanding that, <u>*under Title IX*</u>, adverse treatment based on a medical condition or procedure that only a specific group people may experience or undergo constitutes discrimination against

said group. In other words, Title IX's regulatory history confirms that the reasoning of *Geduldig*, *Gilbert*, and *Skrmetti* runs counter to the understanding of what constitutes discrimination under Title IX and Section 1557.

The same is true for Section 1557, which was adopted in 2010, as its legislative history reveals. It is well established that "where, as here, Congress adopts a new law incorporating sections of a prior law, Congress normally can be presumed to have had knowledge of the interpretation given to the incorporated law, at least insofar as it affects the new statute." *Lorillard v. Pons*, 434 U.S. 575, 581 (1978). In other words, when Congress adopted Section 1557, it did so with the understanding that adverse treatment based on a medical condition or procedure (like pregnancy) that only a specific group of people (like persons assigned female at birth) may experience or undergo constitutes discrimination against said group. Indeed, Section 1557's regulations have consistently prohibited discrimination based on pregnancy across presidential administrations.[7] And for the same reasons, Section 1557 prohibits discrimination against transgender people through the proxy of gender dysphoria. *See Hammons v. Univ. of Md. Med. Sys. Corp.*, 649 F. Supp. 3d 104, 117-18 (D. Md.

---

[7] *See*, *e.g.*, *Nondiscrimination in Health Programs and Activities*, 89 Fed. Reg. 37,522, 37,699 (May 6, 2024); *Nondiscrimination in Health and Health Education Programs or Activities*, 85 Fed. Reg. 37,160, 37,179-80 (June 19, 2020); *Nondiscrimination in Health Programs and Activities*, 81 Fed. Reg. 31,375, 31,467 (May 18, 2016).

2023) (refusing to apply *Geduldig* to Section 1557 claim involving gender-affirming medical care "given Congress's clear disapproval of that reasoning").

Under Defendant's theory (and *Anderson*'s and *Pritchard*'s reasoning) extending *Geduldig* and *Skrmetti*'s judicially created rule to the statutory context, discrimination based on pregnancy could be lawful under Title IX and Section 1557.

In short, by not recognizing Congress's rejection of *Gilbert*'s reasoning and animating principle and the Supreme Court's acknowledgment of the same, Defendant asks this Court to contravene the prior-construction and legislative acquiescence canons of statutory construction. Legislative history shows that the principle that animated *Geduldig* and *Skrmetti* in the equal protection context—*i.e.*, that regulation of a medical condition or procedure that only a specific group people may experience or undergo does not constitute discrimination against that group—is not applicable in the statutory context. For this reason, *Skrmetti* does not apply.

### C. The Court must consider the purpose and congressional intent behind the Affordable Care Act, and extending *Skrmetti*'s reasoning to this context would undermine the Affordable Care Act's protections.

The context of this Affordable Care Act case matters. When Congress penned Section 1557 of the Affordable Care Act, it intended to protect healthcare enrollees from discrimination based on their health status, medical diagnosis, and the medical services they use. *See*, *e.g.*, 42 U.S.C. §§ 300gg-3(b)(1) (prohibiting discrimination based on pre-existing conditions), 300gg-4 (prohibiting discrimination based on

health status), 18022(4)(B), (D) (prohibiting discrimination of essential health benefits based on age, disability, medical dependency, or expected length of life), 18116(a) (prohibiting discrimination based on race, sex, disability and age). The Affordable Care Act's Section 1557 was thus adopted to statutorily protect Americans from health insurance discrimination that targets people based on a protected characteristic by excluding or limiting coverage of medical diagnoses or procedures.

The congressional record pertaining to the Affordable Care Act documents that the ACA's reforms were particularly directed at preventing discrimination against people based on medical diagnosis, health status, or medical use. *See*, *e.g.*, 111 Cong. Rec. Vol. 156, No. 45, E462 (March 23, 2010) ("This legislative Language makes clear that Congress understands the subtle discrimination that can occur against people with [] other disabilities in the area of benefit design"); 111 Cong. Rec. H1855 (March 21, 2010) ("It is more control ... for consumers, and less for insurance companies. It is the end of discrimination against Americans with preexisting conditions"). Congress knew that eliminating barriers to enrollment in health insurance (such as ending pre-existing condition limits), without more, would not end health insurance discrimination. Health insurers could achieve the same result by incorporating exclusions and limitations in their benefits. That is why Congress included new benefit design anti-discrimination requirements in the

Affordable Care Act. Congress intended the Affordable Care Act to prohibit discrimination based on race, sex, age and disability, including when medical diagnoses and services are used as a proxy for such protected characteristics. *See* 42 U.S.C. § 18116(a).

If this court interprets *Skrmetti* to mean that medical diagnoses or services can never be a proxy for a protected trait even under the Affordable Care Act, as Defendant argues, then the Affordable Care Act's promise to eliminate benefit design discrimination would be a mirage. Health insurers could simply use medical diagnoses as the basis for exclusions and limitations to avoid the Affordable Care Act's anti-discrimination requirements. Insurers could freely exclude diagnoses like gender dysphoria, autism, cancer, or HIV from coverage, without running afoul of Affordable Care Act—essentially bringing back the very barriers to health coverage that the Affordable Care Act was designed to end. This cannot be so. As the Supreme Court concluded in *King v. Burwell*, "[i]n every case we must respect the role of the Legislature, and take care not to undo what it has done." 576 U.S. 473, 498 (2015). The Supreme Court, despite its holdings in *Geduldig* and *Gilbert*, has itself recognized Congress's intention to remove these barriers to coverage with the Affordable Care Act. "In the Affordable Care Act, Congress addressed the problem of those who cannot obtain insurance coverage because of preexisting conditions or other health issues." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 547

(2012); *see also Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S 212, 216 (2022).

*Skrmetti* cannot be interpreted to override Congress's purpose and intent when enacting the Affordable Care Act.

### D. Importing *Skrmetti's* reasoning would create a "transgender exception" inconsistent with the Affordable Care Act's statutory purpose and plain text.

The Affordable Care Act's Section 1557 was adopted to protect Americans from health insurance discrimination that occurs when an insurer designs a health plan to exclude certain diagnoses, medical procedures, or devices required by or associated with a protected class. "Prior to the ACA's enactment, an insurer could generally design plans to offer or exclude benefits as it saw fit without violating federal antidiscrimination law … ." *Schmitt v. Kaiser Found. Health Plan of Wash.*, 965 F.3d 945, 949, 948 (9th Cir. 2020). After the Affordable Care Act, health insurers have "an affirmative obligation not to discriminate in the provision of health care" and must "not design plan benefits in ways that discriminate." *Id.* at 955 (emphasis added). Allowing insurers like Aetna to categorically deny coverage for gender dysphoria treatment would create a "transgender exception" foreign to the intent and plain text of the Affordable Care Act.

Policies that create distinctions for "gender affirming procedures," procedures related to "gender transition," or treatment for gender dysphoria create

an exception for treatment and coverage that only transgender people seek to access. *See Skrmetti*, 605 U.S. at 519 (noting that "only transgender individuals seek treatment for gender dysphoria"); *see also Pritchard*, 159 F.4th at 672 ("Only transgender people can suffer from gender dysphoria."); *Kadel v. Folwell,* 100 F.4th 122, 149 (4th Cir. 2024) (noting "gender dysphoria" is "a diagnosis inextricable from transgender status"), *cert. granted, judgment vacated*, 145 S. Ct. 2838 (2025).

The categorical nature of these policies underscores their discriminatory intent: they turn not on a particular medical condition but rather on whether the care leads to "gender reassignment" which, of course, equates with transgender status. Thus, when a health insurer singles out "sex reassignment" or "gender transition" for differential treatment, it treats transgender people differently – as a class. *See Williams v. Kincaid,* 45 F.4th 759, 772 (4th Cir. 2022).

Nowhere in the Affordable Care Act did Congress intend to exclude transgender people from its anti-discrimination protections or allow discrimination based on sex so long as the individuals are transgender. Instead, Congress intended for the Act to specifically prevent health programs from discriminating against treatment for conditions like gender dysphoria.

### E. The Court should not join the Fourth and Ninth Circuits in extending *Skrmetti*'s reasoning to the statutory context.

*Amicus* is aware that the Fourth and Ninth Circuits have extended *Skrmetti*'s application to the statutory context of the Affordable Care Act. Nonetheless, for the

reasons explained above, *Amicus* respectfully suggests that those decisions were wrongly decided. As such, *Amicus* urges this Court to avoid the same pitfalls and reject the importation of *Skrmetti*'s judicially created legal fiction to the statutory context. The legislative history and purposes of the various statutes at issue demand as much.

## II. Even under *Skrmetti,* proxy discrimination may be actionable under Section 1557 of the Affordable Care Act if a plaintiff can show the use of a proxy or pretext for intentional discrimination against transgender persons.

In any event, even under *Skrmetti*, as *Pritchard* holds, proxy and pretext may serve as additional pathways to finding intentional discrimination here. It is well-established that "[w]hat cannot be done directly cannot be done indirectly," *Cummings v. Missouri*, 71 U.S. 277, 325 (1867). And intentional discrimination, including proxy discrimination, may be adduced from the "totality of the relevant facts." *Washington v. Davis*, 426 U.S. 229, 242 (1976).

"Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 266 (1977); *see also Pers. Adm'r of Massachusetts v. Feeney,* 442 U.S. 256, 279 (1979) ("Discriminatory purpose … implies that the decisionmaker … selected or reaffirmed a particular course of action at least in part because of, not merely in spite of, its adverse effects upon an

identifiable group." *Id*. As a result, courts and other authorities have delineated several factors or indicators to adduce whether a purported facially neutral policy was adopted for a discriminatory purpose.

Among these factors are the impact of the challenged policy, including its foreseeability; its historical background; the sequence of events leading up to its adoption; any procedural or substantive departures; contemporary statements and actions of key stakeholders; and the availability of less discriminatory alternatives. *See League of Women Voters of Fla. Inc. v. Fla. Sec'y of State*, 66 F.4th 905, 922 (11th Cir. 2023); *Arce v. Douglas*, 793 F.3d 968, 977 (9th Cir. 2015); *cf. Dino V. v. Collins*, EEOC Appeal No. 2023002331, 2025 WL 1565797, at *5 (Apr. 15, 2025) ("Indicators of pretext include, but are not limited to, discriminatory statements or past personal treatment attributable to those responsible for the personnel action that led to the filing of the complaint, comparative or statistical data revealing differences in treatment across various protected-group lines, unequal application of Agency policy, deviations from standard procedures without explanation or justification, or inadequately explained inconsistencies in the evidentiary record."). "These factors are non-exhaustive." *Pac. Shores Props.*, 730 F.3d at 1159.

*Skrmetti* acknowledges that pretext is an additional pathway to demonstrating intentional discrimination. And while the court did not rule on whether policies or statutes like the Tennessee law at issue in that case could be pretext for invidious

discrimination, it recognized the possibility that certain medical prohibitions can serve as a proxy or pretext designed to effect invidious discrimination on transgender individuals. *See Skrmetti*, 605 U.S. at 519.

As a result, and given that "[t]he fit between transgender people and people suffering from gender dysphoria is strong," the Ninth Circuit held in *Pritchard* that *Skrmetti* does not necessarily foreclose a proxy discrimination theory. *Pritchard*, 159 F.4th at 672. And thus, there and here, even under *Skrmetti*, there "is some possibility that *Skrmetti* may not necessarily foreclose Plaintiffs' Section 1557 claim." *Id.* at 656.

Furthermore, "[p]roxy discrimination is a form of facial discrimination." *Davis v. Guam*, 932 F.3d 822, 837 (9th Cir. 2019); *see also Cmty. Servs., Inc. v. Wind Gap Mun. Auth.,* 421 F.3d 170, 177 (3d Cir. 2005). It "arises when the defendant enacts a law or policy that treats individuals differently on the basis of seemingly neutral criteria that are so closely associated with the disfavored group that discrimination on the basis of such criteria is, constructively, facial discrimination against the disfavored group." *Davis*, 932 F.3d at 837. Where a particular treatment or condition associated with a protected characteristic is excluded, courts may consider proxy discrimination. *Schmitt,* 965 F.3d at 949, 958.

Under a proxy theory, the crucial question is whether the "fit" between the protected category and the alleged proxy is "sufficiently close" to make a

discriminatory inference plausible. *Schmitt*, 965 F.3d at 959 (holding, under Section 1557, a medical condition (hearing loss) may serve as a proxy for a protected group (people with a disability). And here, the fit between people experiencing gender dysphoria and transgender people is incredibly strong, as both *Pritchard* and *Skrmetti* acknowledge. *See Skrmetti*, 605 U.S. at 519; *Pritchard*, 159 F.4th at 672. Moreover, Defendant admits that medical treatments for gender dysphoria are sometimes necessary, such that they "cannot justify [their] categorical exclusion by citing medical necessity." *Pritchard*, 159 F.4th at 672. "Something else may be afoot, and that something may be invidious discrimination against transgender people." *Id*.

Lastly, it is worth noting that when there is *facial* discrimination—which proxy discrimination is—the presence of a nondiscriminatory reason for the policy does not justify the facial discrimination. *See Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am., UAW v. Johnson Controls, Inc.*, 499 U.S. 187, 199 (1991). Indeed, Title IX "prohibits a recipient of federal funds from intentionally treating any individual worse even in part because of his race, color, or national origin and without regard to any other reason or motive the recipient might assert." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 290 (2023) (Gorsuch, J., concurring) (discussing Title VI, upon which Title IX was modeled). As such, "a recipient of federal funds may never

discriminate," *id.*, on the basis of sex under Title IX and facial sex discrimination cannot be immunized by an alleged nondiscriminatory justification. *See*, *e.g.*, *Cmty. Servs., Inc.*, 421 F.3d at 177; *McWright v. Alexander*, 982 F.2d 222, 228 (7th Cir. 1992) (policy excluding service dogs or wheelchairs would be discrimination based on disability, "even if the stated purpose of the policy were a benign one); *Gerdom v. Cont'l Airlines*, 692 F.2d 602, 608 (9th Cir. 1982); *see also B.P.J.*, 146 S. Ct. at 2383 (Gorsuch, J., concurring) ("The statutory phrase 'because of' does not require biological sex to be the only cause animating discrimination. Instead, that phrase merely requires biological sex to be one such cause.").[8]

## CONCLUSION

The judicially created fiction underlying *Skrmetti* and *Geduldig* should not be extended beyond the limited equal protection context in which those cases arose. Common sense, legislative history, congressional intent, and the rules of statutory construction all counsel against the extension of *Skrmetti*'s reasoning to the statutory context of this case. *Amicus* therefore respectfully urges the Court not to

---

[8] In this regard, *Anderson*'s statement that "to establish a presumption that the Exclusion discriminates by proxy, Plaintiffs must show that the choice to exclude gender dysphoria from coverage is so irrational that nothing could explain it other than an intent to discriminate against transgender persons," is mistaken and conflicts with established precedent, including the aforementioned, *Rice v. Cayetano*, 528 U.S. 495, 509-10 (2000), and *Guinn v. United States*, 238 U.S. 347, 364-65 (1915).

apply *Skrmetti*'s reasoning to the Section 1557 claims at issue in this case and to affirm the district court's decision in that regard.

Dated this 19th day of August 2026.

Respectfully submitted,

*/s/ Omar Gonzalez-Pagan*
Omar Gonzalez-Pagan
Nephetari Smith
**Lambda Legal Defense and Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, New York 10005
Telephone: 212-809-8585
Facsimile: 855-535-2236
ogonzalez-pagan@lambdalegal.org
nsmith@lambdalegal.org

*Counsel for Amicus Curiae*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), I hereby certify that the foregoing complies with the type-volume limit of Fed. R. App. P. 29(a)(5) and 32(a)(7), and Local Rules 29.1(c) and 32.1(a)(4) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 5,535 words. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it was prepared in 14-point Times New Roman font, a proportionally spaced typeface, using Microsoft Word.

Date: August 19, 2026

*/s/ Omar Gonzalez-Pagan*
Omar Gonzalez-Pagan